```
_____ FILED      _____ ENTERED
_____ LODGED     _____ RECEIVED
```

Magistrate Judge Mary Alice Theiler

**APR 24 2018**

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                          DEPUTY

# UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff<br><br>v.<br><br>PRADYUMNA KUMAR SAMAL<br><br>Defendant. | CASE NO. **MJ 18 – 190**<br><br>COMPLAINT for VIOLATION<br><br>Title 18, United States Code, Section 1546 |

BEFORE, Mary Alice Theiler, United States Magistrate Judge, U. S. Courthouse, Seattle, Washington.

The undersigned complainant being duly sworn states:

## COUNT ONE
### Visa Fraud

On or about April 1, 2014, at Bellevue, within the Western District of Washington and elsewhere, the Defendant Pradyumna Kumar Samal ("SAMAL") did knowingly subscribe as true, under penalty of perjury, a false statement with respect to a material fact in a document required by the immigration laws and regulations of the United States, to wit, an I-129 Petition for Nonimmigrant Worker. To wit, SAMAL falsely claimed that the foreign-national beneficiary named in the petition, L.N., had been assigned to work at

COMPLAINT/SAMAL- 1
Case No.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Azimetry, Inc.'s offices on a project for an end-client to which L.N. had not been

2  assigned.

3        All in violation of Title 18, United States Code, Section 1546.

4        And the complainant states that this Complaint is based on the following

5  information:

6        I, Richard Lin, being first duly sworn on oath, depose and say:

## I.        INTRODUCTION AND AFFIANT BACKGROUND

8        1.        I am a Special Agent of the Diplomatic Security Service (DSS), which is an

9  agency of the United States State Department, and I have been so employed for over 16

10  years.  I am presently assigned to the Document and Benefit Fraud Task Force at DHS.

11  This task force investigates sophisticated immigration frauds in the San Francisco Bay

12  Area, and as such, I have received and continue to receive specialized training and

13  instruction from State Department officers who issue entry visas to foreigners overseas

14  and DHS officers who issue employment documents to foreigners already inside of the

15  United States.  I am empowered under 22 U.S.C. § 2709 to investigate visa frauds, as

16  well as to apply for and serve federal arrest and search warrants.  My previous

17  assignments include postings in New York, DSS Headquarters - Washington, D.C.,

18  Karachi, Pakistan, Beirut, Lebanon, and Los Angeles, as well as numerous long-term

19  temporary duty assignments throughout the Middle East and South Central Asia.  Prior to

20  DSS, I served in the U.S. Marine Corps Reserve and also have a Master's Degree in

21  Public Administration from the University of Georgia.

22        2.        The facts in this affidavit come from my personal observations, my training

23  and experience, and information obtained from law enforcement officers and witnesses.

24  This affidavit is intended to show merely that there is sufficient probable cause for the

25  requested arrest warrant and does not set forth all of my knowledge about this matter.

## II.        BACKGROUND AND SUMMARY OF PROBABLE CAUSE

27        3.        Since 2015, the United States Department of State and the United States

28  Department of Homeland Security have investigated two Washington State companies

COMPLAINT/SAMAL- 2
Case No.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  named Divensi, Inc. ("Divensi") and Azimetry, Inc. ("Azimetry") (collectively the

2  "SUBJECT COMPANIES") for committing suspected acts of visa fraud.  As set out in

3  additional detail below, at all times relevant to the investigation, the SUBJECT

4  COMPANIES have provided information-technology services to corporate clients,

5  including a variety of so-called "Fortune 500" companies (and recruiting firms retained

6  by those companies), in the information-technology field.  More specifically, at all times

7  relevant to this investigation, the SUBJECT COMPANIES have hired employees with

8  experience in the information-technology field, such as programmers, marketed those

9  employees to corporate clients, and then placed those employees at corporate clients

10  pursuant to contracts entered into between the SUBJECT COMPANIES and their clients

11  (and/or their clients' agents).

12          4.      The suspected fraud arises out of more than one hundred petitions for

13  nonimmigrant workers that the SUBJECT COMPANIES filed with the United States

14  Citizenship and Immigration Service ("USCIS").  In those filings, the SUBJECT

15  COMPANIES petitioned for certain foreign nationals to receive so-called H-1B visas

16  under Section 101(a)(15)(H) of the Immigration and Nationality Act, pursuant to which

17  the foreign nationals would be permitted to live temporarily in the United States and

18  work in positions that required specialized skills.  The petitions under investigation

19  claimed that the foreign nationals would be working at the SUBJECT COMPANIES'

20  offices in Bellevue on projects for two of the SUBJECT COMPANIES' purported

21  clients.  The petitions included letters that purported to have been issued by those clients,

22  purported to have been signed by those clients' representatives, and claimed that the

23  foreign national named in the petition indeed had been assigned to a project for the client.

