THE HONORABLE JAMES L. ROBART

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>PRADYUMNA KUMAR SAMAL,<br><br>　　　　　Defendant. | No. CR-18-214 JLR<br><br>DEFENSE SENTENCING<br>MEMORANDUM |

## I.    **INTRODUCTION**

The defendant, PK Samal, is before the Court for sentencing pursuant to his guilty plea to: Count 1, Mail Fraud, and Count 2, Failure to Pay or Collect or Pay Over Tax. Sentencing is presently scheduled before the Honorable James L. Robart for September 20, 2019 at 9:30 a.m.

P.K. Samal is a complex, interesting and ultimately troubled man.  His ability to take an idea, grow it into a flourishing business, and make a profit is a skill few people possess.  With that ability and with the drive it takes to succeed as an entrepreneur in the highly competitive world of computer and technological innovation, comes—for Mr. Samal at least—a certain callousness and a win at all cost mentality.  When Mr. Samal realized he could grow his H1-B operations by

DEFENSE SENTENCING MEMORANDUM - 1

falsifying end client letters to grow the pool of potential H1-B workers he did it, never imagining that his own incarceration would be the end result.

And yet, Mr. Samal is also, without question, a loyal husband, dedicated father and involved member of our community.  He is sharp-witted, funny and at times wryly self-deprecating.  It has not been easy to watch him struggle and fight to shield his family from the tremendous fallout of his poor decision-making.

This investigation and this prosecution have forced Mr. Samal to accept that he is flawed.  That a person's character is not just what they do at home but also what they do at work.  That the ends do not always justify the means.  And that the wall that is often built between the professional side of one's life and the personal side is not unbreakable. During the pendency of this case, Mr. Samal has faced his own flaws and he has owned those flaws, both in formally accepting responsibility for these offenses but also in sitting down with his sons to explain that he made a horrible mistake in the name of success.  His teenage sons have gone from a life of affluence and privilege to one of struggle, confusion and shame. It seems unlikely that Mr. Samal will ever forgive himself for what has happened to their lives.   See Exhibit A, Mr. Samal's Letter Accepting Responsibility.

There is, however, a glimmer of hope here.  When Mr. Samal stepped onto the plane to return to the United States from India—knowing that he would be arrested, knowing that he would be charged in federal court, knowing that his life would never be the same—he demonstrated to himself, to his family, and ultimately to this Court, that he is done making excuses for the decisions that he has made.  In pleading guilty to these offenses, he has stopped blaming other people for his mistakes, he has stopped making excuses, and he has shown that he understands that there is no such thing as a good person who only acts deceptively to succeed in business.

The question now, of course, is what length of incarceration is appropriate. Mr. Samal and his counsel respectfully request that the Court impose a custodial

sentence of 18 months which will be followed by two years or more of custody in ICE detention.

## II.   ADVISORY SENTENCING GUIDELINE CALCULATIONS

**A.   COUNT 1**

1.   The base offense level is 7, pursuant to U.S.S.G. § 2B1.1(a)(1).   **7**

2.   A 16-level enhancement is warranted, pursuant to U.S.S.G. § 2B1.1(b)(1)(I), due to the parties' stipulation that Mr. Samal's offense involved a gain of $1,625,532.84 so that the gain exceeds $1.5 million but is less than $3.5 million.   **+16**

3.   A four-level leadership enhancement is warranted, pursuant to U.S.S.G. § 3B1.1(a).   **+4**

4.   A three-level downward departure is warranted, pursuant to U.S.S.G § 3E1.1(a)-(b), for acceptance of responsibility.   **-3**

_____
**Offense Level = 24**

**B.   COUNT 2**

1.   The base offense level is 20, pursuant to U.S.S.G. §§ 2T1.6 & 2T4.1(H) as Mr. Samal failed to pay $1,119,867.00 in taxes.   **20**

2.   A three-level downward departure is warranted for acceptance of responsibility, pursuant to U.S.S.G § 3E1.1(a)-(b).   **-3**

_____
**Offense Level = 17**

**C.   GROUPING**

U.S.S.G. § 3D1.2(d) directs that Count 1, covered by U.S.S.G. § 2B1.1, and Count 2, covered by U.S.S.G. § 2T1.6, must be grouped together.

Then, pursuant to U.S.S.G. § 3D1.3(b), the combined offense level of the single resulting Group is based upon the aggregated quantity and covered by the Guideline that produces the highest offense level.  As the total combined monetary gain is $2,745,399.84 ($1,625,532.84 + $1,119,867.00), the Guideline calculations remain unchanged and Mr. Samal's total offense level is **24.**

**D.   THE STANDARD RANGE**

With a total offense level of 24 and Criminal History Category II, Mr. Samal's *advisory* standard range is 57-71 months.

DEFENSE SENTENCING MEMORANDUM - 3

## III.   OBJECTIONS TO THE PRESENTENCE REPORT

The final presentence report ("PSR") filed on August 16, 2019 incorporated the parties' stipulation to the amount of financial gain involved in Count 1.