24  In truth and in fact, the petitions' claims were false and the purported supporting

25  documents were fabricated.

26          5.      According to records maintained by the Secretary of State for Washington

27  State, Samal incorporated Divensi in 2010 and Azimetry in 2011.  At all times relevant

28  to the investigation, the SUBJECT COMPANIES' corporate documents listed SAMAL

COMPLAINT/SAMAL- 3
Case No.

1    as the Chief Executive Officer ("CEO"), the highest-ranking position in the corporate

2    hierarchy.

3        6.      As set out below, there is extensive probable cause to believe that, in his

4    role as CEO of the SUBJECT COMPANIES, SAMAL conceived, directed, participated

5    in, and then attempted to cover up the fraud.  The evidence consists of emails produced

6    by the SUBJECT COMPANIES' email service provider,[1] records found at the SUBJECT

7    COMPANIES' erstwhile offices,[2] and interviews with the SUBJECT COMPANIES'

8    former and current employees and contractors, including SAMAL himself.  In short,

9    SAMAL received and reviewed petitions before filing, affixed unauthorized signatures

10   on letters that appeared to have been issued by others, directed employees to market

11   foreign nationals to clients other than those named in the fraudulent petitions, and then

12   lied to investigators and attempted to destroy evidence of the fraud.

13                **III.    BACKGROUND REGARDING H-1B WORK VISAS**

14       7.      The H-1B visa program is a program administered by USCIS.  Under the

15   program, employers in the United States may apply to USCIS to issue visas to foreign

16   nationals under which those foreign nationals may enter the United States and work in a

17   "specialty occupation" for the petitioning employer while in this country.  In recent years,

18   U.S. employers typically have sought H-1B visas for foreign nationals who have

19   experience and post-graduate degrees in computer programming, biological sciences, and

20   engineering.  Because H-1B visas originally were designed to enable U.S. employers to

21   use foreign nationals for certain narrow categories (i.e., "specialty occupation") of jobs in

22   the absence of a large enough labor pool in the United States, H-1B visas are subject to

23   strict issuance requirements, including quotas, certifications by the petitioning employers

24   regarding wages, and lengthy processing times.

25   _____

26   [1] The SUBJECT COMPANIES' email-service provider produced emails pursuant to a warrant issued by the
     Honorable Brian A. Tsuchida, United States District Court for the Western District of Washington, under cause

27   number MJ16-313.
     [2] In October 2017, law-enforcement agents searched the SUBJECT COMPANIES' offices in Bellevue, Washington,

28   pursuant to two warrants issued by the Honorable Mary Alice Theiler, United States District Court for the Western
     District of Washington, under cause number MJ17-413.

COMPLAINT/SAMAL- 4
Case No.

### A.    *Background Regarding Application Procedures for H-1B Visas*

8.    In order to apply for an H-1B visa, a petitioning employer ordinarily must follow all of the following steps:

9.    ***First***, the U.S. employer, acting as a petitioner, must submit a Labor Condition Application ("LCA") for Nonimmigrant Workers to the United States Department of Labor ("DOL") through an online portal.  In the LCA, the employer must make certain attestations, including that employing a foreign national under an H-1B visa will not adversely affect the working conditions of similarly-situated U.S. workers (e.g., by depressing wages or interfering with a labor strike).  The employer must also post a hardcopy or electronic notice of the LCA for ten days at the employer's office and at the offices of the end client (if any) where the foreign worker will work.  In the event that DOL approves the LCA and determines that the American company qualifies to hire foreign workers, the petitioning employer is required to maintain the LCA onsite for inspection by immigration and law-enforcement officials.  Based on my training and experience, petitioning companies typically will email copies of the LCA and supporting documentation to their employees, government officials upon request, and other companies with which they are engaged in business. Moreover, a copy of the LCA must be given to the H-1B worker no later than when he/she reports to work.

10.    ***Second***, if and after the DOL approves a petitioning employer's LCA, the employer must submit to DHS a Petition for a Nonimmigrant Worker (referred to as an "I-129" form) for every foreign worker that it wishes to employ pursuant to an H-1B visa. The I-129 is a thirty-six (36) page application that USCIS makes available on its website at www.uscis.gov in a "fillable" portable document format ("PDF").  The form can be completed electronically and then saved to a digital device, after which it can either be printed and mailed to DHS or filed electronically.[3]  The I-129 requires the petitioning

---

[3] In the event that an I-129 is filed electronically, DHS issues an "electronic receipt" – a digital acknowledgment of the filing of an I-129 – to the petitioning employer.