While the defense does not want to quibble with the facts, a few clarifications are required.

First, the PSR alleges that it was improper for Mr. Samal to charge security deposits for the H-1B applicants.  According to Mr. Samal's former immigration attorney, however, the practice comports with all legal regulations.  See Exhibit B, Declaration of Diane M. Butler at 3, ¶10.  And, the Companies rightly did not return the deposits if the visa holders did not fulfill the terms of their contracts.

Ms. Butler also disputes the allegation that the alleged "bench and switch" scheme was violative of any regulation.  See id. at 4-6, ¶¶14-20.

## A.   AN ENHANCEMENT FOR "SOPHISTICATED MEANS" IS UNWARRANTED

The PSR suggests that an enhancement pursuant to U.S.S.G. § 2B1.1(b)(10) is warranted because

> (1) a substantial part of the fraudulent scheme was committed from outside the United States as Mr. Samal had several employees in India who recruited foreign nationals, prepared them for consular interviews in India, and collected visa fees from them in India, and (2) Mr. Samal used sophisticated means to carry out the scheme, by doctoring documents, manipulating immigration filings, and using amendments to whitewash the fraud.

PSR at 9, ¶38.

A two-level enhancement applies where "a substantial part of the fraudulent scheme was committed from outside of the United States" or where "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." U.S.S.G. § 2B1.1(b)(10)(B)-(C),   The Government, however, cannot fulfill its burden of demonstrating by a preponderance of the evidence that either prong applies.

DEFENSE SENTENCING MEMORANDUM - 4

1

**1.     A *Substantial* Part of the Scheme *Was Not* Committed from Outside of the United States**

First, it is clear that a "substantial part" of Mr. Samal's scheme *did not* occur in India.  Mr. Samal maintained independent business operations in India and only employed a single recruiter during the 2015 calendar year—when the Government approved none of the H-1B petitions.  The scheme, itself, involved submitting H-1B applications with forged signatures.  This occurred solely within the United States.

While there is little authority in this Circuit regarding this prong, United States v. Duperval, 777 F.3d 1324 (11th Cir. 2015) provides guidance.  The Duperval Court found that the enhancement applied because the goal of the defendant's wire fraud scheme was to secure favors from a telecommunications company, the defendant worked for the company in Haiti, lived in Haiti, and met with his co-conspirators in Haiti.  Id. at 1336.

Here, by contrast, there is no evidence that Mr. Samal perpetrated his scheme from abroad— lest that a "substantial part" of the scheme occurred abroad.

**2.     Mr. Samal's Scheme *Did Not* Involve Sophisticated Means**

As to otherwise sophisticated means, this prong is likewise inapplicable because Mr. Samal did not engage in "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense."  See U.S.S.G.  §  2B1.1(b) cmt. n.9(b).    The Application Note further provides: "Conduct such as hiding assets or transactions or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means."    Id.    Because none of these factors are present, the enhancement is unwarranted.

The PSR seeks application of the enhancement because Mr. Samal doctored documents and manipulated immigration filings.  Such acts, however, are the very

LAW OFFFICES OF JOHN HENRY BROWNE PS
801 SECOND AVENUE, SUITE 800
SEATTLE, WASHINGTON  98104
(206) 388-0777 • FAX: (206) 388-0780

simple basis for Count 1—the filing of the H-1B petitions with forged end-client letters.

With respect to the amendments, this is par for the course when H-1B applicants take new jobs or some other circumstance changes. Rather than file the amendments to hide his scheme, the amendments actually brought the Companies into compliance. In addition, of the 71 new H-1B recruits cited by the Government whose petitions contained forged signatures, there were no amendments as to those individuals. And, finally, the Companies did file amendments, as required, if the job placement was more than 30 miles away.

Immigration attorney Diane M. Butler, by contrast, notes that USCIS's policy regarding amendments was "liberal and flexible" until April 9, 2015. See Ex. B at 6, ¶¶20-21. Even after promulgation of the new rules, not all reassignments required amendments; and, USCIS announced that it would exercise discretion to accommodate petitioners who had followed the previous rules and also offered a "safe harbor" period for filing amended or new petitions through January 15, 2016. Id. at 6-7, ¶¶23-25. In Ms. Butler's legal and professional opinion, Mr. Samal was aware of the policy changes and endeavored to ensure his Companies were in compliance. Id. at 7, ¶27.

Here, then, Mr. Samal submitted forged signatures on official documents and then mailed the documents to the Government in the most basic form of visa/mail fraud.

In United States v. Valdez, for example, the Court reversed the district court's application of the enhancement where the defendant took money fraudulently obtained from Medicare and directly deposited into his bank account into his operating account, which was in his name, and moved it into his investment account, also in his name. 726 F.3d 684, 695 (5th Cir. 2013). The Court concluded that "there is no indication that this open and transparent direct deposit and movement of funds involved sophisticated means or could have made it more difficult for his offense … to be detected." Id.