COMPLAINT/SAMAL- 5
Case No.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

1    employer to disclose, *inter alia*, the foreign national employee's name and biographical

2    information, the wage that the employer proposes to pay the foreign national, the

3    business address at which the foreign national will work, and information about the

4    employer itself.

5        11.    The I-129 includes numerous sections that require the petitioning employer

6    to certify the truthfulness of the information contained therein and that warn the

7    petitioner about the consequences of including false information in the application.[4]

8    During the application process, USCIS informs the petitioner that it reserves the right to

9    verify any information submitted, including through written and telephonic

10   correspondence and "unannounced physical site inspections of residences and places of

11   employment and interviews."  Once the I-129 is submitted, USCIS adjudicates it based

12   on the information in the application and any supplemental documentation.  In the event

13   that USCIS approves the I-129, it approves the issuance of an H-1B visa to the foreign

14   beneficiary named in the application, following which the beneficiary may either pick up

15   their visa at an American consulate (if they reside in a foreign country) or may have the

16   visa mailed to them (if they reside in the United States).

17       12.    Some petitioning employers, such as the SUBJECT COMPANIES, are in

18   the business of applying for H-1B visas for employees who ultimately will be assigned to

19   projects for a client of the petitioner's (an "end client").  The petitioning employer acts as

20   an intermediary, by servicing its clients' need for labor to perform specified projects.  In

21   such visa applications, the petitioning employer demonstrates that the proposed foreign-

22

23   _____

24   [4] For instance, the I-129 requires the petitioner to "certify under penalty of perjury that this petition and the evidence
     submitted with it are true and correct to the best of my knowledge." In the accompanying instructions for the I-129,

25   the Petitioner is advised that "[b]y signing this form, you have stated under penalty of perjury (28 U.S.C. section
     1746) that all information and documentation submitted with this form is true and correct." The instructions also

26   add that "[i]f you knowingly and willfully falsify or conceal a material fact or submit a false document with your
     Form I-129, we will deny your Form I-129 and any other immigration benefit. . . . In addition, you will face severe

27   penalties provided by law and may be subject to criminal prosecution." Thus, when a petitioner signs the Form I-
     129, it assumes the legal responsibility for the truth and accuracy of all information submitted.  If an I-129 is not

28   signed, it will not be considered properly filed.

COMPLAINT/SAMAL- 6
Case No.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   national beneficiary will be assigned to an end-client project that qualifies as a "specialty

2   occupation" by submitting proof of its commercial relationship with the end client and

3   proof that the foreign-national beneficiary will work on a project for the end client.

4       13.    More specifically, in my experience and training, petitioning employers

5   that seek H-1B visas for employees who will be assigned to the petitioner's end clients

6   typically will submit the following types of documents[5]:

7       a.    **End-client letters** are letters submitted by the petitioner's end client

8   or the third party worksite at which the foreign-national employee will work.[6]  The letter

9   generally certifies that the end client has agreed with the petitioning employer that the

10  foreign-national employee will work on a specialty occupation for the end client.  In my

11  experience, such letters set forth the name of the foreign-national employee, their future

12  job title, the project(s) to which they will be assigned to, the name of their onsite

13  supervisor, and the projected duration of the foreign-national employee's services for the

14  end client.

15      b.    **Master Service Agreements** ("MSA") between the petitioner,

16  vendor (if any), and the end client are used to clarify and establish the

17  business/contractual relationship(s) between the parties.

18      c.    **Statements of Work** ("SOWs") are contracts between the petitioner,

19  vendor (if any), and end client, and generally serve as contractual extensions to the MSA.

20  SOWs are generally used to specify in greater detail the terms of the end client's project

21  and are sometimes referred to as "Purchase Orders."

---

[5] At all times relevant to the investigation, USCIS has published instructions regarding petitions for nonimmigrant workers. The USCIS instructions direct petitioning employers to include with their petitions "evidence" to support the statements made in petitions, including evidence of the foreign national's educational background, a copy of the employment agreement between the foreign national and the petitioning employer, and evidence regarding the purported client projects to which the foreign national purportedly will be assigned.

[6] Certain end clients use so-called "trusted vendors" to coordinate their labor needs. In such cases, the "end-client letter" will be submitted by one of those "trusted vendors" and will contain all of the information that an end-client letter generally includes.