LAW OFFICES OF JOHN HENRY BROWNE PS
801 SECOND AVENUE, SUITE 800
SEATTLE, WASHINGTON 98104
(206) 388-0777 • FAX: (206) 388-0780

Here, Mr. Samal's conduct is akin to the defendant's conduct in United States v. Hulse, in which the Court determined that the enhancement was inapt. 989 F.Supp.2d 1224 (M.D. Ala. 2013). Analogous to the Hulse defendants, Mr. Samal personally "signed documents, made representations, and received funds in [his] own name[]. While corporations were involved, including overseas corporations in tangential resects, nothing about the involvement of the corporate form suggests the intent or effect of concealing the offense." Id. at 1226.

The Hulse Court further noted that for the enhancement to apply, "the level of complexity or intricacy must set that particular scheme apart from ordinary schemes, and even ordinarily complex or intricate schemes." Id. As the Court explained:

> The reasoning behind this heightened requirement is obvious. The essence of fraud involves deceit or deception. See Black's Law Dictionary (9th ed. 2009) (fraud involves a "knowing misrepresentation of the truth or concealment of a material fact"). More likely than not, some complexity will always be required to carry out such deceit. If the only requirement to apply this enhancement were some complexity, nearly every fraud would qualify. Therefore, to assure that this guideline does not result in a defendant being punished twice for fraud, the drafters of the guidelines restricted the enhancement to only those schemes that are especially complex or intricate.
>
> The court recognizes that the scheme here involved large sums of money and the use of complex financial instruments, but neither of these circumstances nor any of the circumstances cited by probation or the government, alone or collectively, establishes that the scheme itself was "especially" complex or intricate. Rather, considering all of the circumstances of these crimes, the court finds that the scheme was rather straightforward. At its core, this scheme was essentially a series of unabashed lies, in which, first, Hulse claimed to be a very wealthy man with bonds worth millions of dollars that he could offer as collateral for loans, and Mock and Teers similarly claimed that Hulse was a very wealthy man; and in which, second, Hulse then fraudulently used the loan proceeds for purposes not authorized by the loans. That is, the crux of this case is that the defendants lied to obtain money and then lied about the use of the money. As such, the

LAW OFFICES OF JOHN HENRY BROWNE PS
801 SECOND AVENUE, SUITE 800
SEATTLE, WASHINGTON 98104
(206) 388-0777 • FAX: (206) 388-0780

court is not convinced that this scheme was especially complex, intricate or anything else. It just involved an unusually large amount of money, about which the defendants lied. Since the defendants' offense level already amply reflects their culpability based on the loss amount, the court finds that the circumstances here do not warrant an additional sophisticated-means enhancement.

Id. at 1226-27.

Here, in like manner, Mr. Samal used forged signatures on documents that he personally signed and then conducted business as usual.  As there is no evidence that his scheme is anything more than garden-variety visa/mail fraud, the sophisticated means enhancement is inapplicable.

## C. AN ENHANCEMENT FOR USING A MEANS OF IDENTIFICATION TO OBTAIN ANOTHER MEANS OF IDENTIFICATION IS UNWARRANTED

The PSR recommends application of a two-point enhancement, pursuant to U.S.S.G. § 2B1.1(b)(11)(C)(I) based upon the belief that Mr. Samal "used a means of identification unlawfully to obtain another means of identification, specifically, Mr. Samal used signatures belonging to his clients when forging letters for use in the fraudulent petitions."  PSR at 9, ¶39.

While unclear, the Government seems to suggest that the fact that Mr. Samal used forged signatures in the H-1B petitions, which is the actual offense conduct for Count 1, somehow constitutes two different means of identification. This is error.

U.S.S.G. § 2B1.1(b)(11)(C)(I) provides that a two-level enhancement applies where the defendant used "any means of identification unlawfully to produce or obtain another means of identification."

"Means of identification," in turn, "means any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any--

(A) name, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number;

LAW OFFICES OF JOHN HENRY BROWNE PS
801 SECOND AVENUE, SUITE 800
SEATTLE, WASHINGTON 98104
(206) 388-0777 • FAX: (206) 388-0780

(B) unique biometric data, such as fingerprint, voice print, retina or iris image, or other unique physical representation;

(C) unique electronic identification number, address, or routing code; or

(D) telecommunication identifying information or access device (as defined in section 1029(e)).

See U.S.S.G. § 2B1.1(b) cmt. n.1 (citing 18 U.S.C. § 1028(d)(7)).

Although a signature *ostensibly* constitutes a means of identification, see United States v. Sardariani, 754 F.3d 1118, 1121–22 (9th Cir. 2014), the Commentary to the Guideline is explicit: "Forging another individual's signature **is not** producing another means of identification." Id. at cmt. n.10(C)(iii)(II) (emphasis added).

More to the point, though, is the fact that 18 U.S.C. 1028(d)(7) clearly "does not include mail or an address within the list of means of identification; nor are the examples easily analogized to a piece of mail or an address." United States v. Hawes, 523 F.3d 245, 250 (3d Cir. 2008). An "address or piece of mail does not seem to fit the Guideline's definition of 'means of identification.'" Id. at 252.