COMPLAINT/SAMAL- 7
Case No.

      d.   **Company-support letters** are written by the petitioning company to USCIS on behalf of the foreign worker and identify the foreign worker by name, job duties, education and skills, and establish the contractual relationship(s) between the end client, vendor and any subcontractors.

14.    Though USCIS does not require petitioning employers to submit such supporting documentation with their applications, in my experience, the absence of such documentation typically will result in USCIS issuing a Request for Evidence ("RFE") to the petitioning employer. Because an RFE can significantly delay the adjudication and issuance of an H-1B visa, petitioning employers ordinarily seek to submit as much supporting documentation as possible with their initial visa applications. Moreover, in the event that USCIS issues an RFE seeking additional evidence regarding a purported client project described in the petition, petitioning employers may submit these types of documents in order to prove the existence of that project and to prove that the foreign national will be assigned to it.

15.    The validity date for an H-1B visa is determined by USCIS based on the petitioner's stated dates of employment for the foreign worker/beneficiary, as well as the evidence submitted in support of the petition. The maximum initial issuance period for an H-1B visa is three years, but can be extended for an additional three years, for a total of six years. In the event that the beneficiary's employment concludes prior to the visa's expiration date, the visa typically can continue to be used by the beneficiary for subsequent employment, so long as notification of the change is made to USCIS and DOL.

16.    Even if the petitioner acts on behalf of an end client, unless and until the beneficiary's visa has expired or has been transferred to a new petitioning company, the petitioner is the formal employer of the beneficiary. While working at or for the end client, the employee is paid by the petitioner, and it is standard industry practice that the petitioner is paid an ongoing fee by the end client that covers the cost of the wage or salary as well as a profit margin for the petitioner.

COMPLAINT/SAMAL- 8
Case No.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

     B.  *Background Regarding "Bench-and-Switch" Visa-Fraud Schemes*

   17.  In my training and experience, the H-1B application process sometimes is used to perpetuate fraud, including through the use of false statements in application materials. Petitioning employers typically engage in such schemes in order to gain an unfair competitive advantage in the labor market.

   18.  I have investigated numerous fraud schemes that commonly are referred to as "bench-and-switch" schemes. In a "bench-and-switch" scheme, a petitioning employer falsely claims to USCIS that a foreign-national beneficiary already has been assigned to a project at an end client of the petitioner's. The fraudulent application includes documents that purports to substantiate the foreign-national beneficiary's job assignment at the end client.

   19.  In reality, the foreign national has not been assigned to work for any such end client, and the purported documents submitted in support of the claim are false and/or doctored. In some cases, the purported end client is a fictitious company that the petitioning employer has created (and, sometimes, conspired with others to create) in order to perpetuate the fraud.

   20.  In successful "bench-and-switch" schemes, petitioning employers obtain H-1B visas for foreign-national employees through false representations to USCIS. Once those visas are granted, or even before the visas are formally approved, the petitioning employer markets the foreign national to end clients other than those named in the actual petition. By doing so, the petitioning employer can shorten (or eliminate entirely) the ordinary lag time between when an end client agrees to use a foreign-national employee and when DHS issues an H-1B visa to that employee. Shortening or eliminating the lag time enables petitioning companies to place employees at end clients faster than their competitors are able to.

COMPLAINT/SAMAL- 9
Case No.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## IV.   FACTS ESTABLISHING PROBABLE CAUSE

21.     On or about November 19, 2015, I was assigned to investigate the SUBJECT COMPANIES due to suspected visa fraud.  Specifically, during its review of certain I-129 petitions filed by the SUBJECT COMPANIES, USCIS developed reason to believe that the SUBJECT COMPANIES had filed petitions claiming that the foreign nationals named in the petitions would be working on particular client projects that did not actually exist.  Since opening my investigation, I have reviewed the SUBJECT COMPANIES' filed petitions (including supporting materials) from 2011 to the present, interviewed several former and current employees and contractors at the SUBJECT COMPANIES, reviewed email records, reviewed records produced by the SUBJECT COMPANIES' actual clients, and reviewed records produced by the purported clients named in the petitions.  Based on those investigative steps, I have developed probable cause to believe all of the following, which is discussed in further detail in the subsections below:

a.     **First**, I have developed probable cause to believe that petitions filed by the SUBJECT COMPANIES between 2012 and 2015 contained false statements and forged documents.[7]

b.     **Second**, I have developed probable cause to believe that SAMAL knew about, and indeed helped prepare, the false statements and forged documents in the SUBJECT COMPANIES' petitions.

c.     **Third**, I have developed probable cause to believe that SAMAL knew that the statements in the petitions were false and that the documents attached to the petitions were fraudulent and forged.