Here, then, as Mr. Samal used forged signatures on mailings that are not, themselves, means of identification, the enhancement cannot apply.

## D.   AN ENHANCEMENT FOR OBSTRUCTION OF JUSTICE IS UNWARRANTED

### 1.   Relevant Facts

Mr. Samal and his employees, pursuant to legal advice, cleaned up the client files during the fall of 2016—well before any criminal investigation. Even though they removed the fraudulent end client letters from the hard copy public access file as directed by the Murthy Law Firm audit, a copy of which is attached hereto as Exhibit C, the documents remained on the computer servers and in emails—as is legally required. The Government actually produced such evidence in discovery. Mr. Samal, moreover, is certainly sufficiently computer-savvy that if he wished to destroy the documents, he would have deleted the electronic files and thereby committed obstruction.

DEFENSE SENTENCING MEMORANDUM - 9

Mr. Samal did not flee from justice, but rather went to India on an annual charitable excursion.  He later returned to the United States knowing that he would be arrested, but wanted to take responsibility for his conduct.

### 2.    <u>Legal Analysis</u>

A two-level enhancement for obstruction of justice is appropriate, pursuant to U.S.S.G. § 3C1.1, where the defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with resect to the investigation, prosecution, or sentencing of the instant offense of conviction" and such conduct related to the offense of conviction and any relevant conduct or a closely related offense.

The Commentary specifically provides that the following types of conduct *do not* constitute obstruction: (1) Making false statements, not under oath, to law enforcement officers—unless such statements were "materially false" and "significantly obstructed or impeded the official investigation or prosecution of the instant offense"; and (2) Avoiding or fleeing from arrest.  <u>See</u> U.S.S.G. § 3C1.1 cmt. nn.4-5.  In addition, "inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice.  <u>Id</u>. at cmt. n.2.    These provisions thus easily dispose of the arguments that Mr. Samal's allegedly false statements to investigators in 2017 and his extended stay in India somehow constitute obstruction.

As to the alleged document destruction, in April of 2016, Mr. Samal retained the Murthy Law Firm and agreed in May of 2016 that the firm should conduct an internal audit, which it completed on November 3, 2016.  <u>See</u> Ex. C. Pursuant to the results of the audit, Mr. Samal directed his employees to clean up and reorganize the office files.  While it may be true that the staff removed the fraudulent end client letters, these are not required in the public access file.  <u>See id</u>. And, more importantly, Mr. Samal and his employees maintained the entirety of the files on the computer server—which the Government extracted from his

LAW OFFICES OF JOHN HENRY BROWNE PS
801 SECOND AVENUE, SUITE 800
SEATTLE, WASHINGTON  98104
(206) 388-0777 • FAX: (206) 388-0780

computer and produced in discovery.  There was thus no actual destruction of anything and no impediment to the investigation.

The sole provision that may, arguably, apply to Mr. Samal's conduct is: "Obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction."  See U.S.S.G. § 3C1.1 cmt. n.1.  The document reorganization, however, was  not obstructive and, given that Mr. Samal retained the documents electronically, he could not possibly have purposefully calculated his behavior to likely thwart the investigation.

Finally, while "destroying or concealing or directing or procuring another person to destroy or conceal evidence that is material to an official investigation or judicial proceeding (e.g., shredding a document or destroying ledgers upon learning that an official investigation has commenced or is about to commence), or attempting to do so" typically constitutes obstruction, see U.S.S.G. § 3C1.1 cmt. n.4(D). here, there was no destruction or concealment—just a reorganization to comply with an audit conducted by an immigration law firm.

An enhancement for obstruction is thus both factually and legally unwarranted.

## IV.    DEFENSE SENTENCING RECOMMENDATION

Given PK's guilty plea to mail fraud rather than visa fraud and resulting exposure to increased incarceration in hopes of being able to remain here in his adopted country with his family; his return from India despite knowing he would be immediately arrested; the nature of his hybrid regulatory/criminal conduct; the fact that he is subject to an *additional* period of ICE confinement unlikely to last less than two to three years upon his release from federal prison; his age, family ties, and lack of recidivism; and sincere acceptance of responsibility, the defense hereby recommends a total sentence of 18 months of incarceration as sufficient,

LAW OFFFICES OF JOHN HENRY BROWNE PS
801 SECOND AVENUE, SUITE 800
SEATTLE, WASHINGTON  98104
(206) 388-0777 • FAX: (206) 388-0780

but not greater than necessary, to accomplish the stated purposes of sentencing. 18 U.S.C. § 3553(a).

> In determining the final sentence to be imposed, the Court should consider:

> the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; the kinds of sentences available; the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense.

Id.

Here, given these factors, a sentence of 18 months (to be followed by two to three years in ICE detention), is thus appropriate.