---

[7] To be clear, my reference to petitions filed between 2012 and 2015 is not meant to imply that petitions filed outside of that timeframe were accurate.  The Government is continuing to investigate petitions filed by the SUBJECT COMPANIES *after* 2015, including petitions filed in 2016 and 2017.  Because this affidavit is being submitted for the purpose of establishing probable cause that SAMAL committed the offense set out in Count One, I do not discuss the Government's findings with regard to the post-2015 petitions.

COMPLAINT/SAMAL- 10
Case No.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

A.   *Between 2012 and 2015, the SUBJECT COMPANIES Filed False and Fraudulent Petitions for Nonimmigrant Workers*

22.   Between 2012 and 2015, Divensi filed approximately seventy-one (71) petitions for nonimmigrant workers in which it claimed that the foreign national named in each petition already had been designated to work at Divensi's offices on a project for a corporate end-client named referred to herein as CLIENT A.  During the same timeframe, Azimetry filed approximately sixty-six (66) petitions for nonimmigrant workers in which it claimed that the foreign national named in each petition already had been designated to work at Azimetry's offices on a project for a corporate end-client referred to herein as CLIENT B.  The petitions include the petition that is the subject of Count One:  an April 24, 2014 Petition for Nonimmigrant Worker filed by Azimetry for a foreign-national referred to herein as "L.N.," in which Azimetry claimed that L.N. would be assigned to a project for CLIENT B.  USCIS approved the petition on September 11, 2014.

23.   To assert that the foreign nationals named in the petitions would be assigned to projects for CLIENT A and CLIENT B, the SUBJECT COMPANIES made the following statements in, and attached the following documents to, their petitions:

a.   In cover letters to petitions, Divensi claimed that the foreign nationals named in the petitions would be assigned to projects for CLIENT A. Azimetry's cover letters to its petitions likewise claimed that the foreign nationals named in the petitions would be assigned to projects for CLIENT B.  The cover letters further claimed that the projects had a duration of three years – i.e., the maximum validity period for an H-1B visa.

b.   In the I-129 forms, the SUBJECT COMPANIES claimed that the foreign nationals would work at the offices of the petitioning employer (i.e., Divensi or Azimetry) in Bellevue, Washington.

c.   Divensi attached to its petitions purported contracts with CLIENT A and Azimetry attached to its petitions purported contracts with CLIENT B.  Each contract, or so-called "Statement of Work" or "SOW," purported to describe a project

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   that CLIENT B had retained Azimetry to perform or that CLIENT A had retained

2   Divensi to perform.  The project descriptions in the SOW matched the descriptions of the

3   purported projects that appeared in the cover letters to the petitions.

4         d.        The SUBJECT COMPANIES also attached to the petitions

5   purported end-client letters that appeared to have been issued by CLIENT A (in the case

6   of Divensi's petitions) or CLIENT B (in the case of Azimetry's petitions).  The letters

7   appeared on the issuing client's letterhead.  CLIENT A's letters appeared to have been

8   signed by CLIENT A's current CEO, V.K.,[8] and CLIENT B's letters appeared to have

9   been signed by CLIENT B's director of production operations, R.M.  The letters claimed

10  that the foreign national named in the petition indeed had been assigned to a project for

11  the client that issued the letter.

12        24.      For instance, Azimetry's petition relating to "L.N." – the subject of Count

13  One – attached a letter on CLIENT B's letterhead, which purported to have been

14  addressed to USCIS and signed by R.M.  The letter purported to "verify that [CLIENT B]

15  will be using the services of [L.N.], an employee of Azimetry Inc., through our contract

16  agreement with Azimetry."  The letter further represented that [L.N.] will be providing

17  services as a Network and Computer Systems Administrator."  As CLIENT B's

18  representatives have explained, the company did not issue the letter or authorize

19  Azimetry to submit the letter on its behalf.

20        25.      These statements and documents were material to USCIS' decision whether

21  to approve each petition.  The statements and documents were material because they

22  attested to USCIS that the foreign nationals indeed had roles in "specialty occupation"

23  fields, as the H-1B visa requires.  The statements and documents also were material

24  because they provided USCIS with information regarding the requested validity period of

25  the visa and the project location.

26

27  _____

28  [8] CLIENT A's current CEO was previously a managing director at his company.  Earlier drafts of the fraudulent
    letters therefore referred to him by the title of Managing Director.