## A. MR. SAMAL'S PERSONAL HISTORY[1]

### 1. Mr. Samal is a Devoted Family Man

Pradyumna Kumar Samal ("PK") has lived for the past 20 years in the Seattle area. He wants to remain in the United States. He has spent considerable amounts of his now extinguished assets on immigration and criminal defense attorneys in hopes of reaching a resolution that would permit him to stay in the country he has called home for years—even though he may face more severe consequences by pleading guilty to Mail Fraud with its 20-year statutory maximum sentence, see 18 U.S.C. § 1341, instead of Visa Fraud and its 10-year statutory maximum sentence. See 18 U.S.C. § 1546(a).

Mr. Samal traveled to the United States with his wife of 22 years, Sagarika, who is now an American citizen. They have two American citizen children. Their older son, Ritesh, recently graduated from Bellevue High School and planned to

---

[1] Much of this section is drawn from Mr. Samal's Motion for Conditional Release Pending Sentencing, Dkt. #54, at 7-10.

DEFENSE SENTENCING MEMORANDUM - 12

attend Penn State University and enroll in its computer engineering program, but decided that he had to remain close to home to help care for the family, particularly his fragile mother.  He is thus going to matriculate to Bellevue Community College and forestall his education.  Their younger son, MS, is about to enter high school.

While Mr. Samal is close with his family and his father, Sagarika does not get along very well with her in-laws.  In 2008, when Mr. Samal's family visited from India.  Sagarika experienced "trigger acute stress as family from India now here on extended visit.   [Patient] will need to be admitted for psychiatry medications and anxiety control."  See Dkt. #54 at Ex. C. She had to remain hospitalized overnight.  She had also experienced a similar event when visiting the same family in India the year prior.  See id.

Sagarika's relationship with her in-laws is why Mr. Samal bought the house in India, which is heavily encumbered, near his parents' residence—so they can stay there during extended family visits.  The family has since lost any interest in the home due to the lack of payments, but Mr. Samal is still obligated to pay the initial loan amount.

Sagarika, then, does not react well to stress, and Mr. Samal's absence at this particular time is causing her great difficulties.  She does not have a driver's license and does not drive, she has never had a job, and she is having trouble attending to their family and providing for the needs—both emotional and financial—of their children.

Mr. Samal's father, moreover, got into a car accident after hearing of his son's arrest and suffered a fractured hip which prevented him from moving for six months and still inhibits his range of activity.

Mr. Samal's mother, finally, is also elderly, infirmed, and reliant upon him—espcially now that her husband/PK's father is unable to work and provide support for the family.  See Exhibit D, Immediate Family Letters of Support.

LAW OFFICES OF JOHN HENRY BROWNE PS
801 SECOND AVENUE, SUITE 800
SEATTLE, WASHINGTON  98104
(206) 388-0777 • FAX: (206) 388-0780

### 2. Mr. Samal is an Extremely Successful Entrepreneur

Mr. Samal is an extremely successful entrepreneur with a strong track record of building successful businesses and creating employment opportunities in the area and will continue to be productive upon release. He arrived in America in 2000 with modest expectations, a work visa, and a job that paid $60,000/year. From there, he founded a series of successful business entities that created jobs and positively contributed to society.

Beginning with just $50.00, a credit card, and a keen acumen for recognizing opportunity in the technological sector, in 2001, Mr. Samal started his first business. He successfully grew the business, Planet Guru, but operating costs forced closure by 2005. When Planet Guru shut down, Mr. Samal worked to find jobs for his employees at other locations.

In the meantime, Mr. Samal founded another business, Minecode, in 2001. With no money and two credit cards, Mr. Samal was nevertheless able to grow the company to employ 500 employees across the world.. The demise of Minecode was a result of a contract dispute that led Mr. Samal to, unfortunately, take matters into his own hands and resort to criminal activity. As a result of the prior misdemeanor conviction from this District, Mr. Samal owed millions of dollars in personal liability.

In 2010, Mr. Samal founded Divensi and in 2011 he founded Azimetry, again with no financial support. Again, Mr. Samal was able to successfully grow his companies from the ground up. By 2015, he had paid off all of his obligations from the prior case and was able to once more dedicate more of his time and resources to charitable endeavors.

### 3. Mr. Samal Donates Significant Time and Resources

In 2004, Mr. Samal started his first charity, Planet Guru Foundation. After a tsunami ravaged parts of Asia in 2004, the Foundation sponsored a fundraiser that received accolades from President Clinton, Governor Gregoire, and Senator Cantwell.

DEFENSE SENTENCING MEMORANDUM - 14

1

2
     Mr. Samal was also active in helping to build a Hindu temple in Maple Valley, assisting the Women's Center at the University of Washington, and supporting the "Walk for Rice" effort of the Asian Community Referral Service.

3

4
     Mr. Samal further sponsored Palli Spree Jubak Sangha, a rural Indian non-profit that aids children, particularly girls and those suffering from mental and physical disabilities.  He not only offered money, but also his time.

5

6
     Minecode offered free or reduced-cost services to non-profit or public service organizations and helped other startup companies.  This is actually one of the things Mr. Samal enjoys the most—mentoring entrepreneurs and new start up companies.  See, e.g., Exhibit E, Linda Klug's Letter of Support.  Ms. Krug relates that she met Mr. Samal in 2016 through a mutual business connection.  Over the course of the next year, he helped mentor her to grow her own successful business, Airin, Inc.  Id.