COMPLAINT/SAMAL- 12
Case No.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1        26.    The following facts establish probable cause to believe that the petitions'

2    claims about the projects for CLIENT A and CLIENT B were false, and that the

3    documents submitted in support of those projects were fraudulent and forged:

4        a.    On January 18, 2018, CLIENT A's current CEO, "V.K.," whose

5    signature appeared on the end-client letters that Divensi attached to its H-1B petitions,

6    told me that he did not sign the end-client letters.[9]  CLIENT A also produced records

7    showing that Divensi never billed CLIENT A for the services of the foreign-national

8    employees whose petitions, which Divensi submitted to USCIS between 2012 and 2015,

9    claimed they would be working on a CLIENT A project.

10       b.    On April 6, 2015, a representative of CLIENT B informed USCIS

11   over email that CLIENT B did not issue the CLIENT B end-client letters, and did not

12   agree to assign the foreign-national employees named in the underlying petitions to its

13   projects.  CLIENT B also produced records showing that Azimetry did not bill CLIENT

14   B for any of the foreign-national employees whose petitions claimed they would be

15   working on an Azimetry project.  In particular, Azimetry did not bill CLIENT B for any

16   work done by L.N., the foreign national named in the petition that is the subject of Count

17   One, and L.N. never worked on any projects for CLIENT B.

18       c.    I have interviewed fourteen foreign nationals who were named in the

19   petitions submitted by Divensi and Azimetry, including L.N. (as discussed below).

20   Those foreign nationals told me that they did not work on the projects described in their

21   petitions and did not believe they would be assigned to any such projects.

22       d.    The SUBJECT COMPANIES' internal email records, particularly

23   their emails with the foreign nationals named in the petitions and with actual end clients

24   also show that the statements and documents in the petitions were fraudulent.

25

---

26   [9] USCIS officers first emailed CLIENT A in or around March 2015, inquiring about the legitimacy of the end-client
     letters that Divensi had attached to its petitions.  At that time, CLIENT A's representatives told USCIS that CLIENT
27   A had not issued the end-client letters and never agreed to use the foreign-national employees named in those letters
     on its projects.  CLIENT A has also produced an email that V.K. sent SAMAL in March 2015 regarding the USCIS
28   inquiry, in which V.K. said "I received this email from the Visa office asking if I signed this.  I did not.  I don't even
     know who this resource is.  This is concerning?  Pls advise on how this happened?"

COMPLAINT/SAMAL- 13
Case No.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   Specifically, in numerous emails sent before petitions were filed and while petitions were

2   pending adjudication by USCIS, the SUBJECT COMPANIES' employees told foreign-

3   national employees that the companies planned to send the employees' resumes to clients

4   other than CLIENT A and CLIENT B.

5        27.    Email records and other evidence relating to L.N., the foreign national who

6   was the subject of the petition referred to in Count One, make clear that the petition's

7   representations about L.N. were false.  For instance, even though the petition claimed that

8   L.N. would be assigned to a project for CLIENT B, L.N. emailed three employees at the

9   SUBJECT COMPANIES just weeks after the petition was filed (and while it was still

10   pending adjudication) and stated: "I remember you telling me that I should look for jobs

11   and let you know regarding the same so that you could put forward my resume to those

12   openings."  After the petition was approved, L.N. emailed the SUBJECT COMPANIES'

13   employees on numerous occasions about the status of his job search.  L.N. has since told

14   me during a voluntary interview on January 31, 2017 that he did not have a project when

15   his petition was filed, while his petition was pending, or even when he arrived in the

16   United States.  L.N. has also acknowledged that the statements in his petition about his

17   purported project at CLIENT B were false.[10]

18        *B.*     *SAMAL Prepared the SUBJECT COMPANIES' Fraudulent Petitions*

19        28.    I have also developed probable cause to believe that SAMAL prepared the

20   SUBJECT COMPANIES' fraudulent petitions, including the false statements and forged

21   documents in those petitions claiming that the relevant foreign nationals would be

22   assigned to projects for CLIENT A and CLIENT B.  My belief is based on the facts set

23   out in the paragraphs below.

24

25

26

27

28

---

[10] During his interview, L.N. initially claimed that he believed he would be working on a project for CLIENT B. When confronted with emails in which he and the SUBJECT COMPANIES' employees discussed the need for him to find a project, L.N. admitted that he knew at the time the petition was filed that there was no actual position for him at CLIENT B or any other end client, and that he would need to find such a project in the event his petition was approved.