7

8

9

10

11

12
     Mr. Samal's brother-in-law, Siddhartha Samal, likewise relates that Mr. Samal helped him build his career and also attests to his dedication to his work and his family.  See Exhibit F, Siddhartha Samal's Letter of Support.

13

14

15
     In 2011, when unemployment had peaked in Washington, Mr. Samal—through Azimetry—collaborated with several unemployment departments, including WorkSouce, to provide many people with software data analytics training (LiDAR) to veterans and college drop outs.  This resulted in the launch of at least 58 successful professional careers with the likes of Microsoft, Google, and Facebook.

16

17

18

19

20
     After Mr. Samal fulfilled his financial obligations in 2015, he was able to dedicate more time and energy to charitable causes.  In 2015, he founded Startup Fair (www.startupfair.org), a non-profit with a goal of helping young entrepreneurs succeed while not taking any equity or interest in their ventures.  It provided a platform for young start-up companies to present their ideas and potentially win a cash prize of $5,000, $10,000, or $20,000.  The Microsoft Accelerator Group as well as the University of Washington saw the worthiness of

21

22

23

24

LAW OFFICES OF JOHN HENRY BROWNE PS
801 SECOND AVENUE, SUITE 800
SEATTLE, WASHINGTON  98104
(206) 388-0777 • FAX: (206) 388-0780

the project and eagerly partnered with the organization to promote and provide a high visibility platform, product design, and development while Mr. Samal personally donated the cash awards.  Over two years, the organization assisted nine different start-ups with no personal benefit to Mr. Samal.  See, e.g., Exhibit G, the Letter of Support from Anuradha Vashisht, Managing Trustee of the non-profit Nivritti Trust.

Mr. Samal also founded the Samal Family Foundation (www.samalfamilyfoundation.org), whose goal is to contribute to lifelong learning and stability within the community by: (1) reeducating high school and college drop outs with free software development training and subsequent job placement; (2) co-sponsoring a large theological diagnostic meditation center in the Himalayan Mountains that came to fruition in 2018 when Mr. Samal was visiting India; and (3) providing material and labor for local community food banks.  See, e.g., Exhibit H, the Letters of Support from Vikas Sharma; Arun Arora, CPA; and Mukesh k. Makker.

Mr. Samal is community-oriented and used to donate both his time and his money.  He volunteered at Seattle Sangat every week from 11:00 a.m. to 1:00 p.m. on Mondays and from 6:00 p.m. to 9:00 p.m. on Thursdays helping to prepare food and set up the meditation stage.  He also annually traveled to India to participate in the non-profit he co-founded to construct a meditation center.

He is a devout Hindu, practices meditation, and is a vegan who does not consume or use any animal products.  He has never used drugs and has imbibed only on a few social occasions throughout his entire life, but not since 2013.

### 4.    Acceptance of Responsibility and Community Support

As expressed in his letter accepting responsibility, PK fully takes to heart his situation.  See Ex. A.  The shock of federal prosecution and incarceration finally forced him to realize that he essentially abandoned his high personal ethics and morals and ethics in the business context.  With this better understanding of himself, he is even more likely to succeed in the future.

LAW OFFICES OF JOHN HENRY BROWNE PS
801 SECOND AVENUE, SUITE 800
SEATTLE, WASHINGTON  98104
(206) 388-0777 • FAX: (206) 388-0780

1
2
3

PK also still has the loving support of his family and community.  As the letters from his family demonstrate, in his personal life, PK is a kind, gentle, caring, and giving individual.  See Ex. D.

4
5

And, as the additional letters of support demonstrate, he has a community of people to which to return when he does reintegrate back into society.  See Exhibit I, Community Letters of Support.

6

**B.    MR. SAMAL HAS A LOW RISK OF RECIDIVISM**

7
8
9
10
11
12
13
14
15
16
17
18
19
20

Given his acceptance of responsibility, the circumstances of the offense, his strong family support, and his current age of 50, Mr. Samal is an extremely low risk to recidivate.  See, e.g., U.S.S.C, Recidivism Among Federal Offenders: A Comprehensive Overview (2016); U.S.S.C., Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines 12 (2004), available at www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/ 2004/200405_Recidivism_Criminal_History.pdf ("Recidivism rates decline relatively consistently as age increases"); United States Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, Recidivism of Prisoners Released in 30 States in 2005: Patterns from 2005 to 2010 12, NCJ 244205 (April 2014) available at http://www.bjs.gov/content/pub/pdf/ rprts05p0510.pdf; Raymond E. Collins, Onset and Desistance in Criminal Careers: Neurobiology and the Age–Crime Relationship, 39 J. Offender Rehabilitation 1, 1–8 (2004) (finding that neurotransmitters affecting aggression supplied at the synapses of brain neurons vary based on age, and may explain the decrease in recidivism that accompanies aging); U.S.S.G. § 5H1.1 (policy statement that age may be a relevant consideration at sentencing).