COMPLAINT/SAMAL- 14
Case No.

29.   **First**, SAMAL's name and signature appear in the section at the end of each Divensi I-129 petition, in which a representative of the petitioning employer attests that the information in the petition is true and correct, under penalty of perjury.  In addition to signing all of the Divensi petitions claiming that the foreign nationals named in the petitions would work on projects for CLIENT A, SAMAL also signed forty-three (43) Azimetry petitions claiming that the foreign nationals named in the petitions would work on projects for CLIENT B.  In particular, SAMAL signed the Azimetry petition relating to foreign national "L.N.," which is the subject of Count One.

30.   **Second**, email records show that SAMAL regularly received drafts of the fraudulent petition materials from an outside contractor who prepared petition materials for the SUBJECT COMPANIES, and from a High Ranking Executive at the SUBJECT COMPANIES.  SAMAL received the petition materials before the SUBJECT COMPANIES filed them with USCIS, so that he could review and approve their content, before signing them.  Two representative examples of the many emails that SAMAL received with drafts of petition materials are as follows:

a.   On March 19, 2014, an outside contractor emailed SAMAL with drafts of the petition materials for a foreign national referred to herein as "A.K.," who would be the subject of an Azimetry petition.  The drafts included a letter that purported to have been issued by CLIENT B, which claimed that A.K. had been assigned to work on a project for CLIENT B.

b.   On January 1, 2013, an outside contractor emailed SAMAL with drafts of the petition materials for a foreign national referred to herein as "R.A.," who would be the subject of a Divensi petition.  The drafts included a letter that purported to have been issued by CLIENT A, which claimed that R.A. had been assigned to work on a project for CLIENT A.

31.   **Third**, email records also show that SAMAL prepared fraudulent petition materials before they were filed.  In particular, I have found emails in which the outside contractor, the High Ranking Executive, and/or other employees at the SUBJECT

COMPLAINT/SAMAL- 15
Case No.

1  COMPANIES sent SAMAL unsigned drafts of fraudulent end-client letters and directed

2  SAMAL to affix signatures to those letters.  Representative examples of such emails

3  include:

4         a.      On January 3, 2013, the outside contractor emailed SAMAL an

5  unsigned draft of a purported end-client letter from CLIENT A for a foreign national

6  "R.A.," which purported to claim that "R.A." would be assigned to a project for CLIENT

7  A.  The email stated "Dear PK:  Please provide me with signed [CLIENT A] letter."  The

8  copy of the letter that Divensi later sent USCIS included what appeared to be V.K.'s

9  signature.

10        b.      On February 27, 2013, the outside contractor emailed SAMAL an

11  unsigned draft of a purported end-client letter from CLIENT A for a foreign national

12  "M.M.," which purported to claim that "M.M." would be assigned to a project for

13  CLIENT A.  The email stated "Dear PK:  Please provide a signed [CLIENT A] end-client

14  letter and give it to [HIGH RANKING OFFICIAL].  Also I think page 4 of the SOW

15  delivery date is incorrect.  It should be September 15, 2014.  Can you provide a longer

16  term SOW."

17        c.      On March 28, 2014, SAMAL emailed a Human Resources

18  Employee at the SUBJECT COMPANIES and asked the employee to send him the client

19  letter for a foreign national "M.J."  SAMAL's email claimed he needed to "fix some

20  mistake" in the draft of the client letter.  In response, on March 29, 2014, the Human

21  Resources Employee emailed SAMAL a purported end-client letter from CLIENT A for

22  "M.J.," which purported to claim that "M.J." would be assigned to a project for CLIENT

23  A.

24        C.      *SAMAL Knew the Petition Materials Were Fraudulent*

25  32.     Finally, there is probable cause to believe that SAMAL knew the petitions

26  materials were fraudulent – that is, SAMAL knew that, contrary to the assertions in the

27  petitions, the foreign nationals *had not* been assigned to projects for CLIENT A or

28

COMPLAINT/SAMAL- 16
Case No.

1    CLIENT B and the end-client letters *had not* been issued by those clients. The evidence

2    that SAMAL knew the petition materials were fraudulent is as follows.