21
22
23

In addition to the scientifically accepted age/crime curve, that Mr. Samal maintains tight family bonds further mitigates his risk of recidivism: "In recent years, we have come to appreciate that when offenders are connected to family, and when families are well supported, reduced recidivism and thus, safer

24

DEFENSE SENTENCING MEMORANDUM - 17

communities are the result." Eldon Vail, Secretary, Wash. St. Dep't of Corr., Children and Families of Incarcerated Parents (2010).

The Sentencing Commission's research shows that individuals with financial dependents are less likely to recidivate than those without dependents. See "Recidivism in the First Offender" (May 2004). This positive correlation between family ties and reduction in recidivism rates is documented across study populations, time period, and methodological procedures. See, e.g., Shirely R. Klien et al., "Inmate Family Function," 46 Int'l J. Offender Therapy & Comp. Criminology 95, 99-100 (2002). Indeed, research demonstrates that "intervening in the lives of incarcerated parents and their children to preserve and strengthen positive family connections can yield positive societal benefits in the form of reduced recidivism, less intergenerational criminal justice system involvement, and promotion of healthy child development." Nat'l Conf. of St. Leg.'s, Children of Incarcerated Parents at 1 (2009).

The weight of modern social science research, finally, indicates that "incarceration—imposing it at all or increasing the amount imposed—either has no significant correlation to recidivism or *increases* the defendant's likelihood to recidivate." United States v. Courtney, 76 F. Supp. 3d 1267, 1304 (D.N.M. 2014) (adding emphasis) (citing, e.g. Lin Song & Roxanne Lieb, Recidivism: The Effect of Incarceration and Length of Time Served 4–6, Wash. St. Inst. for Pub. Pol'y (Sept.1993), available at http://wsipp.wa.gov/ReportFile/1152/ Wsipp_Recidivism

At the time of his release, PK will be in his fifties and will still have a large support network and a great capacity for business success. Even if he is sentenced to a term of 18 months, he will still serve an additional two to three years in ICE detention.

LAW OFFFICES OF JOHN HENRY BROWNE PS
801 SECOND AVENUE, SUITE 800
SEATTLE, WASHINGTON 98104
(206) 388-0777 • FAX: (206) 388-0780

## C.   MR. SAMAL WILL LIKELY HAVE TO SERVE AN ADDITIONAL TWO TO THREE YEARS IN ICE DETENTION AFTER COMPLETION OF HIS CRIMINAL SENTENCE

In consultation with several immigration attorneys and based on the publicly available statistics, it seems that after serving his criminal sentence, Mr. Samal will likely serve another two to three years in ICE detention.

Once Mr. Samal is transferred to ICE custody, he will have to wait approximately four to six months to obtain an initial hearing, an additional indeterminate period to obtain a decision, and another four to six months for an appeal to the Bureau of Immigration Affairs.  This seems consistent with statistics complied last year.  See Exhibit J, Article and Chart Showing the Immigration Backlog at various locations.

If denied, an appeal to the Ninth Circuit will likely take one to two years.

Then, even after an order of removal, it is likely to take an additional 12 months to obtain the proper Indian travel documents in order to return to India.  See Exhibit K, Declaration of Deportation Officer Ryan M. Jennings at 3, provided via courtesy of the Office of the Federal Public Defender.  Per Mr. Jennings, it typically takes India about 12 months to issue a travel document after the United States has entered on Order of removal.

Subsequent to his federal incarceration, then, Mr. Samal is apt to serve another two to three years in ICE detention, which, according to multilple reports, is less than ideal.  See, e.g., Exhibit L, Seattle Times Article, "To dispel 'bad information,' ICE opens detention facility in Tacoma to first-of-its kind media tour," dated September 10, 2019.

## D.   REHABILITATION

While the Court must, certainly, consider the need to punish Mr. Samal in light of his offenses, deter any similar future conduct, and protect the public from his misdeeds, equally important is the need to provide the defendant with

LAW OFFFICES OF JOHN HENRY BROWNE PS
801 SECOND AVENUE, SUITE 800
SEATTLE, WASHINGTON 98104
(206) 388-0777 • FAX: (206) 388-0780

correctional treatment "in the most effective manner."   See 18 U.S.C. § 3553(a)(2).  A different section makes this more abundantly clear:

> The court, in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.

18 US.C. § 3582(a).

As noted above, there is a growing body of scientific studies demonstrating that prison, by disrupting employment, reducing prospects of future employment, weakening family ties, and concentrating offenders together, leads to increased recidivism, and that community treatment programs are more effective in reducing recidivism than prison based programs. See, e.g., Sentencing Project, Incarceration and Crime: A Complex Relationship, 7-8 (2005); Wash. St. Inst. for Pub. Pol'y, Evidence-Based Public Policy Options to Reduce Future Prison Construction, Criminal Justice Costs, and Crime Rates (October 2006). The rehabilitative needs of Mr. Samal are thus best achieved in through community based MRT and cognitive behavioral mental health programming, which are available on supervised release.