3        33.    *First*, email records show that SAMAL never intended for foreign nationals

4    to work on projects for CLIENT A or CLIENT B in the event their petitions were

5    approved. In emails, SAMAL directed the SUBJECT COMPANIES' employees to

6    "market" foreign nationals named in petitions, as soon as those petitions were approved

7    (and, in some cases, while those petitions were pending). At SAMAL's direction, the

8    SUBJECT COMPANIES' employees proceeded to send the foreign nationals' resumes to

9    actual end clients (and agents of those clients), in order to determine whether those

10   clients were interested in hiring the foreign nationals to serve as contractors on part-time

11   projects. In short, these emails establish that, contrary to the assertions in petitions that

12   he signed, SAMAL knew and indeed directed that the foreign nationals named in

13   petitions would not work on projects for CLIENT A or CLIENT B (because, as explained

14   above, no such projects existed).

15       34.    Representative examples of SAMAL's emails to the SUBJECT

16   COMPANIES' employees include the following emails:

17          a.    On July 8, 2013, SAMAL emailed four employees at the SUBJECT

18   COMPANIES, whose roles included marketing foreign-national employees to clients for

19   short-term projects. In his email, SAMAL attached the resumes for various foreign

20   nationals, whose petitions recently had been approved by USCIS. SAMAL included the

21   note: "[H]ere is our bench resume. Please market them immediately."

22          b.    On September 13, 2013, SAMAL emailed five employees at the

23   SUBJECT COMPANIES, whose roles included marketing foreign-national employees to

24   clients for short-term projects. SAMAL attached to his email the resume for a foreign-

25   national employee, whose petition included a fraudulent CLIENT B letter and had been

26   approved by USCIS nine days earlier. In his email, SAMAL told the companies'

27   employees to "start marketing him immediately."

28

COMPLAINT/SAMAL- 17
Case No.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

35. ***Second***, SAMAL participated in other email chains in which one or more participants recognized that the SUBJECT COMPANIES' petitions were fraudulent. For instance:

a. In a July 5, 2013 email, a foreign national whose petition was pending informed SAMAL that he had signed an employment agreement with Divensi, but that he recognized the agreement was for "*USCIS purpose*" insofar as it made representations to USCIS about his salary and role.

b. In numerous emails, such as an August 13, 2014 email, employees at the SUBJECT COMPANIES reported to SAMAL about their "bench" candidates – i.e., candidates whose visas had been approved but who still had not been placed at projects. Foreign nationals sent similar emails to SAMAL; for instance, in an October 31, 2013 email, a foreign national, whose petition included a fraudulent CLIENT B letter, told SAMAL that she had "been trying hard to get a client but still not getting an interview call."

c. SAMAL also received emails in which the SUBJECT COMPANIES' employees directed foreign nationals to make false statements at visa interviews with U.S. consulate officers.[11] For instance, on November 24, 2013, the High Ranking Executive forwarded SAMAL an email exchange in which the executive instructed a foreign national to tell U.S. consular officers that the foreign national would be working on "an internal development position and they customize the product to different customers. They said I will be customizing for [CLIENT A] as first project and I have to work in Divensi establishment not at the customer site." The High Ranking Executive proceeded to tell the foreign national that "let me know once [you're] done and ready to fly [so that] recruiters can arrange interviews."

---

[11] In my training and experience, I am aware that, even after USCIS approves an employer's petition for a nonimmigrant worker, the foreign national must submit to a consulate interview in the event that he or she is located overseas at the time the petition is approved. The consulate officer has the authority to issue (or to deny) a visa stamp, based on that interview.

COMPLAINT/SAMAL- 18
Case No.

36.  ***Third***, SAMAL has made false statements that evidence his consciousness of guilt.  Specifically, on May 31, 2017, during an interview in the presence of his counsel, SAMAL told me that the SUBJECT COMPANIES' High Ranking Executive had inserted copies of the fraudulent end-client letters into petitions without SAMAL's knowledge.  SAMAL claimed that the only fraudulent CLIENT A or CLIENT B end-client letters he had seen were letters that those clients alerted him to when USCIS began its investigation in March 2015.  In truth and in fact, and as explained above, numerous emails show that SAMAL received and prepared end-client letters before those letters were attached to the SUBJECT COMPANIES' petitions.

## V.    CONCLUSION

Based on the above facts, I respectfully submit that there is probable cause to believe that, on or about April 1, 2014, in Bellevue, within the Western District of Washington and elsewhere, Pradyumna Samal did knowingly and intentionally commit visa fraud, in violation of Title 18, United States Code, Section 1546.

Richard Lin, Complainant
Special Agent, Department of State

Based on the Complaint and Affidavit sworn to before me, and subscribed in my presence, the Court hereby finds that there is probable cause to believe the Defendant committed the offense set forth in the Complaint.

Dated this _24_ day of April, 2018.

MARY ALICE THEILER
United States Magistrate Judge

COMPLAINT/SAMAL- 19
Case No.