In addition, research demonstrates that unnecessarily lengthy sentences only increase the risk of recidivism due to reduction in future employment prospects, weakening family ties, and furthering institutionalization of the individual.   See, e.g., The Commission's Legislative Agenda to Restore Mandatory Guidelines, 25 Fed. Sent. R. 293, 301 (2013).  Though the certainty of being caught and punished does have some deterrent effect, research has shown that "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, Purposes and Functions of Sentencing, 34 Crime & Just.1, 28 (2006).

LAW OFFICES OF JOHN HENRY BROWNE PS
801 SECOND AVENUE, SUITE 800
SEATTLE, WASHINGTON  98104
(206) 388-0777 • FAX: (206) 388-0780

## E.    ANALOGOUS CASES AND SENTENCING DISPARITY

Given that many similar cases are referred for civil litigation rather than criminal prosecution and also that the sentences imposed in analogous cases typically involve less than 36 months of incarceration—with no additional ICE detention time—a sentence of 18 months is appropriate.

To begin, Infosys Limited, an Indian corporation, in 2013 agreed to a $34 million settlement with the Government due to systemic visa fraud and abuse of immigration processes. See, e.g., Exhibit M, ICE News Release dated October 29, 2013, "Indian corporation pays record $34 million fine to settle allegations of systemic visa fraud and abuse of immigration processes."   The wide-ranging nature of the manifold violations included: fraudulently using B-1 visa holders to perform skilled jobs that had to be filled by American citizens or H-1B visa holders; submitting false statements in "invitation letters" to U.S. Consular officials; directing the B-1 visa holders to deceive U.S. Consular officials by means of a written memorandum describing the "Do's and Don'ts"; writing and revising contracts to conceal that the B-1 visa holders were performing work properly done by American citizens or H-1B visa holders; billing clients for the use of off-shore resources when the work was actually performed by B-1 visa holders in the United States; and failing to maintain proper records of the foreign nationals in the United States.  Despite these serious and repeated violations, there was no criminal prosecution.

In the most similar case the defense located, United States v. Guntipally, et al, No. CR-16-189-LHK (N.D.Cal.), the facts are more egregious than in the present case and the Court impose only 30 months of incarceration.  The co-defendants were charged with conspiracy, ten counts of substantive visa fraud, seven counts of using false documents, and four counts of mail fraud.  Venkat, the co-leader of the conspiracy, pleaded guilty to conspiracy to commit visa fraud involving over 100 petitions with fraudulent end client letters and admitted to obstruction of justice by directing workers to lie to investigators and by laundering

LAW OFFICES OF JOHN HENRY BROWNE PS
801 SECOND AVENUE, SUITE 800
SEATTLE, WASHINGTON  98104
(206) 388-0777 • FAX: (206) 388-0780

money.   The Court sentenced Venkat to 30 months, three years of supervised release, and a forfeiture of $500,000.   The Court also permitted his self-surrender. The co-leader of the conspiracy, Sunitha, also engaged in witness tampering and was sentenced to 52 months.

Here, Mr. Samal's conduct is analogous, though less serious, but he is also facing a lengthy term of ICE confinement subsequent to his federal imprisonment, which the Court should consider and incorporate when imposing sentencing.

### V.   CONCLUSION

For the foregoing reasons, a total sentence consisting of 18 months of incarceration (to be followed by 24-36 months in ICE detention) is sufficient, but not greater than necessary, to punish Mr. Samal's criminal conduct and promote the underlying purposes of sentencing.

DATED this 13th day of September, 2019.

Respectfully submitted,

LAW OFFICES OF JOHN HENRY BROWNE, P.S.

/s/ Craig D. Suffian
Craig D. Suffian, WSBA #52697
Attorney for PK Samal
801 Second Avenue, Suite 800
Seattle, Washington 98104
206-388-0777 fax: 206-388-0780
e-mail: ceesuff@gmail.com

/s/ Emma C. Scanlan
Emma C. Scanlan, WSBA #37835
Attorney for PK Samal
801 Second Avenue, Suite 800
Seattle, Washington 98104
206-388-0777 fax: 206-388-0780
e-mail: emma@jhblawyer.com

LAW OFFFICES OF JOHN HENRY BROWNE PS
801 SECOND AVENUE, SUITE 800
SEATTLE, WASHINGTON  98104
(206) 388-0777 • FAX: (206) 388-0780

1

## CERTIFICATE OF SERVICE

2

3      I hereby certify that on the 13th day of September, 2019, I electronically

4      filed the foregoing with the clerk of the court using the CM/ECF system, which

5      will send notification of such filing to the attorneys of record for the parties.  I

6      hereby certify that I have served any other parties of record that are non-CM/ECF

7      participants via Tele-fax/U.S. Postal mail.

8

9                    s/ Craig Suffian
                     Craig Suffian, WSBA #52697
10                   Email: ceesuff@gmail.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

LAW OFFFICES OF JOHN HENRY BROWNE PS
801 SECOND AVENUE, SUITE 800
SEATTLE, WASHINGTON  98104
(206) 388-0777 • FAX: (206) 388-0780