THE HONORABLE JAMES L. ROBART

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

Plaintiff,

vs.

PRADYUMNA KUMAR SAMAL,

Defendant.

No. CR-18-214 JLR

DECLARATION OF DIANE M. BUTLER: LEGAL ANALYSIS RELATED TO COMPLIANCE WITH H-1B REGULATIONS

1. I, Diane M. Butler, attorney at the law firm of Davis Wright Tremaine LLP in Seattle, attest to the following under penalty of perjury.

2. I began representing Azimetry Inc. in November 2016 and began representing Divensi Inc. in 2017. The majority shareholder for both companies was Pradyumna Kumar (PK) Samal. At the time, I was the Chair of the Immigration Practice Group at Lane Powell PC in Seattle.

3. Azimetry had two basic lines of business: outsourcing IT workers and development and application of LiDAR[1] technology, as described, for example, in the company letter of support for the H-1B petition of Lakshmikishore Nittala, dated March 24, 2014 ("L.N." as referenced in the Complaint):

> Azimetry's Product Development and Engineering service line offers a full life cycle software development and engineering services to independent software vendors, systems companies and companies offering enterprise, cloud, web, social networking, media and mobile application.

---

[1] "LiDAR" stands for Light Detection and Ranging, is a remote sensing method that uses light in the form of a pulsed laser to measure ranges (variable distances) to the Earth. These light pulses—combined with other data recorded by the airborne system—generate precise, three-dimensional information about the shape of the Earth and its surface characteristics.

DECLARATION OF DIANE M. BUTLER- 1

LAW OFFFICES OF JOHN HENRY BROWNE PS
801 SECOND AVENUE, SUITE 2100
SEATTLE, WASHINGTON 98104
(206) 388-0777 • FAX: (206) 388-0780

Our services span product development, testing, technical support, implementation and sustaining engineering.

Azimetry is also developing a Software product that allows the user to create powerful, realistic 3D visualizations and easily extract important features and products from LiDAR point cold data.

4.  Divensi was in the business of augmenting the U.S. workforce for companies needing short-term or other project work through information technology services. The arrangement was to serve as a trusted vendor to place the H-1B workers on end-client projects, often at their sites, a practice that is common with H-1B workers and provides a much-needed resource for U.S. businesses.

5.  Azimetry had been represented by Murthy Law Firm, a reputable immigration boutique firm in Maryland. In November 2016, an attorney at the firm contacted me to inform me that the U.S. Department of Labor (DOL) Wage & Hour Division (WHD) was conducting an H-1B Labor Condition Application (LCA) audit of Azimetry that covered H-1B petitions the company filed from September 24, 2014 to September 23, 2016. The attorney previously had referred a Seattle area DOL H-1B audit to me, and said she wanted to refer the Azimetry audit to me because the distance made it challenging for her to handle. I agreed to undertake the representation.

6.  After meeting Mr. Samal and conducting my initial assessment, I concluded that Azimetry had some compliance violations primarily of a technical nature, but that the company was attempting to get on the right track to be fully compliant with DOL LCA regulations and also U.S. Citizenship & Immigration Service (USCIS) H-1B regulations.[2]

7.  I met with Mr. Samal many times over the course of my representation, joined him for lunch during lengthy meetings, met his wife and his sons, and overall enjoyed his company.

8.  The DOL Field Operations Handbook (FOH), Chapter 71, Enforcement of H-1B Labor Condition Application, is the authoritative source for WHD in conducting audits. Attached hereto as Exhibit A is the DOL Field Operations Handbook (version 09/27/2016), Chapter 71, Enforcement of H-1B Labor Condition Application (FOH).

9.  I reviewed the FOH in connection with preparing to respond to the WHD audit. Mr. Samal and I discussed the company practices, and I examined a list of

---

[2] There was no indication to me that any of the H-1B petitions contained letters that, as described in the Complaint, "purported to have been issued by [] clients, purported to have been signed by those clients' representatives . . ." Complaint at 4. No one at either of the companies mentioned any such issue before the Complainant Special Agent Richard Lin commenced his investigation by an onsite visit with Mr. Samal in 2017.

DECLARATION OF DIANE M. BUTLER- 2

Azimetry employees as well as the documents that Azimetry provided from each H-1B employee's Public Access File (PAF), their employment periods and work locations, pay records, and H-1B petitions including supporting letters. I provided the WHD investigator with information responsive to the requests on behalf of the company. Mr. Samal was fully cooperative throughout the audit.

10. The WHD auditor raised the issue of whether Azimetry's process of accepting security deposits from H-1B beneficiaries, to be refunded after a period of employment, was a violation of H-1B regulations. I reviewed the deposit and refund records for the H-1B approved petitions for the audit period, September 24, 2014 to September 23, 2016. Azimetry's policy was to collect a deposit from the H-1B beneficiary which was refunded provided that the employee continued Azimetry employment for a period of time. Up to the fiscal year beginning October 1, 2015, the time period was 12 working months, including H-1B petitions filed April 1, 2015; thereafter, the employment term for deposit refund eligibility was 24 working months. The records showed that Azimetry refunded the security deposit to those employees who worked for the company for the requisite period of time. The employees who did not received refunds either had not yet worked for the company for the requisite period of time, or had quit before the security deposit was due.

11. Attached hereto as Exhibit B is my communication with the WHD auditor on February 28, 2018, related to the security deposits and refunds.

12. My initial assessment was that the security deposit practice might be a violation of the H-1B rules; however, upon further review of the FOH and case law, the Azimetry practice appeared to be acceptable. The reason that the company developed the practice was that in the competitive industry of IT outsourcing, a relatively high percentage of new hires quit and departed the company within short periods of time. I assessed the applicable provisions in the FOH, Section 71d08, regarding USCIS fees, and Section 71d11, regarding deductions by which H-1B workers' cash wages are decreased, and concluded the security deposit practice did not violate the provisions. Further, the FOH specifically allows an "early cessation penalty" and liquidated damages: "However, the employer is permitted to recoup bona fide liquidated damages for the employer's losses or expenses incurred due to the worker's leaving employment early (see 20 CFR 655.731(c)(10)(i)." FOH 71d20. The provision prohibits withholding a final paycheck, but there is no prohibition against collecting a security deposit. FOH 71d20(g). The practice also was held to be acceptable under ALJ authority finding that an employer may receive bona fide liquidated damages from the H-1B nonimmigrant worker who ends employment with the employer early. Matter of Woodmen of the World Life Insurance Society, 2016-LCA-00018, Oct. 26, 2016.[3] However, the WHD disagreed and disregarded the case law and, in a final in-person meeting with me advised that the WHD calculated the security deposit

---

[3] https://www.litwinlaw.com/blog/2016/11/dol-alj-finds-visa-fees-can-be-deducted-from-employees-unused-vacation-time.shtml (last visited, Sept. 12, 2019).

DECLARATION OF DIANE M. BUTLER- 3

LAW OFFICES OF JOHN HENRY BROWNE PS
801 SECOND AVENUE, SUITE 2100
SEATTLE, WASHINGTON 98104
(206) 388-0777 • FAX: (206) 388-0780

as including the H-1B filing fee and construed the Azimetry practice as noncompliant under a separate provision of the FOH, "The H-1B worker must be paid his or her wages cash in hand, free and clear, when due." FOH 71d10(a). The DOL issued the final audit determination on July 23, 2019, nearly a year after Mr. Samal's arrest, leaving no practical means to challenge or appeal.

13. In March 2017, Divensi had filed 22 new H-1B petitions in the "lottery" during the H-1B "cap" season, which I prepared and submitted.  The majority of the H-1B beneficiaries were outside the United States and, before they could begin work for the company, they each needed to have the H-1B petition selected in the random lottery operated by USCIS and processed and approved by USCIS, and then the beneficiaries needed to apply for and have an H-1B visa approved by the State Department, and they needed to relocate to the United States.[4]

14. In August 2017, I moved my immigration practice to the law firm of Davis Wright Tremaine, and Mr. Samal transferred his legal matters to the firm.

15. Azimetry did not file any H-1B petitions during the H-1B "cap" season in 2017 or thereafter, as Mr. Samal was finding, he informed me, that he could locate or train skilled U.S. workers for the LiDAR work. However, I filed some H-1B extensions, transfers, and amendments for Azimetry workers who already had H-1B approvals.

16. The Complaint alleges immigration violations in the H-1B petitions filed between 2012 and 2015, and suggests that Mr. Samal committed criminal violations of H-1B law through a "bench and switch" practice. Complaint, at 17-20. Complainant Special Agent Richard Lin describes it as a scheme where a petitioning employer claims that an H-1B beneficiary has been assigned to a project at an end-client of the petitioner's, and then markets the foreign national to end-clients other than those named in the actual petition.

17. Nonproductive status, commonly referred to as "benching" is the term applied to the situation where "an H-1B worker is idle and/or nonproductive (i.e., not producing income for the employer) due to a decision by the employer . . . and is not paid the required H-1B wage." FOH 71d07(a). The remedy for benching violations is back wages, and the FOH has extensive guidance on calculating back wages. FOH 71d07(f). Willful violations also may generate civil monetary penalties (CMPs). Benching (with few exceptions) is unequivocally a violation of the H-1B regulations.

18. The regulations also require that an employer who dismisses an H-1B worker before the end of the approval period – for lack of work or other reasons – must

---

[4]   Of these cap cases, 11 were accepted in the lottery.  Divensi withdrew two.  USCIS issued a Notice of Intent to Deny for each of the remaining nine, to which Divensi responded.  USCIS did not process the petitions, and, when they still were pending more than a year later when Mr. Samal was arrested in August 2018, we withdrew them all.

LAW OFFICES OF JOHN HENRY BROWNE PS
801 SECOND AVENUE, SUITE 2100
SEATTLE, WASHINGTON 98104
(206) 388-0777 • FAX: (206) 388-0780

offer return transportation to the last country of residence abroad. (8 CFR 214.2(h)(4)(iii)(E)). Some employees given a choice would elect temporary benching and loss of pay when the alternative is leaving the country. However, this does not alleviate the violation of benching for reasons that are not of the employees choosing.

19. On the other hand, "switching" an H-1B beneficiary from one job to another is not necessarily a violation, but a manufactured concept, for which the rules changed from being quite flexible to more stringent in 2015, around the end of the timeframe investigated by the Complainant.  The concept of "switching" does not appear in the FOH as a basis of seeking enforcement against an H-1B employer.

20. To consider the intersection of business planning and H-1B compliance, it is important to understand the typical steps and timing of an H-1B case processed in the "lottery."  The quota of 85,000 new H-1Bs is available at the beginning of every fiscal year, October 1. Petitions can be filed six months in advance, on April 1. Employers anticipate that the quota will be quickly filled, as demand historically has outstripped supply by a wide margin.  Consequently, virtually all cap-case H-1B petitions are submitted on April 1, even though the employer must wait at least six months before being able to employ the beneficiary. H-1B preparation takes place in a compressed timeframe, typically, as follows:

| Action | Timeframe |
|---|---|
| • Employer decides to petition for a specific beneficiary. | January to February |
| • Employer/attorney files an LCA with the DOL.  DOL generally takes 7 days to process.  Employer/attorney prepares the rest of the H-1B petition documents. | February to March |
| • Employer/attorney sends all H-1B petitions to USCIS. | March 31 |
| • USCIS begins receiving H-1B petitions. | April 1 |
| • H-1B acceptance window closes. | April 7 |
| • USCIS completes the lottery.  For petitions selected, USCIS sends the employer a receipt notice.  For petitions rejected, USCIS returns the entire petition. | Around June |
| • USCIS processes the H-1B petitions, and may approve, or send a request for additional evidence or a notice of intent to deny, or deny the petition. | Between June – December (or into the following year) |
| • Earliest date a cap-case beneficiary can work in H-1B status | October 1 |
| • Beneficiary obtains H-1B visa at U.S. consulate or embassy abroad, and enters the U.S. to start work. | September 20 to any time w/i 3 years after |

DECLARATION OF DIANE M. BUTLER- 5

| | H-1B approval |
| --- | --- |

18. Due to processing timeframes and other factors, an H-1B beneficiary might not arrive in the United States to begin work until one year (or later) after the employer filed the LCA indicating the intended job for the person. This means that in February an employer will need to have identified the intended for a job for a worker to fill in October (or sometime in November or even in the following year). For companies like Divensi, they are expected to have identified an end-client's project on which the beneficiary would work six months in the future.

19. An analogy is a law firm offering a job in February to an associate living abroad, knowing that the earliest the firm could employ the associate would be October 1. Under the Complainant's theory, if, come October (or whenever the associate arrived after obtaining the visa and moving to the U.S.), the case had settled or the work could not wait on the associate, and upon or even after arrival the firm assigned the associate to any different client(s) or case(s), the law firm would have committed criminal fraud.

20. Up to April 9, 2015, USCIS policy on permitting an employer to switch job assignments was liberal and flexible. The employer could reassign an H-1B worker, and then inform USCIS later on when the employer needed to file an extension petition or an amendment.

21. On April 9, 2015, USCIS changed the policy, directing that for most reassignments, employers first must file an H-1B amended petition and only could switch the H-1B worker after employer filed the petition and USCIS received it.[5] The change was announced when USCIS' Administrative Appeals Office (AAO) issued the precedent decision, Matter of Simeio Solutions LLC, 26 I&N Dec. 542 (AAO 2015).

22. As described in the USCIS Policy Memo, "[s]pecifically, the decision stated:

1. A change in the place of employment of a beneficiary to a geographical area requiring a corresponding LCA be certified to the Department of Homeland Security (DHS) with respect to that beneficiary may affect eligibility for H-1B status; it is therefore a material change for purposes of 8 C.F.R. §§ 214.2(h)(2)(i)(E) and (11)(i)(A) (2014).

2. When there is a material change in the terms and conditions of employment, the petitioner must file an amended or new H-1B petition with the corresponding LCA."

---

[5] However, the employer need not wait for approval for the H-1B employee to start work at the new assignment.

LAW OFFICES OF JOHN HENRY BROWNE PS
801 SECOND AVENUE, SUITE 2100
SEATTLE, WASHINGTON  98104
(206) 388-0777 • FAX: (206) 388-0780

Policy Memorandum:  USCIS Final Guidance on When to File an Amended or New H-1B Petition after *Matter of Simeio Solutions, LLC,* PM-602-0120 (July 21, 2015).

23. USCIS announced that, "This precedent decision represents the USCIS position that H-1B petitioners are required to file an amended or new petition before placing an H-1B employee at a new place of employment not covered by an existing, approved H-1B petition." *Id*.

24. Under the new policy, not all reassignments require an amendment. If a petitioner's H-1B employee is simply moving to a new job location within the same area of intended employment, that is not considered a material change, and the petitioner does not need to file an amended or new H-1B petition. In addition, a petitioner may place an H-1B employee at a new worksite under certain circumstances for up to 30 days, and in some cases 60 days (where the employee is still based at the "home" worksite), without needing an amended or new H-1B petition. *See* 20 CFR 655.715.

25. USCIS announced it would exercise its discretion to accommodate petitioners who had followed the earlier rules for switching positions and needed to come into compliance with *Simeio* in 2015, and generally would not pursue new actions (e.g., denials or revocations) solely based upon a failure to file an amended or new petition regarding that move after July 21, 2015. USCIS established a safe harbor period for filing an amended or new petition by January 15, 2016, and considered filings during this safe harbor period to be timely for purposes of the regulation and meeting the definition of "nonimmigrant alien" at INA section 214(n)(2).

26. I did not analyze the Azimetry and Divensi petitions filed between 2012 and 2015 to assess whether there were any "switching" violations, because the concept of "switching" is not a violation subject to WHD enforcement, and the H-1B rules for that period of time were very flexible. However, in responding to the WHD audit, I did not identify any "material misrepresentations" in the prior H-1B submissions.

27. In my dealings with Mr. Samal, he was aware of the change in the rules after *Matter of Simeio* and endeavored to assure that Divensi and Azimetry were in compliance. If there were any occasions where one of the companies reassigned an employee and did not timely file an amended petition when required to do so, they were few, and I do not recall any such situation, either in the records I reviewed for the Azimetry audit, or in the cases I handled on behalf of the companies.

DECLARATION OF DIANE M. BUTLER- 7

28. Overall, my impression was that Mr. Samal was aware of some areas of noncompliance in his companies, but that he was endeavoring to be fully compliant.

28. Further Declarant sayeth naught.

DATED this 13th day of September, 2019.

/s/ Diane M. Butler
*Diane M. Butler, WSBA #22030*

DECLARATION OF DIANE M. BUTLER- 8

LAW OFFFICES OF JOHN HENRY BROWNE PS
801 SECOND AVENUE, SUITE 2100
SEATTLE, WASHINGTON  98104
(206) 388-0777 • FAX: (206) 388-0780

4840-6880-1189v.1 0110184-000002

# EXHIBIT A

## Chapter 71

## ENFORCEMENT OF H-1B LABOR CONDITION APPLICATION

### Table of Contents

**71a**      **INTRODUCTION**

    71a00       Background and statutory standards: division of responsibilities.
    71a01       Labor Condition Application (LCA).
    71a02       Coverage.

**71b**      **COMPLAINT INTAKE PROCESS**

    71b00       General.
    71b01       Complaint from an aggrieved party.
    71b02       Complaint from credible source other than aggrieved party.
    71b03       Secretary-certified investigations.
    71b04       Random investigations of willful violators.
    71b05       Confidentiality of complainants and informants.
    71b06       Deadline for filing an actionable complaint.
    71b07       Employer out of business or bankrupt.

**71c**      **INVESTIGATION PROCEDURES**

    71c00       Investigation overview and objectives.
    71c01       Scope of investigation.
    71c02       Investigation period.
    71c03       Initial contact with employer; investigative techniques.
    71c04       Public access file.
    71c05       Documents authorizing employment.
    71c06       Posting of notice via hand copy or electronically.
    71c07       H-1B-dependent and willful violator employers.
    71c08       Portability.

**71d**      **ENFORCEMENT ISSUES**

    71d01       Required wage documentation.
    71d02       Exempt H-1B worker.
    71d03       Recruitment and selection of U.S. workers.
    71d04       Displacement or lay off of U.S. workers.
    71d05       Whistleblower protections.
    71d06       Prevailing wage rate request to the ETA during an investigation.
    71d07       Non-productive status and/or benching.
    71d08       USCIS fees.
    71d09       Required wage rate.
    71d10       Payment of wages and benefits.
    71d11       Deductions.
    71d12       Place of employment: worksite.
    71d13       Short-term placement.
    71d14       Notification requirements.

71d15      Changes in employer's corporate structure or identity.
71d16      Misrepresentation of a material fact on the LCA.
71d17      Working conditions.
71d18      Strike or lockout provisions.
71d19      Specific and accurate information on the LCA.
71d20      Early cessation penalty.
71d21      Required records.
71d22      Failed to otherwise comply with subpart H or I.
71d23      Good faith compliance or conformity.

**71e        LIST OF VIOLATIONS AND REMEDIES**

71e00      Level or degree of employer's wrong-doing in violations.
71e01      Misrepresentation of a material fact on the LCA.
71e02      Failed to pay wages as required.
71e02A     Failed to offer benefits, equal eligibility for benefits, or both.
71e03      Failed to provide working conditions as required.
71e04      Filed an LCA during a strike or lockout in the course of a labor dispute in the
           occupational classification at the place of employment.
71e05      Failed to provide notice of the filing of the LCA.
71e06      Failed to accurately specify on the LCA.
71e07      Displaced a U.S. worker.
71e08      Failed to make the required displacement inquiry of another employer at a
           worksite where an H-1B nonimmigrant was placed, as required.
71e09      Failed to recruit in good faith steps, as required.
71e10      Displaced a U.S. worker within the period beginning 90 days before and ending
           90 days after the date of filing of any visa petition supported by the LCA, in the
           course of committing a willful failure and/or willful misrepresentation of a
           material fact on an LCA, as prohibited.
71e11      Required and/or accepted from an H-1B worker, payment or remittance of the
           additional $750.00, $1000.00, and/or $1,500.00 fee incurred in filing an H-1B
           petition.
71e12      Required or attempted to require an H-1B nonimmigrant to pay a penalty for
           ceasing employment prior to an agreed upon date.
71e13      Discriminated against an employee for protected conduct.
71e14      Failed to make available for public examination the LCA and necessary
           document(s) at the employer's principal place of business or worksite.
71e15      Failed to maintain documentation, as required.
71e16      Failed to cooperate in the investigation, as required.
71e17      Failed to comply with the provisions of subpart H or I.

**71f        REMEDIES**

71f00      General.
71f01      Civil money penalty.
71f02      Back wages.
71f03      Other remedy(ies).
71f04      Employer's satisfaction of penalties and remedies.
71f05      Debarment.
71f06      An employer's refusal to comply, pay back wages, and/or perform the
           remedy(ies).

**71g**        **REVIEW AND DISPOSITION**

          71g00        Review.
          71g01        Disposition.

**71h**        **WRITTEN NOTIFICATION OF INVESTIGATION FINDINGS**

          71h00        General.
          71h01        Service of determination letter and cover memo.

**71i**        **POST-DETERMINATION LETTER ISSUES**

          71i00        Request for hearing.
          71i01        Handling of investigation findings that became a final agency action.
          71i02        Unfulfilled performance of remedy(ies).
          71i03        Fulfilled performance of remedy(ies).
          71i04        Installment payments.

**71j**        **PROGRAM COORDINATION**

          71j00        Exchange of information between the WHD and the Department of Homeland
                       Security's USCIS.
          71j01        Debarment notification to the USCIS.
          71j02        Exchange of information between the ETA and WHD.

**71k**        **H-1B1 NONIMMIGRANT WORKERS**

          71k00        Background and enforcement responsibilities.

**71l**        **E-3 NONIMMIGRANT WORKERS**

          71l00        Background and enforcement responsibilities.

AILA Doc. No. 18011933.  (Posted 1/19/18)



AILA Doc. No. 18011933. (Posted 1/19/18)

**71a**          **INTRODUCTION**

**71a00**       **Background and statutory standards: division of responsibilities.**

(a)     The H-1B program allows an employer to hire a nonimmigrant in a specialty occupation or as a fashion model of distinguished merit and ability.  A "nonimmigrant" is an Immigration and Nationality Act (INA) term for an individual from another country who is authorized by the Department of Homeland Security's United States (U.S.) Citizenship and Immigration Services (USCIS) (formerly the Immigration and Nationality Service (INS)) to enter the U.S. for a limited period of time for specific purposes.  This is the opposite of an "immigrant," who is an individual authorized by the USCIS to remain permanently in the U.S.  The nonimmigrant in this program is the individual certified by USCIS as eligible for H-1B status or "TN" status (*see* 20 CFR 655.700(c)(2) for more information on "TN" status).

(b)     The H-1B process begins with the employer's filing of a Labor Condition Application (LCA) Form ETA 9035 (Form ETA 9035) and/or Form ETA 9035E (Form ETA 9035E) with the Employment and Training Administration (ETA) (*see* 20 CFR 655.700(b)(1) and FOH 71a00(b)).

(c)     The Wage and Hour Division (WHD) enforces all elements of the LCA, which include the material facts and labor condition statements.  The regulations for this program are in 20 CFR 655 subparts H and I (*see* 20 CFR 655.700(b) for other agencies' responsibilities under the H-1B program).

**71a01**       **Labor Condition Application (LCA).**

(a)     **Function and purpose of the LCA**

(1)     The LCA is the document that a prospective H-1B employer files to initiate employment of an H-1B worker (*see* 20 CFR 655.700(b)).  The LCA is *not* employee specific; it does not identify a particular foreign worker who is to be employed (*see* section 212(n)(1)(D) of the INA and 20 CFR 655.730(c)(2)).  The visa petition (USCIS Form I-129: Petition for Nonimmigrant Worker (Form I-129)/USCIS Form I-129: H-1B Data Collection and Filing Fee Exemption (Form I-129W), filed by the employer with the USCIS, is employee specific; it identifies the foreign workers and sets their qualifications for USCIS adjudication.

(2)     The LCA is the basis for the WHD's enforcement of the employer's H-1B obligations.  The employer's submission of, and signature on, the LCA make enforceable "promises," "statements," or "attestations."  *See* 20 CFR 655.730(d).  LCA obligations are in effect/enforceable for the entire validity period of the LCA, as follows:

a.     The validity period of the LCA *begins and ends* on the dates specified by the ETA official who certifies the LCA.  If the H-1B worker begins employment with a new H-1B employer prior to the ETA certification date (pursuant to the portability option (*see* FOH 71a00(b)), the beginning date of the LCA's validity period is the date on which the H-1B worker began employment.

b.     The LCA validity period *ends* on the date specified by the ETA official who certifies the LCA, *except that* the LCA remains in effect and enforceable for

AILA Doc. No. 18011933. (Posted 1/19/18)

as long as any H-1B worker is employed pursuant to it *or* until the conclusion of any WHD enforcement proceeding involving the LCA, including any hearings and appeals (whichever date is the latest) (*see* 20 CFR 655.750(a)).

    c.     For wage obligations during the LCA's validity period, *see* 20 CFR 655.731(c)(6) -(7).

**(b)**      **Types of LCAs**

Investigations may disclose several types of LCA forms depending upon the date on which the employer filed the LCA with the ETA (*see* 20 CFR 655.720 and http://www.lca.doleta.gov).

**(c)**      Regardless of which LCA form is used, the employer's submission of and signature on the LCA make promises, statements, or attestations that are enforced by the WHD.  For the three-page, four-page, or electronic LCA, these promises are fully spelled-out in the cover pages: Form ETA 9035CP (http://www.lca.doleta.gov).  In signing and submitting the LCA, the employer is stating that he or she has read these provisions and agrees to them.

**(d)**      **Procedures for employer's filing of the LCA**

The employer must file the LCA with an ETA processing center, which determines whether to certify it for the employment of H-1B workers.  The ETA regional certifying officers, located in all of the ETA regional offices, do *not* process LCAs (*see* 20 CFR 655.721).  There are two procedures for the employer to file an LCA: electronically at http://www.lca.doleta.gov or U.S. mail (*see* 20 CFR 655.720).  LCAs require that the employer seeking to employ an H-1B worker attest to:

    (1)     paying the H-1B nonimmigrant worker the required wage (*see* 20 CFR 655.731),

    (2)     establishing the working conditions requirement (*see* 20 CFR 655.732),

    (3)     establishing the no strike or lockout requirement (*see* 20 CFR 655.733), and

    (4)     establishing the notice requirement (*see* 20 CFR 655.734).

**(e)**      Additional obligations apply to H-1B dependent employers (*see* 20 CFR 655.736(a)), willful violators (*see* 20 CFR 655.736(f)), and employers (*see* 20 CFR 655.736(g).

**(f)**      **The WHD's access to LCAs certified by the ETA**

    (1)     Certified LCAs can be viewed at (b) (7)(E) █████████████ Enter the employer's employer identification number (EIN) or the employer name and the employer state.  This information is available to the public and provides access to information by searching, viewing, and printing information on any certified LCA; the system does not provide an actual LCA (just the information contained in the LCA).

(2)     ETA's LCA Online-ESA System provides the WHD access to information by searching, viewing, and printing certified LCAs.  Access is limited to WHD staff only.  The relevant LCA can be printed and used by the WHD.

(3)     The LCA Online ESA System is accessed at www.lca.doleta.gov/esa.  Press "Enter" and follow the instructions.  To obtain the "LCA Online-ESA User Guide," go to www.lca.doleta.gov/esa and click on the "Online Help" hyperlink at the top of the webpage.

(4)     The WHI should contact the national office (NO), Office of Policy (OP), Division of Enforcement Policy and Procedures (DEPP), Farm Labor/Immigration Branch, for any LCA not available.

**71a02    Coverage.**

(a)     An employer is covered under the H-1B program if it has an LCA certified by the ETA.  The WHD need not prove an employment relationship between the LCA-filing employer and the H-1B worker(s).  The LCA-filing employer is deemed to be the employer of the H-1B worker(s), and the employment relationship exists as a matter of law (*see* FOH 71d04(f)).

(b)     The employer identified on the LCA is the subject of the investigation.  The H-1B program does not include the Fair Labor Standards Act (FLSA) enterprise concept. (b) (7)(E)

(c)     Foreign workers might work for an employer before acquiring H-1B status (*e.g.*, employment under another nonimmigrant visa classification, such as F-1 (student), or illegally) and/or

after their H-1B status has expired (*e.g.,* working after acquiring other employment authorization, such as the permanent program's greencard, or illegally).  H-1B provisions apply to the worker only when the worker is in H-1B status (as authorized by USCIS on the USCIS Form I-797: Notice of Action (Form I-797)), and employed by the employer.  A worker employed under the H-1B portability provision may begin employment, and be subject to all H-1B provisions, while the Form I-129/Form I-129W is pending with the USCIS, but this pre-adjudication work time will not be reflected on the USCIS notice of action when it is issued (*see* 65 FR 80110 and 65 FR 80118).

(1)     A worker employed by the employer, even before and/or after H-1B status, is subject to the protections found under other programs enforced by the WHD.  For example, a foreign worker employed by the employer under the F-1 (student) or J-1 (summer work/travel) visa classification could be protected by the FLSA, Family and Medical Leave Act (FMLA), government contract acts (*i.e.*, Davis Bacon Act (DBA) or McNamara-O'Hara Service Contract Act (SCA)), or any other program enforced by the WHD, assuming the employer has the required program coverage.

**71b**          **COMPLAINT INTAKE PROCESS**

**71b00**        <u>**General.**</u>

    **(a)**          WHD enforcement will be initiated *only* through one of four processes:

        **(1)**          Aggrieved party complaints (*see* FOH 71b01, 8 USC 1182(n)(2)(A), and 20 CFR 655.806);

        **(2)**          Credible source investigations (*see* FOH 71b02, 8 USC 1182(n)(2)(G)(ii), and 20 CFR 655.807);

        **(3)**          Secretary of Labor (Secretary)-certified investigations (*see* FOH 71b02, 8 USC 1182(n)(2)(G)(i), and 20 CFR 655.807(h)); or

        **(4)**          Random investigations of willful violators (*see* FOH 71b03, 8 USC 1182(n)(2)(F), and 20 CFR 655.808).

        **(5)**          Complaints received from other than aggrieved parties should be considered as possible credible source investigations.  Information that fails to qualify for either investigation process should be considered for a Secretary-certified investigation.

    **(b)**          Until further notice, provide a copy of every non-actionable H-1B complaint to the NO, OP, DEPP, Farm Labor/Immigration Branch, to allow the NO to maintain data on *total* number of complaints received.

    **(c)**          All complaints must be in writing.  The H-1B complaint form (H-1B Nonimmigrant Information Form, WH-4) (*see* FOH 54: WH-4) may be used for this purpose.  This WH-4 form is found at http://www.dol.gov/dol/esa/public/forms/whd/WH-4.pdf.  If the complainant makes oral contact, the WHI who receives the oral communication will reduce the complaint to writing.  If the WH-4 is not used by the complainant (*i.e.*, the complainant submits a written complaint without using the form), the information requested on the form must be obtained by the WHI for the investigative file.

    **(d)**          Standard main office-district office (MODO) procedures specified in FOH 61 will be followed in H-1B cases.  Where an H-1B employer has operations in multiple worksites encompassing the jurisdiction of more than a single WHD district office (DO), but the H-1B employer's main office does not maintain the public access files, the DO with jurisdiction over the location of the H-1B employer's public access file is its MODO.

    **(e)**          Aggrieved party complaints may not be conciliated except for complaints alleging only a failure to pay a final paycheck (*see* FOH 71c01(a)(6)).  The WHD lacks authority to close an investigation and/or compliance action administratively without issuance of a determination as to whether violations occurred.  A determination letter must be issued on every actionable complaint received by the WHD (*see* 20 CFR 655.806(3)).

    **(f)**          **Notice to complainant**

        One of the following letters must be issued on each complaint:

        **(1)**          *Notice to the complainant that the complaint is not actionable*

AILA Doc. No. 18011933. (Posted 1/19/18)

If the complaint does not present reasonable cause for investigation, the complianant must be sent a no cause (to investigate) letter advising that no investigation will be scheduled.  An oral notice to the complianant is not sufficient for this purpose.  The complianant may submit a new complaint with additional information.

(2)    *Notice to the complainant that the complaint is actionable*

If the complaint presents reasonable cause for an investigation, the complianant may be sent a notification letter to complainant advising that the WHD will investigate.

**(g)    Determination letter concluding investigation**

The WHD is required by the INA to issue a formal determination in every investigation and/or compliance action, and must assess back wages owed workers and other remedies as appropriate (*see* 8 USC 1182(n)(2)(A) -(B), 8 USC 1182(n)(2)(D), FOH 71b07, and 20 CFR 655.815).

**71b01    Complaint from an aggrieved party (20 CFR 655.806).**

**(a)**    The INA authorizes the Department of Labor (DOL) to conduct an investigation on a complaint from an aggrieved person or organization, including bargaining representatives (*see* 20 CFR 655.715), filed within 12 months of the alleged violation.  To be an *aggrieved party,* the complianant must be a person or entity whose operations or interests are adversely affected by the employer's alleged non-compliance with the H-1B program (*see* 20 CFR 655.805).  The complianant may be anonymous, but the screening of complaints shall establish that they are aggrieved parties.  Aggrieved parties include, but are not limited to:

(1)    a worker whose job, or job prospects, wages and/or working conditions are adversely affected by the employer's alleged violation(s);

(2)    a bargaining representative for workers;

(3)    a government agency with programs impacted by the alleged violation(s), such as the Department of State; or

(4)    an employer's competitor adversely affected by the alleged violation(s).

**(b)    Screening of complaint**

Each complaint must be reviewed and/or screened to determine if reasonable cause exists to initiate an investigation, and include the following elements:

(1)    *Employer coverage*

The employer must have a certified LCA.  Coverage is assumed, if compliants indicate that they are H-1B workers employed by the employer or that the employer employs an H-1B worker, even if the complianant cannot provide a copy of the LCA.  The LCA must be reviewed if there is any question about whether or not an LCA has been certified, *see* FOH 71a01(f).  If there is no LCA on file, there is no coverage to authorize an investigation.  If an investigation is initiated, and later fact-finding determines that there is *no* LCA on file, the investigation should be discontinued and

the compliant and employer so notified.  A no coverage determination letter must be issued.  The compliant must be an aggrieved party.

(2)  *Allegation of violation(s) of the H-1B program*

An investigation will be initiated where there is reasonable cause to believe that an H-1B violation has been committed (*e.g.*, only on a complaint with allegations which, if true, would constitute violations of the program).  In screening a complaint, the WHI may contact the compliant to clarify allegations or obtain additional information.  Such contacts should not be so detailed or extensive as to constitute fact-finding, which would begin after the complaint is determined to present reasonable cause and an investigation is initiated.  The categories of violations are identified in the regulation at 20 CFR 655.805 (*see* FOH 71e01 -17).

(c)    **Deadline for screening a complaint**

The reasonable cause determination must be made within 10 days of the date the aggrieved party complaint is received by the WHD (*see* 20 CFR 655.806(a)(2)).  The complaint is accepted for filing if reasonable cause to believe a violation occurred is found.  The date of the *receipt* of the complaint, not the date of the completion of the *screening*, is the controlling date for determining the 12-month window for a timely and/or actionable complaint (*i.e.*, there must be allegation(s) of violation(s) within 12 months prior to date of receipt of complaint).  If no reasonable cause exists to initiate an investigation, the complaint shall be advised and allowed to submit a new complaint with additional information.  If the complainant alleges whistleblower violations, *see* FOH 71d05.

**71b02    Complaint from a credible source (8 USC 1182(n)(2)(G)(ii) and 20 CFR 655.807).**

(a)    Effective 03/08/2005, the H-1B Visa Reform Act of 2004 reinstates and expands the WHD's authority to conduct an investigation if it receives information from a known credible source likely to have knowledge of an employer's practices or labor conditions.  The credible source information must meet the requirements listed in FOH 71b02(c)(2).  The INA requires that an investigation based on credible information from a source other than an aggrieved party must be conducted under specific procedures, including a notice to the employer to allow a rebuttal of the allegations (*see* FOH 71c03(b) and FOH 71c03(d) below).  A case shall be set up in WHISARD as an investigation to capture time spent by WHIs on the responsibilities described below pertaining to complaint intake, screening, notice to employer, and opportunity for employer response.

(b)    **Receipt of complaint**

A complaint may be filed either orally or in writing (*see* FOH 71b00(c) and 20 CFR 655.807(a)).  The WHD office that receives the complaint shall forward the information to the NO, OP, DEPP, Farm Labor/Immigration Branch for review and processing, and shall obtain such additional information as the NO, OP, DEPP, Farm Labor/Immigration Branch may require, including interviewing the complainant if appropriate.

**(c)**      **Screening of complaint**

Upon receipt of the complaint (*i.e.*, the WH-4 and any supporting material), the NO, OP, DEPP, Farm Labor/Immigration Branch shall determine if the information constitutes a basis for taking action.  The criteria listed in 20 CFR 655.807 will be applied.

(1)      Examples of credible sources of information (non-aggrieved parties) include but are not limited to:

a.      An employer, who operates in the same building as an H-1B employer but who is in a different line of business and, therefore, is not a competitor, has been told by the employer's H-1B workers that they are not paid for travel expenses.

b.      A payroll service contractor for an H-1B employer who reports that he or she was ordered by the employer to illegally reduce wages paid to H-1B workers.

c.      A community activist (*e.g.*, immigrants' rights advocate) who reports that H-1B workers told him or her that they are not paid for all hours worked.

d.      A police officer who reports that two H-1B workers reported to him or her that they did not get their last paycheck.

(2)      *Types of violations*

The information from the source must provide a reasonable basis to believe that an employer has engaged in one of the following types of activity:

a.      *Willfully* failed to meet one or more of the following conditions listed in 20 CFR 655.731(wages paid or benefits offered); 20 CFR 655.732 (working conditions); 20 CFR 655.733 (strikes or lockouts); 20 CFR 655.738(c) (displacement of U.S. workers); 20 CFR 655.738(d) (displacement of U.S. workers by secondary employer); and 20 CFR 655.739 (recruitment of U.S. workers).

b.      Engaged in a *pattern or practice* of failures to meet a condition listed in FOH 71b02(c)(2)a.

c.      Committed a *substantial* failure to comply with a condition listed in FOH 71b02(c)(2)a., and the failure affected multiple employees (*see* 20 CFR 655.807(d) -(e)).

(3)      *Deadline for submission of information*

The violation(s) alleged by the source must have occurred within 12 months of the date that the DOL and/or WHD receives the information.

**(d)**      **Notice to employer**

Except as provided in FOH 71b02(d)(2), below, if the NO, OP, DEPP, Farm Labor/Immigration Branch determines that the non-aggrieved party is a credible source and

the complaint is actionable, the DD and/or ADD will notify the employer in writing that allegations have been received.

(1)   The notification shall include a description of the nature of the allegations in sufficient detail to enable the employer to respond, and shall request that the employer respond to the allegations within 10 days from the date of the notification although an additional period should be allowed if needed by the employer to respond before the commencement of an investigation.  The notification may identify the source, but ordinarily will *not* do so (*see* 20 CFR 655.807(f)(1)).

(2)   The notification to the employer may *be omitted when* such notification might interfere with an effort to secure the employer's compliance (as allowed by the statute).  The NO, OP, DEPP, Farm Labor/Immigration Branch's review of the complaint will include a determination on this matter, and the DD will be given instructions by NO, OP, DEPP, Farm Labor/Immigration Branch (*see* 20 CFR 655.807(f)(2)).

**(e)    Opportunity for employer response**

Except as provided in FOH 71b02(d)(2), the employer shall have an opportunity to respond to the allegations made by the complainant.  The response may be in writing, in an informal meeting, or both.  If the employer requests a meeting, the DD and/or ADD shall immediately contact the NO, OP, DEPP, Farm Labor/Immigration Branch for guidance concerning the participants and procedures for the meeting.  All documents submitted by the employer shall become part of the WHD file.  The DD and/or ADD shall forward the employer's response to the NO, OP, DEPP, Immigration/Farm Labor Branch, through appropriate channels, along with any recommendation or analysis that may be appropriate.

**(f)    Investigative procedures**

An investigation shall be conducted in the same manner as an investigation on an aggrieved party complaint.  Section 212(n) of the INA and 8 USC 1182(n)(2)(G)(viii) specify that the Secretary may certify a 60-day investigation.  It is the WHD's position that this time frame is directory and not jurisdictional.  It is important that the WHD make every effort to complete a credible source investigation within the time frame, but if the deadline cannot be met, the investigation will proceed to conclusion.  The H-1B Visa Reform Act of 2004 specifies that if violations are found, the WHD must provide the employer with a determination of the violation(s) found and the opportunity for a hearing to take place within 120 days of the determination of violation.

**71b03    Secretary-certified investigations (8 USC 1182(n)(2)(G)(i)).**

**(a)**    The H-1B Visa Reform Act of 2004 provides new authority, retroactive to 10/01/2003, to initiate an investigation of an employer if there is reasonable cause to believe that the employer is not in compliance with the LCA requirements.  The investigation must be conducted under specific procedures described below, and may only be initiated for reasons other than completeness and obvious inaccuracies by the employer in complying with H-1B requirements.  The Secretary (or Acting Secretary) must personally certify that reasonable cause exists and approve the investigation, and a notice must be provided to the employer to allow a rebuttal of the allegations (*see* FOH 71c03(d) below).  A case shall be set up in WHISARD as a conciliation to capture time spent by WHIs on the responsibilities described

below pertaining to complaint intake, screening, notice to employer, and opportunity for employer response; however, the case *must* be dropped and coded as a "Drop" in WHISARD if the Secretary does not authorize an investigation.  If authorized, the file will be changed in WHISARD from conciliation to investigation status.

**(b)**     Unlike the aggrieved party and credible source investigating process, there is no statutory 12-month limit on receipt of information after the occurrence of the alleged violation(s) for a Secretary-certified investigation.  Information alleging violations occurring more than 12 months previously will be considered during the NO review.

**(c)**     An investigation can be conducted under this authority only if the Secretary (or Acting Secretary) personally authorizes the investigation by certifying that the statutory requirements for such a proceeding have been met.  20 CFR 655.807(h) discusses the process to obtain the Secretary's certification.

    **(1)**     The NO shall determine whether the matter will be referred to the Secretary, based on all the information in the file, including any documents or information provided by the employer in response to the allegations.  No hearing or appeal is available from a determination declining to refer the matter to the Secretary.

    **(2)**     The Secretary shall determine whether a certification will be issued to authorize an investigation.  No hearing or appeal shall be available from a denial of certification.

**(d)**     **Notice to employer**

If the Secretary certifies that reasonable cause exists and approves commencement of the investigation, the DD and/or ADD will notify the employer in writing that allegations have been received, utilizing the guidance provided by 20 CFR 655.807(f) and NO, OP, DEPP, Farm Labor/Immigration Branch.

**(e)**     **Opportunity for employer response**

The same procedure will be followed in this circumstance as is described in FOH 71b02(d) above.

**(f)**     **Investigative procedures**

An investigation shall be conducted in the same manner as an investigation on an aggrieved party complaint, except that it shall be limited to the issues certified by the Secretary.  The Secretary may certify an investigation that may be conducted for a period of up to 60 days (*see* 8 USC 1182(n)(2)(G)(viii)).  It is the WHD's position that this time frame is directory and not jurisdictional.  It is important that the WHD make every effort to complete a certified investigation within the time frame, but if the deadline cannot be met, the investigation will proceed to conclusion.

**71b04     Random investigations of willful violators (20 CFR 655.808).**

**(a)**     The WHD may initiate random investigations of three categories of employers:

    **(1)**     Employers determined by the DOL to have willfully violated an LCA obligation

(2)    Employers determined by the DOL to have willfully misrepresented a material fact on the LCA

(3)    Employers determined by the DOL to have willfully failed to offer a job to an equally or better qualified U.S. applicant after recruitment (applicable only to H-1B-dependent or willful violator employers), or to have willfully misrepresented a material fact on the LCA with regard to such offer

**(b)**    Random investigation authority applies only to employers found by final agency action on or after 10/21/1998 to have engaged in such willful conduct.  Random investigations may be conducted within a period of up to 5 years after determination of the willful violation(s).

**(c)**    Random investigations may be initiated *only* with the NO, OP, DEPP, Farm Labor/Immigration Branch approval.  The investigation will follow the procedures for a complaint from an aggrieved party, except that the screening procedure will not be applied (*see* FOH 71c03(a) -(d)).

**71b05**    **Confidentiality of complainants and informants (20 CFR 655.800(d)).**

**(a)**    Confidentiality rules apply in H-1B as applied in other programs.  However, if the complainant or other confidential source requests an administrative hearing on the WHD determination letter, confidentiality is waived.

**(b)**    Complaints under the H-1B program should be handled like any other WHD program complaint.  However, if the employer asks, the employer may be advised that the investigation was initiated as a result of a complaint.  The employer may be advised of the identity of the complainant if the complainant is a government agency or if the complainant authorizes his or her identity to be revealed.  If the complainant is easily identifiable (*e.g.*, the complainant is the only H-1B worker employed by employer), permission to use the complainant's name should be obtained before initiating the investigation, or the complainant should be informed of the possibility his or her identity may be revealed during the investigation.  If the complainant refuses to permit use of his or her name, and such refusal precludes the WHD's ability to identify any violation(s), the investigation should be closed with a no violation finding.

**71b06**    **Deadline for filing an actionable complaint (20 CFR 655.806(a)(5) and 20 CFR 655.807(c)).**

**(a)**    Complaints must allege violation(s) which occurred within the 12-month window prior to the date of the receipt of the complaints.  Complaints received after this deadline cannot be investigated (*see* FOH 71b02(c)(3)).  Note: the crucial consideration is whether there are *allegations* of violation(s) within the 12-month period, not whether the investigation eventually reveals *actual* violations.  Thus, if the complaint presents reasonable allegations of such violations, an investigation shall be initiated and shall be completed in accordance with FOH 71c02, even where the investigation does not substantiate the alleged violation(s) in the 12-month period.  In the event that an alleged violation has not ended and is ongoing at the time that the complaint is filed and/or received, the last day that the alleged violation occurred, for purposes of screening the complaint, is considered to be the date that the complaint is filed and/or received.

**(b)**    Examples based on the following scenario: the DOL's receipt of the complaint is 11/29/1999, which establishes the 12-month window as 11/30/1998 to 11/29/1999.  The date the LCA was filed is 01/19/1998.

    (1)    *Wages*

        The H-1B programmer complainant alleges pay at the prevailing wage rate, which is lower than the actual wage paid to similarly employed programmers with equivalent education and experience, from 01/01/1998 to 11/15/1998.  The alleged violation is outside the 12-month window and is not actionable.

    (2)    *Posting the notice*

        The complainant alleges that the employer did not post the notice at the worksite when the LCA was filed.  Under the posting requirement, the last day the violation could have occurred was 01/29/1998 (*i.e.*, 10 days after the filing of the LCA).  The date of the alleged violation is outside the 12-month window and the complaint is not actionable.  The analysis would be different if the employer placed H-1B workers at worksites other than the initial worksites during the 12-month window, and has allegedly failed to post notices at such subsequent worksites at the time that the H-1B workers were placed there.

**71b07    Employer out of business or bankrupt.**

Investigations involving employers who go out of business during the course of the investigation must be completed, not dropped or closed administratively.  The INA (*see* 8 USC 1182(n)(2)(A) -(B)) requires that a determination letter be issued on every actionable complaint.  The investigation should be completed based on available evidence.  The determination letter should be prepared in accordance with the joint review committee (JRC) procedures, and mailed by certified mail and return receipt to the employer's last known address.  Where known, the employer's attorney and/or representative should be listed as a "cc" on the determination letter and provided a copy.

AILA Doc. No. 18011933.  (Posted 1/19/18)

**71c**       **INVESTIGATION PROCEDURES**

**71c00**     <u>**Investigation overview and objectives.**</u>

   **(a)**   As every determination is subject to appeal, every investigation shall be prepared to litigation standards.

   **(b)**   The basis for any finding of a violation must be fully documented and must be *included in the investigation file*. For example, if there is a finding that an employer failed to have an appropriate public access file (*see* FOH 71c04), then a full copy of the documentation that *was* disclosed in the employer's public access file should be included in the investigation file. If the size of the file means this is impracticable, the WHI should identify the documents in the file.

   **(c)**   **Time limit on investigation**

        (1)   The statute provides 30 calendar days to conduct an aggrieved party investigation and issue a determination letter (the letter advising the employer of the results of the investigation) (*see* FOH 71h00). The 30 days begin on the day of a finding that there is reasonable cause to conduct an investigation (*i.e.*, the "Date Registered" for WHISARD purposes). The WHD must also provide the employer with notice and the opportunity for a hearing within 60 days of the determination of the violation.

        (2)   The INA specifies that Secretary-certified and credible source investigations may be conducted for up to 60 days. The 60-day period begins on the day that a finding is made that there is reasonable cause to conduct an investigation (*i.e.*, the "Date Registered" for WHISARD purposes). In addition, the WHD must provide the employer with notice and the opportunity for a hearing within 120 days of the determination of the violation. Any H-1B investigation must be registered in WHISARD as either full investigation or limited investigation (*see* FOH 71c01(a)(2)).

        (3)   The 30- and 60-day time limits do not alter the need to conduct a complete, thorough investigation which meets litigation standards. The DOL takes the position that the time limits are not jurisdictional and that the WHD does not lose its investigative authority if the time limits are exceeded.

        (4)   The 30-day investigation, and 60-day investigations for Secretary-certified and credible source investigations, are suspended when a request is made by the WHD to the ETA to provide needed prevailing wage information. The suspension period begins on the date the written request is made to the ETA and ends on the date the ETA responds to the request. In the event the employer files an appeal to the ETA response, the suspension period extends to the date of final adjudication in the ETA administrative review process. Fact-finding for the investigation may continue during the period when the prevailing wage request and/or appeal is pending with the ETA (*see* FOH 71d06(d)).

        (5)   WHISARD provides automatic notification to the responsible manager when an H-1B investigation reaches the 20th calendar day from the WHISARD "Date Registered," 30th day, and every 120th day thereafter until the investigation is "Concluded" or placed in "Inactive Follow-up" in WHISARD.

**71c01     Scope of investigation.**

(a)     **Matters to be investigated**

Each investigation shall review violation issue(s) alleged in the complaint as well as the following matters, even if not included in the complaint allegation(s) giving rise to the determination of reasonable cause:

(1)     Wage and benefit provisions for all H-1B workers (*see* FOH 71d10 -11) except in last paycheck violations (*see* FOH 71c01(a)(6) below) unless the DD determines that review of *all* H-1B workers would not achieve the WHD goal of securing maximum compliance while ensuring effective use of investigation resources.  A determination to limit an investigation, which is only to be done on an initial investigation, and is to be coded as a "limited investigation" in WHISARD *and* indicated in the determination letter (*see* FOH 71c01(e) below), should be made based on the severity of any violation; the potential benefit to be derived from reviewing all H-1B workers; the availability of pertinent evidence; and the resources needed to investigate and document any violation.

(2)     The public access file (*see* FOH 71c04)

(3)     Verification of the employer's dependency status if the employer filed any LCA or H-1B petition or request for an extension of status after 01/19/2001 but before 09/30/2003, or after 03/08/2005 (*see* FOH 71c07)

(4)     If the employer is H-1B-dependent or a willful violator, the employer's compliance with recruitment, secondary employer inquiry, and non-displacement provisions (*see* FOH 71d03 -04)

(b)     Where the complaint alleges *only* a last paycheck violation (*i.e.,* no other allegations of non-compliance), the compliance action may be limited to that violation and the case coded as a "Limited Investigation" in WHISARD.  A more general investigation should be undertaken if the employer's conduct is willful.  In either case, a determination letter must be issued, citing the violation and assessing appropriate remedy(ies) (*e.g.*, back wages, civil money penalties (CMPs) if willful).

(c)     If the WHI discovers facts that give reason to believe that violations other than those identified in FOH 71c01(a) above may have occurred during the initial 12-month investigation period, the scope of the investigation may be expanded to include those additional potential violations, applying the judgment described in FOH 52a00.  The WHD's goal is to secure maximum compliance while at the same time ensuring effective use of investigation resources.  The judgment as to the scope of the investigation should take into account the severity of the possible violation and the potential benefit to be derived from pursuing it, along with the availability of evidence bearing on the issue and the resources needed to investigate and document the violation(s).  The determination of the expansion of the investigation to include other areas of potential violation shall be made through coordination and/or consultation between the WHI, DD and/or ADD, and the RSOL.

(d)     Examples of determining the scope of the investigation (in these examples, there was determined to be reasonable cause to initiate the investigation):

(1)     Upon initiating fact-finding, the WHI determines no violation with regard to the
        public access file and verifies the employer accurately stated its status as non-H-1B-
        dependent on LCAs.  However, the WHI determines that the complainant was
        underpaid as was alleged in the complaint, and that other H-1B workers were also
        underpaid in the initial 12-month investigation period.  In this case, the WHI should
        determine back wages concerning all H-1B workers, not just the complainant.

(2)     Upon initiating fact-finding based on a complaint alleging failure to post the required
        notice at the worksite, the WHI determines no violations occurred with regard to the
        matter complained about and also determines no violations occurred involving wages
        or public access file.  Further, the WHI verifies the employer accurately stated its
        non-H-1B-dependent status on LCAs.  However, the WHI has reason to believe that
        there was a strike or lockout violation.  The scope of the investigation would be
        expanded to include this serious H-1B violation.

(3)     Upon initiating the fact-finding, the WHI determines that the complainant was *not*
        underpaid as alleged and there appear to be no other H-1B violations.  However,
        there are apparent violations under another WHD program (*e.g.*, FLSA, SCA).  The
        WHI should make arrangements to promptly finalize the H-1B investigation
        following procedures specified in this FOH chapter.  This will require a final JRC to
        review the investigation findings, a final conference with the employer dealing with
        the results of the H-1B investigation, and a determination letter to the employer with
        a copy to the complainant and other interested parties.  If a determination is made to
        pursue the apparent violations under another WHD program (*e.g.,* FLSA, SCA), care
        must be taken to ensure that the employer understands the separate and distinct nature
        of the issues and the WHD's separate and distinct authority to investigate them.  It is
        not necessary to hold up on the investigation of the other program violations while
        the H-1B case is being closed.  As a matter of policy, the WHD will *not* rely upon
        authority under a different program to conduct H-1B investigations (*i.e.*, the WHD
        will *not* rely upon its investigation and/or subpoena authority under the FLSA in
        order to investigate facts which may lead to possible H-1B violations).  However,
        apparent H-1B violations revealed in the course of a lawful investigation under a
        different program may be pursued only if personally authorized by the Secretary (*see*
        FOH 71b03).

**(e)     Violations occurring while the investigation is in progress**

Ordinarily, the period during which the investigation is in progress should be short, because
of the statutory deadline of 30 days for completion.  However, absent unusual circumstances,
the investigation should be updated for any case that has been pending for 1 year or less at the
time of the final conference.  In cases where the investigation is not completed for a longer
period of time, consideration should be given in the JRC process whether to update the
investigation to include violations that have occurred while the investigation is underway.
Updating the investigation will also be considered in those cases where a subsequent
actionable H-1B complaint is received against the same employer before the ongoing
investigation is completed.  Where the investigation is not updated, the determination letter
should identify the last date covered by the investigation and make it clear that the employer
is liable for any violations that occur after that date.

AILA Doc. No. 18011933. (Posted 1/19/18)

**71c02**     <u>**Investigation period.**</u>

The period covered in every investigation initiated as a result of an aggrieved party complaint
will be limited, at the outset of the investigation, to the same 12-month period that constitutes
the window used for determining reasonable cause.  The investigation may be expanded to
include periods before or after (*see* FOH 71c01(e) above) this initial 12-month period only in
accordance with the following instructions:

**(a)**     **Period investigated**

H-1B investigations shall always cover the 12-month period ending on the day the WHD
received the complaint.  The WHI should also review payroll records for the preceding 2
years (*see* FOH 71c03(a)(2)(B)).  The only exception will be any last pay check investigation
(*see* FOH 71c01(a)(6)) or other limitations as provided in FOH 71c01(a)(2)).

**(b)**     A timely, actionable complaint provides the WHD the authority to investigate any
compliance issues.  If during the course of the investigation, the WHD learned that there was
no violation for the complainant during the 12-month window, the investigation would not be
terminated.  Since there was reasonable cause to initiate the investigation, the investigation
should be completed and all violations should be cited, even if the complainant receives no
remedy such as back wages.

**(c)**     **Violations outside the 12-month window**

As a general rule, the investigation only examines the 12-month window prior to receipt of
the complaint, to determine compliance.  However, an incident of a particular matter that
occurred *only* before or after the 12-month window (*i.e.,* is not part of a continuing violation
within the 12-month window), can also be cited.

**(d)**     **Wage and benefit violations occurring during and prior to the 12-month investigation
period**

If during the 12-month window the employer failed to correctly pay a certain H-1B worker,
the investigation will be extended backwards on that individual until a calendar period is
reached where the individual was no longer incorrectly paid.  While collecting wage
information regarding such incorrectly paid individuals, the investigation may uncover other
H-1B workers who were underpaid prior to the 12-month window but never during the 12-
month window; these under payments may be pursued.  *See* FOH 71c02(e) below.

**(e)**     **Violations other than wage violations occurring during and prior to the 12-month
investigation period**

Violations other than wage violations found to have occurred within the initial 12-month
investigation period may be pursued backwards beyond the window to include the entire
period in which the violation occurred and for which reliable evidence is available.  The
decision whether or not to pursue such other particular violations backwards shall be made in
consultation with the RSOL, giving consideration to the compliance benefits to be derived
from the backward extension balanced against the resource expenditures involved.  Extending
an investigation backwards should be considered where there is a need for information that
would aid in determining the substantial (*see* FOH 71e00(c)) or willful (*see* FOH 71e00(d))
nature of the employer's actions, if reliable evidence of the violation is available prior to the

12-month period.  The imposition of larger CMP amounts, the establishment of additional debarment offenses or the identification of technical violations and/or inadvertent omissions or errors are *not* valid reasons to extend the investigation backwards.

**(f)      Statute of limitations**

No statute of limitations, *per se*, applies to H-1B violations except for the effective date of the H-1B legislation (*i.e.*, 10/01/1991) and the date on which the LCA applicable to the H-B worker(s), through the visa petition and/or request for extension of status, was filed and/or certified by the ETA.  However, when violations, whether wage or otherwise, appear to have extended backwards to a point in time *prior to 2 years* before the date of the complaint's filing, any decision to extend the investigation for a period longer than 2 years must include consultation with the RSOL to consider the availability of reliable evidence.  *See* FOH 71g00 (Review and disposition).

**71c03      Initial contact with employer; investigative techniques.**

**(a)**      Investigation based on aggrieved party complaint:

(1)      As with most other programs coming under WHD enforcement, there is no statutory or regulatory requirement detailing the method of first contact with the H-1B employer when the WHD has determined a complaint provides reasonable cause for investigation.  Whether initial contact is by phone, by letter, or by unannounced visit, it is always advisable to present an appointment letter to the employer detailing the documentation to be made available for inspection.  *See* FOH 86a02 for additional guidance regarding initiating an investigation.

(2)      At a minimum, access to the following *documents* should be requested:

a.      The employer's public access file (*see* FOH 71c04); the WHI should request any missing materials including documentation of notice requirements (*see* FOH 71c06)

b.      Payroll records for employees in the affected categories for last 2 years

c.      Complete petition package for every H-1B worker employed by the employer in the last 2 years, including the Form I-129/Form I-129W and the Form I-797 (*see* FOH 71c05)

d.      If an employer's dependency status is a part of the investigation:

1.      Computations of the employer's H-1B dependency, including computations of the snap-shot test or the full computation (*see* FOH 71c07)

2.      Records relating to displacement and recruitment of U.S. workers, including documentation of the non-displacement inquiry the employer has made of any secondary employer worksites at which the H-1B workers were placed (*see* FOH 71c08(c))

(3)    (b) (7)(E)



**(b)    Investigation based on credible source and Secretary-certified complaints**

The initial contact with the employer will, in many cases, consist of the notification of the allegations, followed by the opportunity for a response by the employer (*see* FOH 71b02(c)). If the investigation is a credible source investigation, the WHI's contact with the employer shall follow the procedures for investigation on aggrieved party complaints. Secretary-certified investigations (*see* FOH 71b02(e)) shall follow the procedures for investigations on aggrieved party complaints as modified by the Secretary's certification.

**(c)    Random investigations of willful violators**

Follow procedures for aggrieved party investigations outlined above.

**(d)    (b) (7)(E)**



(2)    As questions arise, the WHI should ordinarily ask the employer directly before searching for an answer elsewhere. The employer may be able to explain the matter and establish compliance. Employer admissions on factual matters are valuable evidence and should be immediately documented by the WHI through memoranda to the file and inclusion in the narrative. In some cases, employer admissions may be the only evidence available and may be sufficient to establish the violation(s). For

example, the employer admits never posting LCA notices, or the H-1B-dependent or willful violator employer admits that it never made a secondary employer inquiry when required under the INA (*see* FOH 71d04(g)).

(3)   

(4)   Obtain e-mail addresses for H-1B workers in the same way that home addresses and phone numbers are regularly obtained for workers.  H-1B workers often keep the same e-mail addresses for long periods, even if they change employers, or move to other cities in the U.S., or return to their home countries.  Having the H-1B workers' e-mail addresses can enable the WHI to contact and interview the H-1B workers when needed during an investigation or in preparation for a hearing.

**71c04      Public access file (20 CFR 655.760).**

   **(a)      Location of the public access file**

   The employer is obligated, within 1 day of filing the LCA, to maintain documents described in 20 CFR 655.760(a) for public examination at the employer's principal place of business in the U.S. or at the place of employment.  The public access file shall be made available to members of the public, including employees, who request it.  There are no regulatory standards for the appearance of the public access file.  The file may be maintained in hard copy format or in electronic format.  If the file is electronic, then the employer must provide effective access.

**71c05      Documents authorizing employment.**

   **(a)**   The WHI will review several types of employment documents as part of the investigation, including the LCAs, prevailing wage documents, and the USCIS petitions.  The documents can be obtained, for investigation purposes, from a variety of sources: the employer, an H-1B worker, the complainant, ETA, state employment service and/or state workforce agency, or USCIS.  The file must identify the source of each employment document in order to adequately address Freedom of Information Act (FOIA) requests.  An exhibit chart should be prepared and included as an attachment to the case narrative, listing the sources of all of these documents in the case file.

   **(b)**   *Labor Condition Application*

   While the LCA does not, by itself, authorize employment, it contains the employer's H-1B obligations and is, therefore, the basis for WHD enforcement.  The LCA must be obtained during the course of the investigation (*see* FOH 71a02).

(1)     The employer is required to maintain all LCAs it has filed with the ETA and to provide certified LCAs to the WHD upon request.  A failure to maintain this documentation after employing H-1B workers should be cited as a violation.

(2)     If no certified LCAs are provided by the employer or found by an ETA search (*see* FOH 71a02(g), the WHI may obtain the LCA and related forms from the appropriate USCIS service center (*see* FOH 71j00(b)).

(3)     The WHI may be able to obtain copies of the LCAs from the H-1B workers.  The regulations require that the employer provide H-1B workers a copy of the LCA under which they are employed.

(c)     **U.S. Citizenship and Immigration Services forms: Form I-129/Form I-129W, Form I-797, and Form I-94**

(1)     *Form I-129/I-129W: Visa Petition*

a.     The Form I-129 (accompanied by the Form I-129W) is the employer's petition for a visa for a particular foreign worker.  The Form I-129/Form I-129W provide information specific to individual workers, such as their experience and education, job title, job description, intended place(s) of employment, and the wages to be paid.  The LCA is the primary supporting document to the Form I-129/Form I-129W package.  The Form I-129/Form I-129W should be obtained from the employer to identify each H-1B worker the employer has employed under the program.  Both sides are to be copied and placed into the investigation file as C exhibits with document source noted on exhibit chart.  The WHI can contact the USCIS service center to obtain copies of the Form I-129/Form I-129W, if the employer fails to provide it.

(2)     *Form I-797*

Form I-797 is a notice of action issued by the USCIS to the employer informing the employer of either the approval or denial of the USCIS Form I-129/Form I-129W petition.  Form I-797 specifies the period of time that the H-1B classification is to be valid for a specific H-1B worker working for a specific employer.  Upon employer's receipt of  Form I-797, the visa application process for entry into the U.S. can proceed.  A prospective H-1B worker already in the U.S. obtains an updated Form I-94 from USCIS.  *See* FOH 71c05(c)(3) below.

a.     Form I-797 contains the eligible to work date for determining the *employer's wage obligations* for H-1B workers already residing in the U.S.  H-1B workers are entitled to wages beginning on the first day after the eligible to work date that the employee makes himself or herself available for work, but no later than 60 days after the eligible to work date or the date of adjustment of the worker's H-1B status, whichever is later.  *See* FOH 71d07(b) and 20 CFR 655.731(c)(6).

b.     An H-1B worker may begin working for a new H-1B employer on the date of the filing of the new employer's non-frivolous Form I-129/Form I-129W, pursuant to the portability option, which allows the H-1B worker to move to

a new employer without waiting for the USCIS to complete the adjudication of Form I-129/Form I-129W.  An H-1B worker who ports to a new employer under this option would be eligible to work even without a Form I-797.

c.       It is possible for the USCIS to approve two Form I-129/Form I-129Ws from two different employers for one H-1B worker, thus allowing the H-1B worker to be legally employed part- time, at the same time, by two different H-1B employers.  Each employer would have its own, separate obligations under the program; the FLSA concept of joint employment is not applicable.

(3)      *Form I-94*

Form I-94 is the arrival and/or departure record.  This form is issued by the USCIS to the H-1B worker, and is stamped by U.S. officials at the U.S. border to show the H-1B worker's arrival and/or departure dates.  This form is also updated by the USCIS as a work authorization document, if the H-1B worker is already in the U.S. when the Form I-129/Form I-129W is approved.

a.       The Form I-94's date stamp by U.S. border officials shows the date of entry by the potential H-1B worker into the U.S.  The employer's wage obligation to such an H-1B worker begins when the H-1B worker enters into employment with the employer, but no later than 30 days after the date-of-entry on Form I-94 (*see* FOH 71d07 and 20 CFR 655.731(c)(6)).

(4)      Copies of the above-described documents and any other USCIS documents reviewed during the investigation, which have a material impact on the conclusions of the investigation, shall be placed in the investigation file as C exhibits with an appropriate listing on the exhibit chart.

**71c06      Posting of notice, via hand copy or electronically.**

The employer is required to document compliance with notification requirements and to provide such documentation to the public (*see* FOH 71c04) and to the DOL upon request (*see* 20 CFR 655.734(b) and FOH 71d14).

**71c07      H-1B-dependent and willful violator employers (20 CFR 655.736(d)).**

Special attestations apply to H-1B-dependent and willful violator employers using LCAs filed from 01/20/2001 through 09/30/2003 and after 03/08/2005.

(a)      An employer is considered H-1B dependent if her or she has:

(1)      25 or fewer full-time equivalent employees *and* at least 8 H-1B nonimmigrants; or

(2)      26 - 50 full-time equivalent employees *and* at least 13 H-1B nonimmigrants; or

(3)      51 or more full-time equivalent employees and 15 percent or more are H-1B nonimmigrants (*see* INA 212(n)(3)(A) and 20 CFR 655.736(a)).

(b)      An employer found to have committed either a willful failure or a misrepresentation of a material fact by either the DOL (INA 212(n)(2)) or the Department of Justice (DOJ) (INA

212(n)(5)) is considered a willful violator.  A list of willful violators is found in Fact Sheet No. 59 S.

**(c)**    **Background**

  (1)    Per 20 CFR 655.736(c), every employer that files an LCA or seeks access to H-1B worker(s) by filing any Form I-129/Form I-129W petition or application for extension of status during these periods must take steps to determine whether it is an H-1B-dependent employer and must declare its status on the LCA and the Form I-129/Form I-129W.  The employer must choose one of three statements listed on the LCA (*see* 20 CFR 655.736(e)).

  (2)    LCAs remain in effect for their validity period, as entered on the LCA by an ETA certifying official, with regard to the employer's obligations under these LCAs.  An employer may continue to use a still-valid one-page or two-page LCA to support Form I-129/Form I-129W petitions and requests for extension of H-1B status, *provided that* the employer is, in fact, non-dependent.

**(d)**    Every H-1B-dependent or willful violator employer is subject to additional attestation obligations on the LCA (*see* 20 CFR 655.736(g)) that include the non-displacement of U.S. workers, the recruitment of U.S. workers, and the offer of employment to equally or better qualified U.S. applicants (this last obligation is enforced by the DOJ, rather than by the WHD).

**(e)**    **Change in corporate structure or identity**

An employer that experiences a change in corporate structure or a change in identity must re-determine its dependency status if it wishes to file a new LCA, a new H-1B petition, or a request for an extension of H-1B status for a worker.  Required documentation is described in the public access materials (*see* 20 CFR 655.736(d)(6) and 20 CFR 655.730(e)).

**(f)**    **Single employer**

An employer may determine its dependency status as a single employer under the IRC test (*see* 20 CFR 655.736(b)) and conclude that it is not H-1B-dependent.  *See* 20 CFR 655.736(d)(7).  Such an employer is instructed by the regulations to perform the snap-shot test (and/or full calculation if appropriate).  *See* 20 CFR 655.736(c)(2).  However, as an enforcement policy, the WHD will not assess CMPs for such an employer's failure to perform a snap-shot test or a full calculation if all of the corporate entities that make up the single employer have readily apparent non-dependent status.  In all cases, the employer must maintain records, which should show the number of employees from each entity included in the single employer for purposes of the determination.  In addition, the employer's public access file must contain a list of all entities included as a single employer (*see* 20 CFR 655.736(d)(7)).

**(g)**    An H-1B-dependent or willful violator employer using an LCA to employ only exempt H-1B workers (*see* 20 CFR 655.737 and FOH 71d02) is not subject to the additional non-displacement and recruitment attestation obligations on the LCA.  However, that employer is required to maintain a list of all exempt H-1B workers in the public access file (*see* 20 CFR 655.760(a)(9)).

**(h)**    **Investigative verification of dependency status**

The employer's H-1B dependency status shall be verified in every investigation where the employer has filed an LCA or sought access to H-1B worker(s), by filing a petition or application for extension of status, from 01/19/2001 through 09/30/2003 or after 03/08/2005.





**71c08**   **Portability (20 CFR 655.705(c)(4)).**

Under the October 2000 amendments, an H-1B worker may begin working for a new employer at the time a non-frivolous H-1B petition has been filed by the new employer with the USCIS, without waiting for USCIS' adjudication of that new petition.  This so-called portability option for the movement of an H-1B worker from one employer to another does

not change the worker protections enforced by the WHD under the H-1B program.  *See* 65
FR 80110 and 65 FR 80118 (12/20/2000).



**AILA Doc. No. 18011933.  (Posted 1/19/18)**



AILA Doc. No. 18011933. (Posted 1/19/18)

**71d**       **ENFORCEMENT ISSUES**

**71d01**     <u>Required wage documentation.</u>

**(a)**       The employer is required to maintain all of the documentation it has used to determine both the prevailing wage and the actual wage rates (*see* 20 CFR 655.731(b)(2) -(3) and FOH 71d09).

**(b)**       **Actual wage**

*See* FOH 71d09(c).  The employer must document the basis used to establish the actual wage, including how the H-1B worker's wage rate relates to all other workers with substantially the same duties and responsibilities and similar qualifications and experience, and explaining any adjustments in wage rates in the pay system (*see* 20 CFR 655.731(b)(2)).

**(c)**       **Prevailing wage**

*See* FOH 71d09(e).  The employer must document the source utilized to establish the prevailing wage for the occupation and geographical area for which LCA was filed (*see* 20 CFR 655.731(b)(3)).  If the employer obtained the prevailing from the state employer service and/or state workforce agency, and the job description was accurate, then the WHD will not question the validity of the wage rate (*i.e.*, the employer has safe harbor on the issue of the validity of the wage rate).  Regardless of the source (*e.g.*, state employer service and/or state workforce agency, collective bargaining agreement (CBA), prevailing wage survey from an independent authoritative source), the employer must be able to provide a copy of the document upon request to the WHI.

**(d)**       Since the required wage rate to be paid to an H-1B worker is the higher of either the actual wage or the prevailing wage, the documentation provided by the employer helps to establish the required wage rate.  A failure to obtain, maintain, and/or provide the above documentation may be cited as a violation (*see* FOH 71e14 -15 or FOH 71e17).  In the investigation, the prevailing wage must be determined in order to determine if the employer committed a wage violation.  If the employer is unable to provide a valid source, WHI will obtain the prevailing wage from the ETA (*see* FOH 71d06)).

**71d02**     <u>Exempt H-1B worker (20 CFR 655.737).</u>

**(a)**       An H-1B-dependent or willful violator employer is subject to the additional LCA requirements concerning non-displacement and recruitment of U.S. workers *unless* the LCA is designated and used only for the employment of exempt H-1B workers.

**(b)**       "Exempt H-1B nonimmigrant worker" is a statutory term which is applied *only* in the context of determining which H-1B employers are subject to the *additional* obligations for recruitment and non-displacement of U.S. workers.  This does not relieve an employer from any other H-1B requirements.

(1)       An exempt H-1B worker is not, individually, outside of the H-1B program's protections for H-1B workers; the worker is fully entitled to all the protections of the H-1B program.  The term "exempt worker" in the H-1B program does *not* have the same meaning as under the FLSA.  Thus, an exempt H-1B worker is not exempt from

H-1B protections, in the way that a worker may be exempt from minimum wage and/or overtime protections under the various FLSA statutory exemptions.

(2)     The H-1B-dependent or willful violator employer may be relieved from additional obligations with regard to particular LCA(s), due to the employment of only exempt H-1B worker(s) on the LCA(s).

**(c)**     An exempt H-1B worker is either highly-paid or highly-educated, under the following criteria:

(1)     *Wages*

The H-1B worker receives wages, including bonuses and similar compensation, at an annual rate equal to at least $60,000.00 (*see* 20 CFR 655.737(c)).  The H-1B worker must actually receive the exempt wage.  An H-1B worker's wages are not to be pro-rated for unpaid bench time (*i.e.*, H-1B worker cannot be exempt if unpaid bench time takes his or her wages below $60,000.00, even if such unpaid status would be acceptable under the regulation concerning benching (*see* 20 CFR 655.731(c)(7) and FOH 71d07).  If an investigation determines that an H-1B worker has not yet worked a year, the WHI would determine whether the H-1B worker had been paid an average of $5,000.00 per month, including any guaranteed bonuses or similar compensation received.  Additionally, as discussed in FOH 71d10, the $60,000.00 must be reported to the Internal Revenue Service (IRS) as earnings (*i.e.*, wages, tips, other compensation).  For example, if the employer pays monthly, in any month where the employer reports less than $5,000.00 (monthly equivalent) to the IRS as earnings, the salary test has not been met.

(2)     *Education*

The H-1B worker has attained a masters or higher degree, or its equivalent, in a specialty related to the intended employment.  *See* 20 CFR 655.737(d).

**(d)**     **USCIS determination of exempt status**

Prior to approving any Form I-129/Form I-129W, the USCIS will examine. among other things, the exempt status of any nonimmigrant whose petition is supported by an LCA that designates it will be used exclusively for exempt H-1B workers (*see* 20 CFR 655.737(e)(1)).  The USCIS will first review the LCA for the guaranteed $60,000.00 salary.  If the salary is not present, the USCIS will then review the LCA for education requirements.  If the USCIS determines that the H-1B worker is not exempt, the USCIS will not grant the petition.

**(e)**     **The WHD determination of exempt status based on education**

(1)     If the USCIS determines that an H-1B worker is exempt based on wages and the WHI finds that the H-1B worker is not in fact paid the required amount, the WHI shall examine the Form I-129/Form I-129W package to determine whether the employer designated education as the basis for exempt status.  Where such a designation of education was made, the WHI shall determine whether the H-1B worker is exempt on this basis (*see* 20 CFR 655.737(d)).

(2)      If the USCIS, for any reason, has not made a determination of exempt status, and the WHI finds that the H-1B worker is not exempt based on wages, the WHI shall determine whether the H-1B worker is exempt based on education *if* the Form I-129/Form I-129W contains a designation of education as a basis for exempt status (*see* 20 CFR 655.737(d)).

**(f)**      If the WHD investigation finds that the H-1B worker was not, in fact, exempt, then the employer would be subject to the non-displacement and recruitment requirements. Unless the employer's error in filling out the LCA was an inadvertent error, a violation should be cited. The violation can be cited as a misrepresentation (*see* 20 CFR 655.805(a)(1)) or a simple failure to comply with the regulations (*see* 20 CFR 655.805(a)(16)). Additionally, the WHI should explore the employer's compliance with the additional elements of recruitment, displacement inquiry, and displacement. If it is determined that there were U.S. workers illegally displaced, this violation must be cited, after consultation with RSOL via the DD and/or ADD and the NO, OP, DEPP, Farm Labor/Immigration Branch.

**71d03**      **Recruitment and selection of U.S. workers (20 CFR 655.739).**

Requirements for special attestations (*e.g.,* recruitment attestation) applicable to H-1B-dependent and willful violator employers contained in LCAs (ETA Form 9035 and/or ETA Form 9035E) filed on or after 10/01/2003 were reinstated on 03/08/2005, under the H-1B Visa Reform Act of 2004. However, the special attestations contained in any dependent or willful violator LCA will remain in place for the life of that LCA and will apply to any existing or future H-1B worker placement through the LCA.

**(a)**      All H-1B-dependent and willful violator employers are subject to the recruitment of U.S. workers attestation obligation, *unless* the LCA is designated and used *only* for the employment of exempt H-1B workers (*see* FOH 71d02), *or unless* the LCA is used only for H-1B workers described in section 203(b)(1) of the INA (*i.e.,* aliens with extraordinary ability, aliens who are outstanding professors or researchers, or aliens who are employed by multinational firms to provide executive or managerial services). If an employer claims that the employer does not have to recruit because the H-1B workers fit one of those descriptions in section 203(b)(1) of the INA, the WHI should contact the NO, OP, DEPP, Farm Labor/Immigration Branch, which will consult with the USCIS.

**(b)**      An employer subject to the recruitment requirement must take good faith steps to recruit U.S. workers prior to filing an LCA, filing a petition to hire an H-1B worker, or requesting an extension of an H-1B worker's nonimmigrant status.

**(c)**      *Recruitment* is a process to attract the attention of individual(s) who may apply for employment, including but not limited to, soliciting applications from individual(s) for employment, receiving and/or reviewing applications, and considering applications so as to present the appropriate candidate(s) to the official(s) making the hiring decision(s). *See* FOH 71e09. As described in 20 CFR 655.739(d), this process can be internal or external to the employer's workforce, and active or passive. *See* FOH 71d03(d) below. The recruitment must use procedures that meet *industry-wide standards* (*see* 20 CFR 655.739(e) and FOH 71d03(e)) and it must offer compensation that is equal to at least the required wage (*see* 20 CFR 655.731(a)). The employer may use *legitimate selection criteria relevant to the job that are normal or customary to the type of job involved* (*see* FOH 71d03(g)), as long as the criteria are not applied in a discriminatory manner.

(d)     The employer may use a variety of solicitation methods to recruit U.S. workers.  The focus of
        the solicitation may be internal (*i.e.*, recruiting from within the company) and/or external (*i.e.*,
        seeking employees from outside the company).  The solicitation techniques may be active
        (*i.e.*, seeking out candidates) and/or passive (*i.e.*, waiting for candidates to respond to notices)
        (*see* 20 CFR 655.739(d)(2) and FOH 71d03(f)).

        (1)     Active solicitation involves direct communication with potential applicants, both
                inside and outside the organization.  Examples would include providing training to
                current employees, making contacts with trade and/or professional associations or
                labor unions, participating in job fairs, and using placement services at higher
                learning institutions.

        (2)     Passive solicitation involves the general distribution of information about available
                positions by advertising through newspapers, trade and/or professional journals,
                notices at the work site, job banks, or on the employer's internet homepage.

(e)     **Industry-wide standards**

        An employer is not required to use any particular recruitment method, but the methods shall
        be common in the industry (*see* 20 CFR 655.739(e)).  "Industry," for this purpose, means the
        employers who primarily employ these types of workers (*e.g.*, all healthcare businesses
        employing computer engineers, and not just computer service and/or contractor companies
        employing computer engineers for placement at healthcare worksites) (*see* 20 CFR
        655.739(b)).

(f)     Legitimate selection criteria relevant to the job that are normal or customary to the type of job
        involved.  The statute and regulations permit the employer to use the criteria listed at 20 CFR
        655.793(f).

(g)     The employer may not apply any otherwise-legitimate criteria in a discriminatory manner
        which could skew the recruitment process in favor of the H-1B workers, such as applying a
        selection criterion to U.S. candidates and not to H-1B candidates.

(h)     The employer must conduct its recruitment in good faith.  The employer's recruitment
        process must ensure that U.S. workers are given a fair chance in consideration for a job.  *See*
        20 CFR 655.739(h).

(i)     **Job offer to U.S. applicants**

        An employer subject to the recruitment requirement must also offer the job to a U.S. worker
        applicant as long as the U.S. worker has equal or better qualifications than the H-1B worker.
        This hiring provision is *not* enforced by the DOL, but by the DOJ.  The DOJ's enforcement
        authority requires a complaint from the aggrieved U.S. worker.  The WHD shall refer any
        such worker to the DOJ to file a complaint.  The responsibility to administer this provision
        has been assigned to the Office of Special Counsel (OSC) for Immigration-Related Unfair
        Employment Practices in the DOJ, which administers several other statutes concerning
        employment discrimination based on national origin, citizenship status, and immigration
        document abuse.  Its address is P.O. Box 27728-7728, Washington, DC 20038.  Its telephone
        number and internet web address are 1 (800) 255-7688 (for workers) or 1 (800) 225-8155 (for
        employers), osc.crt@usdoj.gov, and OSC's website at www.USDOJ.gov/crt/osc.

**(j)**    The employer has the burden to show that it is in compliance with the regulations (*see* 20 CFR 655.739(i)).  The WHI must not attempt to contact any media in order to learn whether or not the employer recruited for U.S. workers.  *See* FOH 50j.  If the employer does not maintain records or other evidence that is has complied with the regulations pertaining to recruitment, there is a *prima facie* case that the employer did not comply and a violation should be cited.

**71d04**    **Displacement or lay off of U.S. workers (20 CFR 655.738).**

**(a)**    All H-1B-dependent and willful violator employers subject to the non-displacement of U.S. workers obligations are prohibited from laying off any U.S. worker either directly (*i.e.*, in employer's own workforce) or secondarily (*i.e.*, at the worksite of another and/or secondary employer) from a job that is essentially the equivalent of the job for which an H-1B worker is sought (*see* 20 CFR 655.738).  An H-1B-dependent or willful violator employer who utilizes an LCA to employ only exempt H-1B worker(s) is not subject to this displacement provision (*see* 20 CFR 655.737).

**(b)**    All H-1B employers, whether H-1B dependent, H-1B non-dependent, or willful violators, are subject to an enhanced CMP of up to $35,000.00 and an increased debarment period of at least 3 years for willful violations during which U.S. workers employed by the employer were displaced within a specific period before and after the employer files any H-1B visa petition (*i.e.* beginning 90 days before, and ending 90 days after, the petition or request for extension of H-1B status is filed) (*see* FOH 71e00(d)(3) and FOH 71e10).  This super penalty applies to all H-1B employers and to any willful violations, and must not be confused with the special non-displacement obligations of the H-1B-dependent and willful violator employer.

**(c)**    There are *two types of displacement* of U.S. workers with regard to the H-1B-dependent or willful violator employer.  Each type involves the displacement of a U.S. worker by an H-1B worker that performs the same or essentially similar job.

(1)    *Direct displacement*

An H-1B-dependent or a willful violator employer is prohibited from displacing a U.S. worker *in its own workforce* within the period beginning 90 days before and ending 90 days after the date the H-1B petition or request for extension of H-1B status is filed.  The employer's own workforce includes all U.S. workers employed by the employer.  The statute does not define "employed by the employer." Therefore, the DOL must, per Supreme Court precedents, apply common law standards, not the FLSA standards, in determining when such an employment relationship exists (*see* 20 CFR 655.738(c) and 20 CFR 655.715).  *See* FOH 71d04(f) below, for the common law standards.

(2)    *Secondary displacement*

H-1B-dependent and willful violator employers are prohibited from placing an H-1B worker at a worksite of a secondary employer (*i.e.*, the H-1B employer's client) where there are indicia of an employment relationship between the H-1B worker and that other employer, until the H-1B employer inquires whether the secondary employer has or will displace any of its own U.S. workers and/or employees during the period 90 days before and 90 days after the date of the placement of the H-1B

worker with the secondary employer (*see* 20 CFR 655.738(d)).  *See* FOH 71d04(g) below for discussion of secondary displacement.

**(d)**     **Lay off**

A U.S. worker is laid off, and therefore displaced for purposes of the H-1B statute and regulations, if the employer causes the U.S. worker's loss of employment by using the H-1B worker to perform the essentially equivalent job performed by the U.S. worker.  A loss of employment however, would *not* be considered to be a lay off where any of the situations listed in 20 CFR 655.738(b)(1) occurs.  20 CFR 655.738(b)(1)(iv)(A) -(C) also lists the criteria to be reviewed in discerning the validity of a similar employment opportunity to determine if it, in fact, is a bona fide offer.

**(e)**     **Essentially equivalent jobs**

In order for displacement to occur, within the meaning of the H-1B statute and regulations, the job from which the U.S. worker is laid off must be *essentially equivalent* to the job for which an H-1B worker is sought.  To determine whether jobs of laid-off U.S. workers and H-1B workers are essentially equivalent, the two positions should be compared based upon job responsibilities, qualifications and experience of workers, and area of employment.  The comparison of the two jobs should be on a one-to-one basis where appropriate.  But a more broad comparison may be required if a company eliminates an entire department with several U.S. workers and replaces them with one or more H-1B workers.  In the latter circumstance, U.S. worker(s) who held essentially equivalent job(s) as the H-1B worker(s) would be protected from such displacement (*see* 20 CFR 655.738(b)(2)).  The factors of job responsibility, qualifications and experience, and area of employment (as described in 20 CFR 655.738(b)(2)) must be closely reviewed and analyzed to determine if jobs are essentially equivalent.

**(f)**     **Employed or employment relationship (common law test)**

(1)     The determination of an employment relationship between U.S. workers and an H-1B employer or a secondary employer is necessary *only* in the event of an apparent displacement of such U.S. workers.  Note: it is never necessary to determine such a relationship between the H-1B worker(s) and the H-1B employer, since the relationship is deemed to exist as a result of the employer's having sponsored the worker(s) as the employer for H-1B employment-based nonimmigrant visa(s).

(2)     The prohibition against displacement of U.S. workers is a protection that applies only to U.S. workers who are employed by the H-1B employer (*i.e.*, direct displacement prohibition) or by the secondary employer (*i.e.*, secondary displacement prohibition).  Therefore, bona fide consultants and independent contractors who are, by definition, not employees, are not protected against the loss of work due to the use of H-1B workers, even though the consultants and independent contractors may be performing services for the H-1B employer or the secondary employer.  *See* 20 CFR 655.738(c) -(d).

(3)     The H-1B program does *not* use the suffer or permit to work test for an employment relationship that is used under the FLSA.  Instead, the H-1B program uses the common law multi-factor test, in which the key determinant is the right to control the means and manner in which the work is performed.  For enforcement purposes, the

WHD will assume that any U.S. worker treated as an employee for tax purposes and other purposes (*e.g.*, Federal Insurance Contributions Act (FICA), workers' compensation) is, in fact, an employee.  Where the worker's status as an employee is not certain, the WHI shall make a determination considering the following and similar factors, which are not all required to be present to determine whether the U.S. worker receives displacement protection:

a.      The putative employer has the right to control when, where, and how the worker performs the job

b.      The work does not require a high level of skill or expertise

c.      The putative employer, rather than the worker, furnishes the tools, materials, and equipment

d.      The work is performed on the premises of the putative employer

e.      There is a continuing relationship between the worker and the putative employer

f.      The putative employer has the right to assign additional projects to the worker

g.      The putative employer sets the hours of work and the duration of the job

h.      The worker is paid by the hour, week, month or an annual salary rather than for the agreed cost of performing a particular job

i.      The worker does not hire or pay assistants

j.      The work performed by the worker is part of the regular business, including governmental, educational, and nonprofit operations, of the putative employer

k.      The putative employer is itself in business

l.      The worker is not engaged in his or her own distinct occupation or business

m.      The putative employer provides the worker with benefits such as insurance, leave, or workers' compensation

n.      The worker is considered an employee of the putative employer for tax purposes (*i.e.*, withholding of federal, state, and FICA taxes)

o.      The putative employer can discharge the worker

p.      The worker and the putative employer believe that they are creating an employee-employer relationship.

q.      A useful reference in determining an employment relationship is the Equal Employment Opportunity Commission (EEOC) approach (*see* EEOC policy guidance on contingent workers (Notice No. 915.002, 12/03/1997)), which

provides a model for identifying particular factors that can be applied in the context of H-1B employment, particularly where workers are placed at third party employer worksites.

(4)     The indicia of employment test, found in the H-1B regulation dealing with secondary displacement, is *not* the test for determining an employment relationship for purposes of identifying the U.S. worker(s) entitled to protection against displacement.  Instead, the indicia of employment test (*see* FOH 71d04(g)(2)b. below) applies only to the identification of the H-1B worker(s) whose placement at a secondary employer's worksite(s) would trigger the prohibition against secondary displacement (which, in turn, protects the U.S. workers employed by the secondary employer).

(g)     **Secondary displacement**

(1)     *Protected U.S. workers*

An H-1B-dependent or willful violator employer is prohibited from displacing U.S. workers who are outside the employer's own workforce.  The prohibition protects *only* U.S. worker(s) who are employed by the secondary employer at whose worksite(s) the H-1B employer places its own H-1B workers (not bona fide consultants or independent contractors).  The displacement prohibition applies 90 days before and ends 90 days after the H-1B employer *places* an H-1B worker at the secondary employer's worksite(s) (prescribed period) in a position essentially equivalent to the job held by the (displaced) U.S. worker.

(2)     *Triggering H-1B workers*

Not every placement of an H-1B worker will require the H-1B employer to make a displacement inquiry and thereby trigger and/or activate the secondary displacement prohibition.  In order for this prohibition to be in effect, both of the following criteria must be met:

a.      The H-1B worker employed by the H-1B-dependent or willful violator employer must perform duties at one or more worksites owned, operated, or controlled by the secondary employer.  If the H-1B worker provides services to the secondary employer without being placed at the secondary employer's worksites(s), then the prohibition would not apply.

b.      There must be indicia of an employment relationship between the H-1B worker and the secondary employer (*see* FOH 71d04(f)(4)).  The common law factors are to be used to determine the existence of indicia of an employment relationship (*see* 20 CFR 655.738(d)(2)(ii)(A) -(I)).  It is not necessary for *all* of the factors to be found in the case.

c.      This indicia of employment relationship test does not constitute employment of these H-1B workers for purposes of making the secondary employer liable under the H-1B program.

(3)     The secondary employer need not be an H-1B employer, but is any employer which accepts the placement of the H-1B workers; the participation of a middleman or intermediate employer and/or operator in the placement of the H-1B workers will not

relieve the H-1B employer of its responsibilities regarding displacement of U.S. workers employed by the employer at whose worksite the H-1B workers are placed. The secondary employer's acceptance of the services of the H-1B workers does not make the secondary employer an H-1B employer (*see* 20 CFR 655.738(d)(3)).

(4)      The H-1B employer, not the secondary employer, is subject to the non-displacement obligations and is liable if the secondary employer displaces any of its U.S. worker employees during the prescribed period. The secondary employer is liable only in circumstances where such secondary employer is an H-1B employer and has failed to comply with its own obligations. However, the secondary employer could be liable for violations under other statutes, such as the FLSA, if an employment relationship with the H-1B worker(s) exists for purposes of those statutes (*see* 20 CFR 655.738(d)(3)).

(5)      *Good faith inquiry by employer*

If there is an indicia of employment between the H-1B worker and the secondary employer, the H-1B employer is prohibited from placing an H-1B worker at a secondary employer worksite or with a secondary employer (*i.e.*, the H-1B employer's client) until it has made a good faith inquiry of the secondary employer as to whether that employer has displaced or intends to displace a U.S. worker in the prescribed period as described in FOH 71d04(g)(1) above) (*see* 20 CFR 655.738(d)(5)). The H-1B employer must exercise *due diligence* and *make reasonable effort* to inquire about potential secondary displacement through methods which are to be documented in the public access file. *See* 20 CFR 655.738(d)(5)(i)(A) -(C) for methods (not all-inclusive) that an H-1B employer may utilize in this process.

(6)      *Further and more specific inquiry by employer*

The H-1B employer's exercise of due diligence may require more specific inquiry about displacement if the H-1B employer has information that suggests that the secondary employer has or will displace U.S. workers during the prescribed period as described in FOH 71d04(d) above (*see* 20 CFR 655.738(d)(5)(ii)).

(7)      *Strict liability*

Even if the H-1B employer makes the required inquiry regarding displacement at a secondary employer's job site, the H-1B employer will still be found in violation of the secondary displacement prohibition if the secondary employer in fact displaces any U.S. worker and/or employee in the prescribed period (*see* FOH 71e08). CMPs and other appropriate remedies may be imposed, but *debarment* can be imposed *only if* the DOL's final agency action finds that the:

a.       employer knew or had reason to know of the secondary employer's displacement of U.S. worker(s) in its workforce at the time of the placement of the H-1B worker(s) with the secondary employer, including circumstances where the employer failed to make the required inquiry; or

b.       employer has been subject to a previous sanction for secondary displacement involving the same secondary employer.

(8)     Since the secondary employer has no obligations under the H-1B program, the WHI shall not require but may encourage the secondary employer to reinstate the U.S. worker(s) and shall not instruct the secondary employer to pay any wages to such worker(s).  In appropriate cases, the H-1B employer may be responsible for back pay and/or front pay to such worker(s).  Such remedies are only to be used with prior NO, OP, DEPP, Farm Labor/Immigration Branch, SOL, and RSOL clearance.

**(h)**     The H-1B employer is responsible for demonstrating compliance with the non-displacement obligations, both primary and secondary (*see* 20 CFR 655.738(e)).  The WHI need not make contact with the employer's customers (*i.e.*, secondary employers) to learn whether or not the employer made the appropriate inquiry.  Additionally, the WHI is not required to attempt contact with former U.S. workers within the employer's work force to determine if any had been displaced or laid off.  If the employer does not maintain records or other evidence that it has complied with the regulations pertaining to displacement or the secondary employer inquiry, there is a violation and it should be cited.  If the employer can credibly establish that it made an inquiry and made a contemporary notation of the inquiry (but is unable to produce the document), the employer should only be cited for a documentation violation.

**71d05      Whistleblower protections (20 CFR 655.801).**

**(a)**     The whistleblower protections for employees are stated in 20 CFR 655.801(a) and administrative remedies available to the WHD as part of the enforcement process are listed in 20 CFR 655.801(b).

**(b)**     Additional immigration status relief and/or protection may be available to the H-1B worker whistleblower.  The INA directs the USCIS and the Secretary to devise a process under which an H-1B worker whistleblower who is otherwise eligible to remain and work in the U.S. may be allowed to seek appropriate employment in the U.S. for a period not to exceed the maximum stay allowed for the H-1B worker's visa classification (*see* INA 212(n)(2)(C)(v)).  The WHD is responsible for providing the information needed by the USCIS to initiate this process.  The USCIS (not WHD) will determine if the H-1B worker and/or complainant meets the statutory requirement to be otherwise eligible to remain and work in the U.S.  The resulting visa status action, if any, taken by the USCIS is not dependent on, nor does it have to wait for, a final WHD determination that a whistleblower violation has in fact occurred.

**(c)      Screening of complaint**

The WHD will screen whistleblower complaints, as it does with all H-1B complaints, to determine within 10 calendar days of date of receipt if the complaint provides reasonable cause to initiate an investigation.  *See* FOH 71b01 for the complaint intake process (information may be supplemented, as appropriate, by interview of complainant).  In addition to the requirements listed in 20 CFR 655.806(a), a whistleblower complaint must:

(1)     concern an employee of the H-1B employer (for purposes of this section, the term "employee" includes present employees, former employees, and applicants for employment, whether or not the employee is an H-1B nonimmigrant);

(2)     allege violations of protected activities as listed in 20 CFR 655.801(a)(1) -(2);

(3)     provide information, supplemented as appropriate by interviews of the complainant, indicating that the employer intimidated, threatened, restrained, coerced, blacklisted, discharged, or otherwise took adverse action that discriminated against the employee (*e.g.*, a reduction in hours, a failure to promote, a change in work hours, refusal to sponsor for permanent employment or a forced relocation);

(4)     provide information sufficient to raise the inference that the employer may have known about the protected activity and that the protected activity may have been a contributing factor in the adverse action (it would normally be considered sufficient, for example, if the complainant provides information that the employer took the adverse action shortly after the protected activity occurred); and

(5)     Allege discrimination which occurred within the 12 months preceding the filing of the complaint with the WHD or, if there were continuing instances of alleged discrimination, at least one of the alleged discriminatory acts occurred within the preceding 12 months.

**(d)     Determination whether to make a referral to the USCIS**

A whistleblower complaint that has been accepted for investigation will be referred to the USCIS, to decide if the whistleblower will be allowed to remain in the U.S. and obtain other employment, *only* if the criteria in FOH 71d05(c) above are present and *in addition*, either at the time the complaint is made or thereafter, there is reason to believe that because of a discriminatory action described in FOH 71d05(c), a complainant who is an H-1B worker:

(1)     has lost his or her position, or is in danger of losing, or is about to lose his or her position with the H-1B employer; or

(2)     may have been impeded in his or her opportunity to seek alternative H-1B employment or alternative legal status; or

(3)     has suffered a significant deprivation of income; or

(4)     has been threatened with the actions in FOH 71d05(d)(1), (2), or (3); or

(5)     has been subjected to conduct by the employer with the purpose or effect of unreasonably interfering with the employee's work performance or creating an intimidating, hostile, or offensive work environment (if the WHD determines that there is not reasonable cause to believe a whistleblower violation has occurred, the complainant will be so notified; the complainant may choose to provide additional information which may constitute an actionable complaint).

**(e)     Method of referral to the USCIS**

When the conditions in FOH 71d05(c) -(d) have been met, the responsible WHD office will notify the USCIS, after contacting and securing clearance from the NO, OP, DEPP, Farm Labor/Immigration Branch.

(1)     Notification shall be made by completing the whistleblower notification letter.

(2)     The completed notification letter will be sent to the local USCIS district office (for locations, *see* http://www.ins.usdoj.gov/graphics/fieldoffices/statemap.htm), with a copy to the NO, OP, DEPP, Farm Labor/Immigration Branch at: U.S. Department of Labor, Wage and Hour Division, 200 Constitution Ave., NW, Room S-3510, Washington DC, 20210; Fax (202) 693-1302; and a copy included with the notification letter to the complainant.

(3)     The WHI shall note a USCIS referral on WHISARD, the block/screen to be provided.

(4)     The WHD shall advise the complainant that an investigation will be scheduled, using the notification letter to the complainant and attaching a copy of the whistleblower notification letter sent to the USCIS.

**71d06     Prevailing wage rate request to the ETA during an investigation (20 CFR 655.731(d)).**

**(a)**     If the employer has failed to establish or document a valid prevailing wage rate (*see* FOH 71d01), the WHI should request that the employer obtain such rate.  If the employer refuses, produces a prevailing wage source which does not satisfy the regulatory requirements, or refuses to apply the appropriate prevailing wage level (from a prevailing wage source providing several levels), then a prevailing wage rate must be obtained from the ETA.  In such a case, the ETA will be the final arbiter on prevailing wage matters.  To obtain a prevailing wage rate from the ETA, the WHI must:

(1)     Prepare the prevailing wage request letter for all levels in the occupation, with an attached copy of the Form I-129/I-129W (including any attachments that offer a job description, including supplement H).  If more than one H-1B worker is involved, attach the Form I-129/I-129W for one or more representative workers.  If not provided by the employer at the initial conference, these documents should be requested from the H-1B worker, who would normally have personal file copies of documents relating to his or her nonimmigrant status.  If not available from the employer or the H-1B worker, contact the USCIS (*see* FOH 71j00(b)).

(2)     Submit the prevailing wage request letter by mail or fax to the appropriate National ETA Processing Center with jurisdiction over the geographic location where the prevailing wage rate is requested, either Atlanta or Chicago.  Address the request to the Center Director.  *See* FOH 71j02 for jurisdictional information and addresses.

**(b)**     Prior to 03/08/2005, prevailing wage rates issued by the ETA provided two wage levels: level "I" (entry) or level "II" (experienced).  The H-1B Visa Reform Act of 2004 requires that surveys used or made available by the DOL to determine prevailing wages must provide at least four levels of survey wage determinations commensurate with experience, education, and level of supervision.  When requesting a prevailing wage rate, the WHI should provide all information available, (*i.e.*, that provided by the employer on the Form I-129/I-129W supplement H and all attachments) to the ETA so that the ETA can determine which level applies.  The WHI should request not only the applicable level but also all levels so the WHD can determine the applicable wage and/or level if the H-1B worker performed duties at a higher level than described by the employer in the Form I-129/I-129W, or determine the applicable wage and/or level for other H-1B workers employed pursuant to that LCA.  The INA provides that where an existing governmental survey has only two levels, two intermediate levels may be created by dividing by three the difference between the two levels offered, then adding the quotient to the first level, and subtracting that quotient from the

second level to yield the two additional levels.  The DOL provides wage surveys from the Occupational Employment Statistics Program (OES) at: www.flcdatacenter.com.

**(c)**     The ETA office obtains the prevailing wage rate from state employment service or state workforce agency to respond to the WHI's prevailing wage request.  The state employment service or state workforce agency is a federally-funded unit of the states providing prevailing wage rates for immigration programs administered by the ETA.  Once the ETA provides a prevailing wage rate to the WHI, the WHI immediately notifies the employer of that rate and of rights to appeal.  It should be made clear to the employer, whether by letter or orally, that appeal of the prevailing wage determination falls solely within the jurisdiction of the ETA.  Any appeal must be made to the ETA, with a copy to the WHD, within 10 days of the employer's receipt of the WHD letter to the employer providing the ETA's prevailing rate determination.

**(d)**     The time spent obtaining a prevailing wage rate from the ETA, including time involved in an appeal in the ETA system, is not counted against the 30-day statutory period to complete the WHD investigation.  Investigation fact-finding may continue during this time.  The WHI should maintain contact with the ETA to provide additional information which may be needed for the prevailing wage determination, and to know the status of the matter in the ETA system.  The WHI should request copies of the ETA and employer correspondence for the investigation file.  Once the ETA process is completed, the WHD investigation shall be completed, using the prevailing wage rate determined by the ETA.

**71d07**     **Nonproductive status and/or benching (20 CFR 655.731(c)(7)).**

**(a)**     Nonproductive status (commonly referred to as benching) is the term applied to the situation where an H-1B worker is idle and/or nonproductive (*i.e.*, not producing income for the employer) due to a decision by the employer, lack of a permit or license, or for any other reason except as specified in 20 CFR 655.731(c)(7)(ii) and is not paid the required H-1B wage.  The employer's wage obligation begins as soon as the H-1B worker has "entered into employment" with the employer (as defined in FOH 71d07(b) below), but in no event later than the 30- or 60-day windows described in 20 CFR 655.731(c)(6)(ii).

    (1)     Once the H-1B worker enters into employment with the employer, the employer must pay the required wage to the H-1B worker even if the H-1B worker is not yet productive (unless the nonpayment of wages is allowable under the benching rules, for reasons not attributable to the employer (*see* 20 CFR 655.731(c)(7)(ii))).

    (2)     Wages need not be paid during the maximum 30- and 60-day windows periods, prior to the H-1B worker's entering into employment.  These periods are not considered to be bench time and are not to be analyzed under the benching standards.

**(b)**     **"Entered into employment"**

    (1)     The H-1B worker enters into employment (on or after the date of need on the H-1B petition (*i.e.*, Form I-129)) when he or she first makes himself or herself available for work or otherwise comes under the direction or control of the employer, *or* when the H-1B worker's activities constitute hours worked under the FLSA concept (whichever comes first).  Examples are described in 20 CFR 655.731(6)(i).

  (2)  The file should include documentary evidence substantiating when an H-1B worker entered into employment; for example:

    a.  A statement from the H-1B worker indicating the date the worker made himself or herself available for work and the duties that the worker performed

    b.  A statement from another worker who observed the dates and type of work performed by the H-1B worker

    c.  Records of a stipend to the worker (*e.g.*, copies of any cancelled checks)

    d.  Records of the employer providing H-1B worker a company car and/or use of the company condo

    e.  Records of the employer adding the H-1B worker to the group insurance plan

    f.  Records of the preparation of the Form I-9 for the H-1B workers

**(c)**  **"Eligible to work"**

"Eligible to work" means the date that an H-1B worker, already present in the U.S. when the petition was approved by the USCIS, is ready, able, and available to work for the new employer.  The H-1B worker is considered to be eligible to work upon the date of need indicated on the approved Form I-129/I-129W petition, or the date of USCIS' approval of the worker's H-1B status, whichever is later.  The eligible to work date never precedes the employment authorization date on the Form I-797 issued by the USCIS for the worker's H-1B status.  Once the eligible to work date is established, the employer's wage obligation starts on the 60th day after the eligible to work date (unless the H-1B worker enters into employment on an earlier date (*see* FOH 71d07(b) above), which would trigger the wage obligation on that earlier date).  When the wage obligation begins, the employer must thereafter pay the required wage for nonproductive and/or bench time, unless the nonproductive status is not attributable to the employer.  *See* FOH 71c08.

**(d)**  **Termination of employment**

  (1)  Once the wage obligation has been triggered, the employer must pay the required wage until the employment relationship is terminated (*see* 20 CFR 655.731(c)(7)(ii)), including payment for nonproductive and/or bench time, unless the nonproductive status is not attributable to the employer.

  (2)  A determination of a bona fide termination will be based on all the circumstances and/or evidence in an individual case and may be evidenced in various ways:

    a.  The best evidence is a copy of a letter and/or notice sent by the employer to the USCIS, notifying the USCIS that the H-1B worker's employment has been terminated as of a particular date.  This notice is required by the USCIS regulations so that the worker's H-1B visa is cancelled (*see* 8 CFR 214.2(h)(11)).  The WHI should always ask the employer to produce this notice if there is any question concerning the existence or date of a

termination of employment for an H-1B worker. The WHI may obtain additional clarification from the USCIS.

    b.    If the employer cannot produce a copy of a letter and/or notice to the USCIS, the WHI should request the employer to provide other evidence regarding the termination of the H-1B worker's employment. For example, the employer may have sent the H-1B worker an e-mail or letter, informing him or her that his or her employment is terminated as of a particular date. The form and date of such evidence will affect its weight (*i.e.*, an e-mail dated 06/01/2001 notifying the H-1B worker that employment is terminated as of 06/15/2001 could be appropriate documentation; whereas an e-mail dated 10/01/2001 stating the same termination date of 06/15/2001 would probably be unacceptable documentation).

    (3)    Where there is incomplete, inconsistent or conflicting information concerning the termination of the H-1B worker's employment, the WHI shall make a determination based on an assessment of the completeness and credibility of the available evidence.

    (4)    The WHD would *not* consider a bona fide termination to have occurred where the employer rehires the H-1B worker if or when work later becomes available, *except if:* the H-1B worker has been rehired after working under an H-1B visa for another employer during the period between the alleged termination and the rehire; the H-1B worker has been rehired after returning to his or her home country after the employer's cancellation of the H-1B visa through notice to the USCIS after the alleged termination; or the H-1B worker has been rehired after having been in the U.S. pursuant to a change of status subsequent to the alleged termination. A bona fide rehire must involve submission of new petition to the USCIS.

    (5)    The wage obligation covers the entire period until the date of the termination, including period(s) for which the WHD determined there had not been a bona fide termination. Benching standards are applied to determine if the employer is relieved from the payment of the required wage for any particular nonproductive time prior to the bona fide termination.

    (6)    The USCIS regulations require the employer to pay the H-1B worker's transportation to his or her home country if the employment is terminated prematurely (*see* 8 CFR 214.2(h)(4)(iii)(E)). However, this requirement is not enforced by the WHD through back wage assessment. Any questions about such return transportation should be referred to the local USCIS office.

**(e)**    Schools or other educational institutions may have nonproductive (*i.e.*, non-work) periods for their H-1B workers, such as summer vacations or term breaks. The H-1B workers need not be paid during such periods, *provided that* the standards in 20 CFR 655.731(c)(4) are satisfied.

**(f)**    Back wages for benched H-1B workers are to be computed as follows:

    (1)    The H-1B worker must be paid the required wage for all hours worked under the FLSA. Therefore, even if the H-1B worker is benched for reasons not attributable to the employer, the H-1B worker must still receive back wages for any hours worked during that time. *See* 20 CFR 655.731(c)(7)(ii). For example, an H-1B worker is on

a 1-month voluntary personal leave (*i.e.*, legitimately benched without wages), but comes to the office to work for 2 days on an emergency project: hours worked.  Back wages will be assessed for the 2 days of work.

(2)   If the nonproductive and/or bench time is subject to the wage obligation, then the assessment of back wages will consider the following factors:

a.   <u>Salary vs. hourly wage</u>

1.   A salaried H-1B worker's wages due would be equal to the appropriate *pro rata* salary for the pay period with bench time (*e.g.*, if the monthly salary is $5,000.00 and the H-1B worker is benched without pay for 2 weeks, the back wages would be $2,307.96 ($5000.00 × 12 ÷ 26)).  However, unlike the FLSA, the H-1B program does not use the workweek or pay period concept as a rigid measure for compliance with wage obligations (as done under the FLSA).  The H-1B employer is allowed some flexibility in satisfying the wage obligations.  The regulations permit the employer to have a salary system which pays less than an absolute *pro rata* installment each pay period, provided that the employer shows that the annual salary is satisfied through nondiscretionary payments such as quarterly production bonuses (*see* 20 CFR 655.731(c)(4)).  If such a system is evidenced, then it should be taken into consideration in determining the extent of the benching violation and the back wage assessment.

2.   An hourly wage H-1B worker's wages due would be equal to wages for the H-1B worker's established, regular number of full-time or part-time hours for a pay period (as described in FOH 71d07(f)(2)b.).  In the H-1B program, as under the FLSA, the hourly wage an H-1B worker earns for his or her hours worked are due for the pay period when the work was performed.  If the H-1B worker worked more than the normal number of hours in one pay period, he or she would be paid for those hours in that pay period; the extra or higher than normal hours and wages would not be reported and/or credited into another pay period for purposes of determining the extent of the H-1B benching violation and the back wage assessment.

b.   <u>Full-time vs. part-time</u>

1.   A full-time H-1B worker is any H-1B worker not designated as part-time either on the LCA or the Form I-129/I-129W.  If the H-1B worker is *salaried*, then his or her wages due will be the *pro rata* payment for the pay period with bench time.  If the H-1B worker is an *hourly wage* worker, then the wages due per week will be the hourly rate multiplied by 40 hours, or by a lower number of hours if the employer can show such number to be full-time employment.

2.   A part-time H-1B worker is any worker designated as part-time either on the LCA or the Form I-129.  The wages due for a pay period with bench time will be based on the number of hours for

part-time employment specified by the employer on the Form I-129. If the Form I-129 shows a range of hours for part-time employment, then the wages due will be based on the average number of hours normally worked by the H-1B worker, provided that the average is within the range shown on the Form I-129.  The regulations require the employer to have hours records for part-time H-1B workers, whether salaried or paid an hourly wage (*see* 20 CFR 655.731(b)(1)).

c.    <u>Actual wage vs. prevailing wage</u>

Where wages are required for a bench period, the WHI must determine which of the available rates (*i.e*, actual or prevailing wage) is the required wage to be enforced through back wages.

1.    **Actual wage**

Where the employer has an established system that yields a specific wage payment regardless of circumstances (*e.g.,* some salary systems), then the actual wage will be enforced for bench time where the actual is higher than the applicable prevailing wage.  However, the employer's actual wage system may include variable rates for different periods and circumstances.  In particular, the system may have a no work, no pay provision, which would generate a wage rate of zero for nonproductive and/or bench time.  A zero rate for an actual wage would necessarily be lower than any possible prevailing wage.  In such a situation, the prevailing wage will be enforced for bench time.

2.    **Prevailing wage**

Where the prevailing wage is higher than the employer's actual wage, either as a general matter or due to the employer's having a zero rate for nonproductive time, then the prevailing wage will be enforced for bench time.

d.    Hours worked under established FLSA principles must be compensated, whether or not the time is considered by the employer to be productive (*i.e.*, an H-1B worker must be paid for time spent in training or orientation, and for on-call time).

**71d08    <u>USCIS fees.</u>**

(a)    **Basic fees**

An employer filing a Form I-129/I-129W petition with the USCIS must submit a $130.00 filing fee ($185.00 filing fee effective 10/26/2005).  This fee is considered to be a business expense for the employer.  Consequently, the employer is prohibited from recouping this fee from the H-1B worker, through payroll deductions or other means, to the extent it reduces the H-1B worker's wages below the required wage.  The amount of such fee illegally paid by the H-1B worker must be repaid.

**(b)**     **Petition fee**

An additional $750.00 or $1,500.00 USCIS filing fee is required for most employers. Payment of this additional fee by the H-1B worker is prohibited by the INA, whether or not the payment would impinge on the H-1B worker's receipt of the required wage. The statute exempts any institution of higher education, nonprofit organization, entity related to or affiliated with an institute of higher education, or a nonprofit research organization or governmental research organization from payment of this fee. A violation will be cited and CMPs will be assessed if the employer recoups this fee, through payroll deductions or other means, from the H-1B worker or if the fee is paid to a third party by the H-1B worker. Back wages will be computed for the entire amount of the fee that was paid by the H-1B worker. Any employer which, mistakenly or otherwise, requires an H-1B worker to pay this fee will be cited for a wage violation (*i.e.*, as an illegal deduction) and the entire fee should be repaid to the worker.

**(c)**     **Premium processing fee**

The employer may obtain expedited USCIS processing of the Form I-129/I-129W, by paying an additional special fee of $1,000.00. This fee, like the basic filing fee, is considered to be a business expense for the employer and, consequently, the employer is prohibited from recouping this fee from the H-1B worker, through payroll deductions or other means, to the extent it reduces the H-1B worker's wages below the required wage. In some rare circumstances, the employer may be able to establish that the use of premium processing was for the worker's primary benefit and was not a business expense. In such a case, the worker's payment of the fee would be permitted. The amount of such fee illegally paid by the H-1B worker must be repaid.

**(d)**     **H-1B Visa Reform Act of 2004 anti-fraud fee**

The H-1B Visa Reform Act of 2004 mandates a $500.00 fraud prevention and detection fee to be paid by all employers which file an H-1B petition. This fee became effective 03/08/2005. Any employer which, mistakenly or otherwise, requires an H-1B worker to pay this fee will be cited for a wage violation (*i.e.*, as an illegal deduction) and the entire fee should be repaid to the worker.

**71d09**     **Required wage rate (20 CFR 655.731).**

**(a)**     The employer must pay the H-1B worker no less than the required wage, which is the higher of the actual and the prevailing wage attested by the employer in all versions of the LCA.

**(b)**     **Overtime pay**

The H-1B required wage does not have an overtime premium wage requirement. If the H-1B workers are *not* entitled to FLSA overtime pay, any overtime premium which is provided by the employer's actual wage system is counted/credited toward satisfaction of the H-1B's required wage. Such an employer is in compliance as long as the total gross amount paid, including non-FLSA overtime, divided by the hours worked is not less than the required wage rate. However, if the H-1B workers *are* entitled to FLSA overtime pay, the standard FLSA rules regarding the treatment of overtime pay are applicable to the H-1B workers' overtime premium. *See* FOH 71d10(g) for explanation of treatment of FLSA overtime pay for H-1B workers.

(c)     **Standards for the actual wage**

The actual wage for the H-1B worker is the wage paid under the employer's own wage scale or system to its workers with similar experience and qualifications for the same type of work the H-1B worker was brought into the U.S. to perform.  When making the determination of actual wage, the employer may consider any legitimate business factors such as experience, job qualifications, education, specific job responsibility and function, job performance, and specialized knowledge.  The employer's factors must relate to the statutory standards for actual wage (*i.e.*, experience; qualifications; specific employment in question) and cannot differentiate between H-1B and U.S. workers on the basis of market forces (*e.g.*, employer cannot simply pay the H-1B worker the lowest wage the H-1B worker is willing to accept).  *See* FOH 71d01(b) and 20 CFR 655.731(a)(1).  The employer's actual wage system must be applied in an even-handed manner to workers in the occupation, so as not to be discriminatory.

(d)     **Establishing and documenting the actual wage**

It is the employer's responsibility to determine the actual wage in accordance with 20 CFR 655.731(a)(1) and to document the determination.  The public access file must contain a description of the employer's actual wage system, in sufficient detail to show how the employer applied the system to determine the wage for the H-1B worker(s).  At a minimum, the description should identify the factors that are considered and how they are applied.  The description may be in various forms (*e.g.*, a copy of a CBA, a copy of a wage scale, a memo summarizing the system).  Documentation of the determination of an actual wage for each H-1B worker must be maintained in that H-1B worker's individual personnel or payroll file, showing how the H-1B worker's actual wage relates to the wages paid to other employees with similar experience, qualifications, and duties.  If this documentation is not maintained, the employer should be cited for violations of public access and/or recordkeeping, as appropriate.

(1)     Discriminatory or illegal factors (*e.g.*, race or nationality) may not be applied by the employer in the determination of the wage rate.

(2)     If the employer does not employ any individuals other than one H-1B worker in the occupation listed on the LCA, the rate that the employer pays the H-1B worker will be the H-1B worker's actual wage.

(3)     If the employer has other employees in the same occupation, the H-1B worker's individual actual wage would be the rate that the employer's actual wage system yields for an individual with the H-1B worker's experience, qualifications, duties, etc.

(4)     If the employer has other employees in the same occupation but has no discernible system for setting H-1B workers' rates of pay, the WHI shall determine the H-1B worker's actual wage from the best information available concerning the wages being paid to comparable workers.

a.      If there is no documentation of the actual wage system and it cannot be reconstructed, it may be necessary to average the wages of the employer's workers with similar experience, qualifications, and duties, and then to use

that average as the actual wage for the H-1B worker(s) in determining the required wage.

b.  The rate of pay entered on the LCA, sometimes called the intended wage, need not be the actual wage.  However, the rate of pay should, at a minimum, reflect the required wage.  If the rate of pay entered on the LCA is significantly higher than the rate paid to the H-1B worker(s), the WHI should examine the circumstances to determine whether the employer misrepresented a material fact on the LCA by entering a wage rate that could not or would not be paid (*see* FOH 71e01).

(5)  The employer's actual wage system may include variable rates.  These variables in the rate of pay in the actual wage system will affect the determination of the required wage for particular periods of time.  For example, the employer may establish a different rate of pay for different tasks, or a different rate of pay for work at different worksites.  The most common variable rates are differences in the pay rates for bench time and productive time (*e.g.*, some employers have a no work, no pay system for nonproductive time).  Where the employer's actual wage system has a rate of zero for bench time, the prevailing wage becomes the required wage for bench time, except where the nonproductive status is not attributable to the employer and is, therefore, not subject to the payment of H-1B required wages.

(6)  Pay adjustments (*e.g.*, cost of living increases, seniority increases), provided in the employer's actual wage system must be made in H-1B workers' wages in the same manner as in the wages of other employees (*see* 20 CFR 655.731(a)(1)).

(7)  Changing economic conditions (or other valid factors) can require that an employer make substantive changes to its actual wage system; the actual wage can go up (*e.g.*, merit increases, cost of living, promotions, *etc.*) or down (*e.g.*, wage reductions).  At the time that the actual wage change occurs, it should be recorded in the public access file (*see* 20 CFR 655.760(a)(3)).  If the actual wage changes, whether higher or lower than the rate of pay on the LCA, there is no need for the employer to file a new LCA to record it because it is recorded in the public access file.  However, if the employer decides to hire another H-1B worker, or extend an existing H-1B worker, the accompanying LCA, attached to the petition package, must correctly reflect the new rate of pay.  If it does not, a new LCA must be obtained.

(e)  **Prevailing wage**

The prevailing wage rate is the weighted average of wages (*i.e.*, mathematical mean) paid to all surveyed individuals in the same occupational classification and area of employment listed on the LCA as the H-1B worker.  The Labor Certification for the Permanent Employment of Aliens in the U.S. (PERM) regulation published on 12/27/2004 (*see* 69 FR 77327 and 69 FR 77385) with an effective date of 03/28/2005, has modified the prevailing wage determination process in three significant ways:

(1)  The use of the Davis-Bacon and Related Acts (DBRA) or the SCA is no longer controlling for prevailing wage determinations, although an employer may request those sources to be considered as an employer-provided source.

(2)     If an employer-provided survey does not contain an arithmetic mean, and only provides the median, the median wage figure can be used for determining the prevailing wage.  Employers may continue to submit published surveys from public or private sources or employer-conducted surveys as long as the survey complies with acceptable standards.  Although the OES prevailing wage data will be provided for four skill levels, employer-provided surveys are not required to contain multiple levels.

(3)     Emplyers that disagree with their prevailing wage determinations are afforded only one opportunity to provide supplemental information to the state employment service or state workforce agency.  Employers may choose to file a new request for a prevailing wage determination or request review by the Certifying Officer and the Board of Alien Labor Certification Appeals.

**(f)**     The employer must identify and document the prevailing wage rate level for the occupational classification in the area of intended employment as identified on the LCA.  The public access file must identify the prevailing wage source and contain a copy of the documentation (*e.g.*, state employment service or state workforce agency determination, CBA, published survey).

**(g)**     Unchallenged sources for prevailing wage.  The WHD will not challenge prevailing wage rates, provided that the employer obtained the current prevailing wage rate for the occupation, area of employment as shown on the LCA, and has correctly applied the level, if the survey provides for more than one level, based on one of the following sources:

(1)     CBA

(2)     OES: the wage component of the survey administered by the Bureau of Labor Statistics (BLS) (http://www.flcdatacenter.com)

(3)     Validated employer-provided survey

**(h)     State workforce agency**

All prevailing wage determinations issued by the state employment service or state workforce agency are the same as OES rates.  Most prevailing wage determinations issued by state employment service or state workforce agency are expressed as hourly rates.  The employer may request that the determination be issued by the state employment service or state workforce agency as a salary.  Or the employer may convert the state employment service or state workforce agency hourly rate into the salary equivalent (*i.e.*, hourly rate × 2,080 hours for an annual amount).  The employer's LCA must accurately state the method of wage payment which will be used (*i.e.*, salary or hourly), so that the prevailing wage is accurately presented.  However, if the employer obtained a prevailing wage rate for an occupation or for an area of employment other than that reflected on the LCA, the employer's use of any of these prevailing wage sources, as it pertains to the incorrect occupation or area of employment, would not be considered to be acceptable.  Additionally, if the employer has incorrectly applied the level, if the survey provides for more than one level, that level of the survey would not be acceptable either.

**(i)**      **Additional sources for prevailing wage**

There are two other sources listed in 20 CFR 655.731(a)(2)(iii)(B) -(C) that may be utilized by an employer in obtaining a prevailing wage rate.  When evaluating the validity of these two additional sources, the WHI shall ensure that the conditions listed in 20 CFR 655.731(b)(3)(iii) have been met.  This should include:

(1)      The employer's prevailing wage rate is for the occupation and place of employment shown on the LCA

(2)      The survey is the most current available from that source and it is no older than 24 months (*i.e.*, publication date no earlier than 24 months prior to date of LCA which used the survey), and is based on data collected within 24 months of the date of publication

(3)      The survey was based on a statistically reliable sample of businesses randomly selected

(4)      The survey was cross-industry, except for nonprofit and educational and research organizations as noted below in FOH 71d09(j)

(5)      The survey was stratified (*i.e.*, includes small, medium, and large employers)

(6)      The wage rate from the survey is a weighted average or mathematical "mean"

(7)      The survey is local (*i.e.*, produces the prevailing wage for the area of intended employment shown on the LCA).  This area is defined as the area within commuting distance of the worksite and/or place of employment.  If the survey does not reflect a representative sample for the local area, the survey can be expanded (*i.e.*, not local) until a representative sample can be identified.  To help WHIs determine if it is necessary to expand an area to obtain a representative sample, the WHI should consult with the local state employment service or state workforce agency.

**(j)**      **Academic and research organizations**

The prevailing wage rate for an institution of higher education or an affiliated or related nonprofit entity, a nonprofit research organization or a governmental research organization, as defined in 20 CFR 656.40(c), need only take into account employees at such institutions and organizations in the area of intended employment (*see* 20 CFR 655.731(a)(2)(viii)).

**(k)**      The investigation cannot be completed until the determination of the required wage has been made.  If there are questions concerning the sufficiency of the documentation, the RSOL should be consulted.  The back wages, if any will be the difference between the required wage and the wages actually received by the H-1B worker(s) (*see* FOH 71f02).

**(l)**      The H-1B Visa Reform Act 2004, effective 03/08/2005, eliminated the *five percent discount on a state employment service or state workforce agency's prevailing wage determination*.  Effective 03/08/2005, employers must pay at least 100 percent of the prevailing wage and back wages will be computed accordingly.  Prior to 03/08/2005, if an employer relied on a prevailing wage from the wage component of the OES survey (*see* FOH 71d09(g) above) (whether obtained through the state employment service or state workforce agency or the

BLS directly), there will be no violation cited and no back wages assessed where the employer paid at least 95 percent of the rate (*see* 20 CFR 655.731(a)(2)(iii) and 20 CFR 655.731(d)(4)).  However, if the investigation reveals that the employer paid less than 95 percent, then the back wages will be computed based on 100 percent of the state employment service or state workforce agency prevailing wage.  The ETA permanent labor certification regulation (on which this H-1B regulation is modeled) states that the 5 percent tolerance/discount does not apply to prevailing wage sources such as SCA, DBA, or CBA rates; therefore, there can be no discount on such rates.  Also, the ETA regulation deals only with the prevailing wage and therefore has no effect on the employer's actual wage under the H-1B program; there is no tolerance/discount whatsoever on the actual wage.

**71d10**      **Payment of wages and benefits (20 CFR 655.731(c)).**

(a)      **Satisfaction of wage obligation**

Once the WHI has determined the required wage rate, the fact-finding should ensure that the required wage rate is satisfied.  The H-1B worker must be paid his or her wages cash in hand, free and clear, when due.  The H-1B worker must actually receive the wages each pay period, except that deductions from wages may be made in accordance with 20 CFR 655.731(c)(9), FOH 71d11, and FOH 71e02.  The H-1B worker's wages are due in accordance with the following standards:

(1)      Salaried H-1B worker wages are due prorated payments on the employer's usual pay schedule but no less often than monthly, except that a rigid *pro rata* payment is not required if the employer has a pay system which includes nondiscretionary bonuses (*see* FOH 71d10(c) below, 20 CFR 655.731(c)(2)(v), and 20 CFR 655.731(c)(4)).

(2)      Hourly wage H-1B worker wages are due at the end of the pay period in which the hours of work are performed, and no less often than monthly.  The hourly rate payout may take into account the employer's nondiscretionary bonus system (*see* FOH 71d10(c) below, 20 CFR 655.731(c)(2)(v), and 20 CFR 655.731(c)(5)).

(3)      Schools or other educational institutions may pay the required wage on a compressed schedule which may not provide a *pro rata* payout for every pay period (*see* FOH 71d07(f) and 20 CFR 655.731(c)(6)).

(b)      Wages paid (for purposes of satisfying the required wage) must meet the criteria which are identified in 20 CFR 655.731(c)(1) -(2).  *See* FOH 71d07(d) below and FOH 71d11.

(1)      *Tax reports filed and taxes paid in accordance with the IRC*

The employer must be able to show that payments as reported for tax purposes have been paid to the IRS as required (*i.e.*, both the employer's and H-1B worker's payments).  The gross wage is the compensation payment that should be reported as the H-1B worker's earnings for tax purposes.

a.      The employer's payment of the required taxes should be shown on the IRS Form W-2: Wage and Tax Statement (Form W-2) filed by the employer with the IRS (not the Form 1099: Miscellaneous Income (Form 1099)) which reports compensation paid to non-employeess or contractors.  The DOL does not enforce the IRS regulations concerning the use of the appropriate tax-

reporting forms.  Therefore, the DOL cannot refuse to credit/count the employer's compensation to H-1B workers merely because the employer chose not to use the Form W-2 reporting form.  However, since the H-1B worker is the employee of the sponsoring employer by operation of law, it may be appropriate to refer the matter to the IRS where the WHD investigation reveals that the employer is not properly acknowledging its employment status in the payment of income taxes.

b.      The WHD will accept amended tax returns which show that the employer reported wages for IRS purposes.  If this is done, the additional wages reported in the amendment may be credited as part of the employer's satisfaction of the H-1B required wage.

c.      If earnings are paid in a foreign currency, the IRS instructions for Form W-2 require that the employer convert the foreign currency to U.S. dollars for tax purposes and keep records of the conversion rate.  Therefore, any employer paying its H-1B worker in the worker's home country in that country's currency must be able to show that the IRS reporting requirements have been met, or that the earnings were not subject to U.S. federal taxes under the IRC.  If the employer is unable to make this showing, the WHI shall use the best available information to determine the U.S. dollar value of all wages paid in foreign currency payments and reported as the H-1B worker's earnings for tax purposes.

(2)     *Payment of FICA*

Unless the H-1B worker's home country has a totalization arrangement with the U.S. social security system, the employer must withhold and pay the FICA payments (*see* 20 CFR 655.731(c)(2)(iii)).

**(c)      Non-discretionary bonuses as wages**

(1)     The H-1B program does not require the use of the workweek or pay period concept used in FLSA investigations.  The H-1B employer may take credit for certain payments that are not made during the pay period credited.  *See* 20 CFR 655.731(c)(2)(v) and 20 CFR 655.731(c)(4).

(2)     *Projected but not-yet-paid bonuses and similar payments (20 CFR 655.731(c)(2)(v))*

The employer may pay less than a *pro rata* salary or less than the required hourly rate in the pay period when the hours of work are performed, *provided that* the employer intends to use some form of non-discretionary supplemental payments in order to meet the wage obligation in the future.  The employer must have documentation showing his or her commitment to make such payment such as a documented history of making such payments when due.  The employer must be able to show the method of determining the amount of such supplemental and/or bonus payments, and that the payments combined with the routine and/or regular wage payments would ensure payment of at least the required wage for each pay period.

(3)     Unlike non-discretionary bonuses, projected but not-yet-paid *discretionary bonuses* are not applicable toward the required wage rate as they are not guaranteed.

      (4)    Claims of supplemental payments or bonus systems should be reviewed with the RSOL to determine whether a wage violation exists and, if so, the method of back wage computation.

**(d)**    Once the supplemental and/or bonus payments are made, whether discretionary or non-discretionary, the payments are treated as wages under the standards for wages paid (*see* FOH 71d10(b) above).

**(e)**    **Facilities furnished to H-1B worker(s)**

      (1)    An employer may take a wage credit (*i.e.*, may reduce or make a deduction from the cash-in-hand payment of the required wage) for matters which are principally for the benefit of and voluntarily agreed to by the H-1B worker in writing (*see* FOH 71d11 on deductions).

      (2)    Housing and food allowances meet the principal benefit of the worker test, *except in circumstances in which* they are employer business expenses as described in 20 CFR 655.731(c)(9)(iii).

      (3)    The wage credit (*i.e.*, deduction) cannot exceed the fair market value or actual cost, whichever is lower, and must be documented by the employer.

      (4)    The amount of the wage credit (*i.e.*, deduction) must appear on the payroll records and tax reports as wages.

      (5)    The amount of the wage credit (*i.e.*, deduction) must not exceed the limit on garnishments under the Consumer Credit Protection Act (CCPA) (*see* 29 CFR 870).

**(f)**    Benefits and eligibility for benefits provided as compensation for services must be offered to H-1B worker(s) on the same basis and under the same criteria as those offered to U.S. workers.  *See* 20 CFR 655.731(c)(3)(i) for detailed requirements.

      (1)    Benefits actually received by the H-1B worker(s) need not be identical to the benefits of U.S. workers, provided that the offers were the same and that the differences in the actual benefits were the result of voluntary choices by the H-1B worker(s) (*see* 20 CFR 655.731(c)(3)(ii)).

      (2)    If there are no U.S. workers similarly employed by the employer, so that the offer requirement is not applicable, the employer's fringe benefits or benefit policies may constitute a part of the employer's actual wage system applicable to the H-1B worker(s).  For example, if the evidence shows that the employer *pays* a particular benefit, or has provided this benefit in the past to U.S. workers similarly employed, this would likely show that the benefit is part of the employer's actual wage and would be due the H-1B worker.  The WHI should consult with the RSOL through appropriate channels to determine the actual wage for purposes of the employer's required wage obligation.

      (3)    Special rules apply to the employer's offer of benefits and rules for benefit eligibility when an employer is part of a multinational corporate operation.  Per 20 CFR 655.731(c)(3)(iii), this employer has three options for meeting its obligation regarding benefits to H-1B worker(s) continued on the home country payroll.

(4)   Benefits provided as compensation for services (*e.g.*, cash bonuses, stock options) may be credited against the required wage (*i.e.*, treated as wages paid) *provided that* the requirements described in FOH 71d10(b) above are satisfied.

**(g)   FLSA overtime pay**

Many H-1B workers are not entitled to FLSA overtime pay because they are exempt either as salaried professionals (*see* section 13(a)(1) of the FLSA) or as skilled computer workers paid at least the FLSA exemption rate of $27.63 per hour (*see* section 13(a)(17) of the FLSA).

(1)   Where the FLSA overtime requirement is *not* applicable, the employer may credit premiums paid for overtime hours to other workweeks.

(2)   Where the FLSA overtime requirement *is* applicable, the following standards are to be followed:

a.   The regular rate for the calculation of the FLSA overtime pay is the H-1B required wage rate for the hours worked in the pay period for which the overtime pay is owed (*e.g.*, where the prevailing wage is the required wage, and the prevailing wage is $18.00 per hour, the regular rate for purposes of FLSA overtime pay is $18.00; where the employer's actual wage is the required wage, and the actual wage is $20.00 per hour, the regular rate for purposes of FLSA overtime pay is $20.00). This is in accordance with the FLSA principle that the regular rate can be no less than the legally-required wage for the hours worked (here, the H-1B required wage rate). *See* 29 CFR 778.315.

b.   The FLSA 40-hour week standard is used to determine whether overtime pay is due, even if the employer's standard for full-time work is greater than 40 hours per week.

c.   Payment of overtime is compelled by a separate and distinct statutory obligation under the FLSA. Therefore, the employer is required to pay the H-1B required wage and, in addition, to pay the FLSA overtime premium wage for each pay period in which FLSA overtime hours are worked.

d.   The employer's payment of FLSA overtime cannot be credited outside of the pay period in which the overtime pay is due. Therefore, the employer cannot credit FLSA overtime pay from overtime weeks to bench weeks in which the H-1B worker worked less than a full-time schedule and would be owed wages for bench time.

e.   The employer will not be required to pay overtime on overtime. The FLSA overtime pay will not be considered to have become part of the employer's actual wage for purposes of the H-1B program, since this could have the result of making the FLSA overtime pay part of the H-1B required wage and, thus, part of the FLSA regular rate for future FLSA overtime compliance purposes.

(3)   If during the course of the H-1B investigation, the WHI determines that there are also FLSA overtime violations, the FLSA findings should be separately reported under

the appropriate act in WHISARD.  The straight time rate for overtime hours will be reflected under the H-1B program and the additional half time for overtime hours will be recorded under the FLSA program in WHISARD.

(4)     Whether to bring litigation under H-1B or the FLSA for overtime violations will depend on the facts of the individual case and should be discussed with the RSOL. Factors to consider include: the amounts involved, the need for an injunction, and the utility of charging an individual as an FLSA employer.

**71d11**     **Deductions (20 CFR 655.731(c)(9)).**

**(a)**     Deduction means any amount by which the H-1B worker's cash wages are decreased.  A deduction may be shown on the payroll records, marked as a deduction or a wage credit (*e.g.*, FICA and housing).  However, a deduction will also be considered to exist where the H-1B worker's cash wages have been decreased through out-of-pocket expenditures made by the H-1B worker for business expenses of the employer (*e.g.*, travel expenses paid by the H-1B worker while on the employer's business).

**(b)**     A wage violation will exist where a deduction causes the cash wage to fall below the required wage, unless the deduction is made in accordance with the H-1B regulations.  If the H-1B worker receives the required wage despite the deduction, there is no violation.  Therefore, a deduction is not necessarily a violation, even where the deduction fails to satisfy the regulatory criteria for allowable deductions.

**(c)**     **Allowable deductions**

Deductions which reduce the H-1B worker's cash wage below the required wage may be made *only* if they meet one of the following criteria (*see* 20 CFR 655.731(c)(9)):

(1)     *Required by law*

The employer may make deductions required by law (*e.g.*, income tax and FICA) (*see* 20 CFR 655.731(c)(9)(i)).

(2)     *Reasonable and customary*

The employer may make deductions which are authorized by a CBA, or are reasonable and customary in the occupation and/or area of employment (*see* 20 CFR 655.731(c)(9)(ii)), provided they:

a.     do not recoup employer's business expense(s) (*see* FOH 71d11(d) below);

b.     were revealed to the H-1B worker prior to the commencement of employment;

c.     if, as a condition of employment, were clearly identified as such prior to the commencement of employment;

d.     are made against wages of U.S. workers, if any, as well as H-1B workers; and

e.          do not violate state or federal law.

(3)     *Voluntary*

The employer may make deductions which meet all of the requirements listed in 20 CFR 655.731(c)(9)(iii).

**(d)     Business expenses**

The employer cannot recoup business expenses (*e.g.,* cost of tools and equipment, transportation costs while on business travel, etc.) to the extent such recoupment reduces the H-1B worker's wage below the required wage (*see* 20 CFR 655.731(c)(9)(iii)(C)).  *See* FOH 71d08 for treatment of the USCIS fees.

(1)     Attorneys fees incurred in the preparation and filing of the LCA, the Form I-129/I-129W, or a request for extension of H-1B status, are considered to be an employer business expense.  However, the employer's business expenses would *not* include costs and fees connected with the H-1B worker's personal obligations in obtaining the H-1B visa (*e.g,* translation of credential materials for submission to the U.S. Consulate) or with the H-1B worker's personal interests concerning the employment (*e.g.*, attorney hired by H-1B worker to negotiate the employment contract, or to review the H-1B worker's immigration status, or to obtain visas for the H-1B worker's family members).  Claims that H-1B worker(s) have paid attorneys fees should be reviewed with the RSOL, through appropriate channels, to determine whether a violation exists and to determine back wages, in the event of a violation.

(2)     Deductions that are not considered business expenses include: initial transportation from, and end-of-employment transportation to, the H-1B worker's home country (this is due to special treatment of transportation expenses in the INA); transportation for the H-1B worker's family; any expense incurred to obtain the H-1B worker's visa or visas for his or her family members at the U.S. Consulate or Embassy; and fair market value or reasonable cost of housing and food *unless* the H-1B worker is in business travel status, or the circumstances indicate that the arrangements for the H-1B worker's housing are principally for the convenience or benefit of the employer (*e.g.,* working and living at the worksite in an on-call status).

(3)     If the employer advances the H-1B worker the cost of non-business expenses (*e.g.*, travel expenses for the H-1B worker and his or her family members from the home country), then the employer may later recoup those advances through voluntary deductions from the H-1B worker's wages, provided that the deductions are in compliance with the regulation for such deductions as discussed in FOH 71d11(c)(3) above (*see* 20 CFR 655.731(c)(9)(iii)(C) and FOH 71e02).

**(e)**     Any unauthorized deduction taken from the required wages is considered by the DOL to be non-payment of that amount of wages.  *See* 20 CFR 655.731(c)(11).  An employer may never withhold payment of required wages, especially the last paycheck.

**71d12     Place of employment and worksite (20 CFR 655.715).**

**(a)**     The employer's obligations under the H-1B program are focused around the H-1B worker's place of employment and worksite.  The employer must have an LCA on file for every place

of employment or worksite, determine the applicable prevailing wage rate, give notice to U.S. workers that H-1B workers may be hired, and comply with the strike or lockout prohibition.

**(b)**      "Place of employment" is the worksite or physical location where the H-1B worker's work is actually performed (*see* 20 CFR 655.715).  Most H-1B program requirements (*e.g.*, wages, notice, and strike or lockout) are tied to the place of employment and worksite.

  **(1)**      H-1B workers may have more than one place of employment and worksite during their stay in the U.S., since they may work for short periods at various worksites and be relocated from one worksite to another.  Regardless of how often H-1B workers travel in the performance of their job, or how often they move from one location to another, every H-1B worker has a worksite at all times, for purposes of determining the LCA which controls the H-1B workers' wage rights and the employer's other obligations.

  **(2)**      An H-1B worker may perform work at some locations that are not considered worksites (*e.g.*, receiving training; making a sales call on a customer), as explained in FOH 71d12(c) below.  The WHI will determine what location(s) constitute worksite(s) for the H-1B worker in an investigation, and then determine whether there are violations concerning the employer's treatment of wages, notice, and other matters with regard to such location(s).

  **(3)**      Worksite examples based on an H-1B worker's job functions are listed in 20 CFR 655.715.

**(c)**      **Non-worksite**

For any days or periods when H-1B workers work at a non-worksite location, their worksite, for purposes of wages and other obligations, would be the H-1B workers' home base or regular worksite LCA.  This regular worksite is often the location identified on the LCA used by the employer to petition for the H-1B worker, but it may be a different location if the H-1B workers were transferred, temporarily or permanently, to some other location after beginning employment.  For any location that is not a worksite, there is no requirement to have an LCA on file for that location, to determine the prevailing wage, or to give notice to the U.S. workers of the employer's intent to hire an H-1B worker.

  **(1)**      There are two categories of non-worksite locations: training sites and short visit sites:

    a.      <u>Training locations</u>

          The place of employment and/or worksite does not include locations where the H-1B worker temporarily participates in various types of employee developmental activities, such as training seminars and management conferences.  This exception would not include the location of an H-1B worker's on-the-job training (*see* 20 CFR 655.715), or an H-1B worker's work as an instructor at a training location.

    b.      <u>Short visit locations</u>

          Sometimes the nature and duration of an H-1B worker's job function may require frequent location changes and result in little time at any one location.

The H-1B worker's visits may be recurring, but are to be on a casual (short-duration) basis.  The following criteria are applied to such situations (*see* 20 CFR 655.715):

1.      **Peripatetic or constantly traveling H-1B worker**

Where the H-1B worker's duties require frequent travel to various locations (local or non-local), and the worker's visit to a location does not exceed 5 consecutive work days, the location will not be considered to be a worksite.  An H-1B worker who makes sales calls or performs service calls on customers' equipment would commonly be peripatetic and the customers' facilities would not be worksites for the H-1B worker.

2.      **Occasional short visits by H-1B worker**

Where the H-1B worker spends most work time at one location but occasionally travels to other locations for short periods of time (*i.e.*, not exceeding 10 consecutive work days on any one visit), the location visited will not be considered to be a worksite.

3.      The worksite analysis focuses on the normal duties of the H-1B worker's occupation, and not the nature of the employer's business.  An employer operating as a staffing provider that routinely sends H-1B workers to customer locations to fill in for other workers or to supplement the customer's workforce in times of heavy workload would be a worksite, unless the nature of the H-1B worker's occupation normally involves frequent visits to various locations.

4.      The H-1B worker cannot be sent to a short visit site as a strikebreaker (*i.e.*, the H-1B worker is not to be at the location performing work in an occupation in which U.S. workers are on strike or in lockout).  If such a placement of an H-1B worker occurs, the location would be considered to be a worksite.  The employer would be subject to all the requirements regarding a worksite (*e.g.*, posting notices) and could be cited for a violation of the strike or lockout standards (*see* FOH 71d18).

c.      <u>Non-worksite short visit examples, based on an H-1B worker's job functions</u> (*see* <u>20 CFR 655.715</u>)

A customer location to which an H-1B computer programmer is sent to troubleshoot complaints regarding software malfunctions; a business location visited by an H-1B sales representative calling on prospective customers within a home office sales territory; a field office or out-station visited by an H-1B manager monitoring the performance of workers (*i.e.*, H-1B and/or U.S. workers); a customer's facilities where an H-1B accountant is conducting reviews or auditing records; or private homes where an H-1B physical therapist treats patients.

**71d13**      **Short-term placement (20 CFR 655.735).**

**(a)**      Short-term placement is a regulatory exception to the usual requirements concerning worksite notice and prevailing wages.  This exception provides an option that allows an employer to place an H-1B worker(s) at a worksite(s) within an area(s) of employment not listed on the employer's already existing LCA(s) (*i.e.*, non-LCA worksites).  *See* FOH 71d12(c).  This option enables the employer to move its H-1B worker(s) quickly to the worksite(s), without waiting to complete the LCA filing process.  Thus, the employer is afforded some flexibility in the use of its H-1B workers to respond to business opportunities and needs.

**(b)**      While the H-1B worker is on a short-term placement, his or her wage rates are controlled by the LCA for his or her permanent worksite, often called the home office.

**(c)**      **Travel and subsistence expenses**

The H-1B employer must satisfy all requirements listed in 20 CFR 655.735(b)(3); the payment of actual expenses is required even where the H-1B worker's expenses do not take the H-1B worker's cash wage below the required wage.  This is the only circumstance in which employer payment of the H-1B worker's travel and subsistence expenses is required without regard to any impact of the H-1B worker's payment of these expenses on receipt of the required wage.  Where an employer is unable to demonstrate the actual expenses incurred, the WHI should use the best information available to make a determination.  In such situations, the WHI may use the General Services Administration (GSA) standards for travel and subsistence expenses (*see* http://www.policyworks.gov/org/main/mt/homepage/mtt/perdiem/travel.shtml.)

**(d)**      The employer cannot place an H-1B worker at a worksite where there is a strike or lockout in the H-1B worker's occupation.  This prohibition applies to short-term placements as well as to permanent transfers and placements.

**(e)**      **Short-term not applicable where an LCA is in effect**

Per 20 CFR 655.735(e), where the employer has an LCA in effect for the area of employment and occupation, the short-term placement option is *not* available as a method for placing H-1B workers at worksites.  In addition, the H-1B worker's first worksite placement must be at a worksite in the area of employment identified on the LCA supporting that worker's Form I-129/I-129W petition.  Therefore, no H-1B worker can be sent on a short-term placement as his or her initial job assignment.

(1)      The short-term placement option does *not* provide a method by which the employer can send extra workers to an area or can evade the LCA obligations by treating some H-1B workers as temporary in that area.

(2)      All H-1B workers at LCA-covered worksites must be employed in accordance with the LCA for that area and occupation.  The existence of the LCA, with its local prevailing wage standard, may require the employer to make adjustments in the wages of H-1B workers who are sent to worksites in the area.  The employer cannot avoid this possibility by claiming to be using the short-term placement option.

(3)      Since the LCA has a designation of the number of H-1B workers to be employed by the employer in the area of employment, it is possible that the employer will be

*overcrowding*, or exceeding the designated LCA number by placing temporary H-1B workers at worksites in the area.  If overcrowding is identified in an investigation, the DOL will not charge a violation of the LCA specificity requirement (*see* FOH 71d19) if the employer's violation is not willful and the employer has taken prompt action to come into compliance (*i.e.*, filing a new LCA to add more slots for H-1B workers).

**(f)      Standards for enforcement**

The determination as to whether a placement is truly short-term is based the following regulatory standard (the "30 + 30" standard):

(1)      30 workdays in a 1-year period will be considered short-term.  The days may be consecutive, but may also be broken into two or more placements during the 1-year period.

(2)      An additional 30 workdays (*i.e.*, a total of 60) in a 1-year period will also be considered short-term, whether consecutive or broken into two or more placements, if the employer can show that the three criteria listed in 20 CFR 655.735(c)(1) -(3) have been met.

(3)      For purposes of this test, "workday" means any day on which the H-1B worker performs any work at any worksite(s) in the non-LCA area, and "1-year period" means either the calendar year (January 1 through December 31) or the employer's fiscal year, whichever the employer has designated.  *See* 20 CFR 655.735(d).

(4)      For purposes of this test, the count of workdays is done worker-by-worker, and the short-term limit is reached when any one H-1B worker has accumulated the maximum number of days in a 1-year period.  The employer is not allowed to continuously rotate H-1B workers in a manner that would evade the purposes of the short-term placement option.  Where the employer continuously or virtually continuously has H-1B workers in an area, but moves individual workers out of the area in a pattern that avoids the maximum days limit, the employer has violated the short-term placement regulations.

(5)      Once the short-term placement option is exhausted (*i.e.*, once any H-1B worker accumulates the maximum number of days at any worksite or combination of worksites in the area in a 1-year period), the employer must take one of the actions available in 20 CFR 655.735(f).

**(g)      Investigative findings and remedies**

After the short-term determination is made, the WHI shall determine the employer's obligation and any appropriate remedies as follows:

(1)      If the placement is short-term, the employer must meet all the requirements in 20 CFR 655.735 (b)(3)(i) -(iii).  If the employer has an LCA in effect for the occupation in the area, the placement cannot be considered to be short-term and the wage and notice obligations under that LCA are fully applicable.

(2)      If the placement is not short-term, and the employer has no LCA in effect for the occupation in the area, the employer must file an LCA for the area of employment

that covers the worksite(s) (which includes the requirement to determine the prevailing wage); the employer must:

    a.    satisfy the notification obligations (*i.e.*, give a copy of the new LCA to the H-1B worker(s) and provide notice at the worksite(s) to the union, or by hard copy posting, or by electronic posting, as appropriate);

    b.    pay the required wage rate applicable to the worksite; *and*

    c.    pay the H-1B worker's actual costs of travel while on the employer's business.  *See* 20 CFR 655.735(g).

    (3)    If the employer has an LCA for the occupation in the area, thus making the short-term placement option non-applicable, the employer must:

    a.    meet the notification obligations under that LCA (*i.e.*, give a copy of the LCA to the H-1B worker upon placement at a worksite in the area);

    b.    provide notice at the worksite(s) to the union, or by hard copy posting, or by electronic posting, as appropriate;

    c.    pay the required wage rate applicable under that LCA, which may require wage adjustments for the H-1B worker(s) in question; and

    d.    pay the H-1B worker's actual cost of travel while on the employer's business, if these expenses depressed the worker's wages below the required wage.

**71d14**    **Notification requirements (20 CFR 655.734).**

**(a)**    Any employer filing an LCA for the employment of H-1B workers must provide notice to the H-1B worker(s) and to U.S. workers.  A failure to meet this requirement will be cited as a violation, and can result in CMPs and debarment if the violation is substantial.

**(b)**    **Notice to H-1B workers**

A copy of the LCA must be given to the H-1B worker per 20 CFR 655.734(a)(3).  The LCA notice to the H-1B worker is required by the DOL regulation; the USCIS regulations require that USCIS give the employer a copy of the Form I-129/I-129W and the Form I-797, but the USCIS does not require that the employer give a copy of these documents to the H-1B worker.  It is common practice for the employer to provide a copy of all of these documents, and many H-1B workers have these copies in their personal files.

**(c)**    **Notice to U.S. workers**

This notification requirement can be met in one of two ways *(union notice* or *worksite notice)* (*see* 20 CFR 655.734).

    (1)    *Hard copy*

The employer must post a notice for at least 10 days in at least two conspicuous locations at each place of employment and/or worksite where any H-1B worker will

AILA Doc. No. 18011933. (Posted 1/19/18)

be employed.  This requirement to notify workers also applies to a client's worksite.
The H-1B employer cannot send an H-1B worker to a client's worksite if the client
refuses to notify its workers.  Appropriate locations for posting the notices include
but are not limited to locations in the immediate proximity of the WHD and OSHA
posters.  The employer may post a copy of the LCA or may create a notice that
contains all the required information (described in subparagraph (d) below).  Where
the employer places an H-1B worker at a worksite not contemplated at the time of
filing the LCA, the employer shall post a notice on or before the date any H-1B
worker begins work at that location.

(2)     *Electronic*

The employer may provide an electronic notification to employees in the
occupational classification for which H-1B workers are sought.  *See* 20 CFR
655.734(a)(1)(ii)(B) for a description of methods that an H-1B employer can use to
accomplish this requirement.

(3)     *Contents of notice*

The notice must contain the following information: number of H-1B workers sought;
occupational classification(s) in which the H-1B workers will be employed; wages
offered; period of employment; location(s) at which the H-1B workers will be
employed; and location where the LCA is available for public inspection.

a.      In addition to the above, the following specific statement for all notices must
be included: "Complaints alleging misrepresentation of material facts in the
LCA and/or failure to comply with the terms of the LCA may be filed with
any office of the Wage and Hour Division of the United States Department of
Labor."  *See* 20 CFR 655.734(a)(1)(ii).

b.      If the employer is an H-1B-dependent employer or a willful violator, and the
LCA is not being used only for exempt H-1B nonimmigrants, the notice must
include "Complaints alleging failure to offer employment to an equally or
better qualified U.S. worker, or an employer's misrepresentation regarding
such offer(s) of employment, may be filed with the Department of Justice,
10th Street and Constitution Avenue, NW, Washington, DC 20530."

(4)     *New worksite(s)*

Where H-1B workers are placed at worksite(s) not contemplated when the LCA was
filed, notice shall be provided in the manner described above at the new worksite(s)
on or before the date the H-1B workers begin work at that site.

(5)     The requirement for notice to U.S. workers applies whether or not an H-1B worker is
ultimately approved to work for the employer on the LCA.

(6)     The employer's notice violation must be *substantial* in order to be penalized by
CMPs and debarment.  An investigation may disclose that the employer failed to
comply with the notice requirement in some respect (*e.g.*, failed to post the notice at
one of several work sites or failed to give a copy of the LCA to every H-1B worker
though many received them).  If the employer immediately and completely corrects

the failures upon being informed by the WHI, the violation will be cited but will not be characterized as substantial. If the employer fails to correct the violation, it will be cited as substantial, resulting in a CMP assessment and debarment. Where the employer's failure to provide notice is pervasive or egregious (*e.g.*, no notice at any worksites), the violation should ordinarily be characterized as substantial and correction of the failure should be required as an administrative remedy, in addition to CMPs and debarment.

**71d15** **Changes in employer's corporate structure or identity (20 CFR 655.730(e)).**

(a)     A corporate employer may experience changes in corporate structure as a result of an acquisition, merger, spin-off, or other action. The employer's obligations and continued participation in the H-1B program will require particular attention by the employer.

(b)     **New corporate employer**

The following criteria shall apply where an H-1B employer changes its corporate identity or structure:

(1)     The new corporate entity may continue to employ the predecessor entity's existing H-1B workers without filing new LCA(s), regardless of whether or not there is a change in the EIN, *provided that* the new entity explicitly agrees to assume the predecessor entity's obligations and liabilities under the LCA(s). *See* 20 CFR 655.730(e)(1)(i) -(iv) for a list of required documentation in the public access file. The non-public records must contain a list of the H-1B workers transferred as employees of the new entity.

(2)     The new corporate entity cannot use the predecessor entity's existing LCA(s) to employ H-1B worker(s). *See* 20 CFR 655.730(e)(2).

(c)     **Successor(s)-in-interest**

If a change in corporate structure or identity occurs and the new corporate entity fails to comply with the standards discussed in the preceding subparagraphs, then liability for H-1B program obligations shall be imposed upon the entity(ies) that are identifiable as the sponsoring or original employer's successor(s)-in-interest. Whether there is a successor-in-interest generally depends on whether the successor firm had notice of the liability at issue, the ability of the predecessor to provide relief, whether there has been substantial continuity of business operations, whether the new employer uses the same plant, whether he or she uses the same or substantially the same work force, whether he or she uses the same or substantially the same supervisory personnel, whether the same jobs exist under substantially the same working conditions, whether he or she uses the same machinery, equipment and methods of production, and whether he or she produces the same products. If such possibilities are raised in an investigation, careful coordination among the WHI, DD and/or ADD, and RSOL is essential.

**71d16** **Misrepresentation of a material fact on the LCA.**

(a)     The employer is subject to CMPs and debarment upon the finding of a misrepresentation of a material fact on the LCA.

AILA Doc. No. 18011933. (Posted 1/19/18)

**(b)**    "Misrepresentation" means that the employer made a statement on the LCA that was false at the time the LCA was filed.  The employer must exercise reasonable care and diligence to ensure the accuracy of its LCA statements; failure to exercise such care and diligence may result in a false statement that could constitute a violation.   The false statement may be a matter that was revealed through subsequent events (*e.g.*, LCA states that a particular wage rate would be paid, but evidence establishes that the employer never intended to pay that wage rate).  To constitute a misrepresentation, the false statement must be more than an inadvertent error.  Where the misrepresentation was willful (*i.e.*, the false statement was made knowingly, or the employer showed reckless disregard for the truthfulness of the statement), the violation is subject to an increased CMP ($5,000.00 maximum, rather than $1,000.00 maximum).

**(c)**    *"Material fact"* means a significant item of information on the LCA.  A material fact may include any of the following: the number of H-1B workers sought; the occupational classification for which the worker is sought; the rate of pay; the address where documentation is kept; the three-digit occupational group code; the job title; the part-time status of the employee(s); the prevailing wage rate and its source; the period of employment; the additional employer labor condition statements; and the location where the H-1B worker will work.

**(d)**    The number of H-1B workers sought, the occupational classification for which the worker is sought, and the rate of pay (and only these three facts) can also be cited as a violation under fail to specify (*see* FOH 71d19) but are never cited under both fail to specify and misrepresentation of a material fact.

**(e)**    For any violation committed by the employer that does not rise to the level of a misrepresentation, the violation can be cited as failed to otherwise comply with subpart H or I (*see* FOH 71d22 and FOH 71e17).

**71d17**    <u>Working conditions (20 CFR 655.732).</u>

**(a)**    Any employer seeking to employ an H-1B worker must attest that the employment of H-1B worker(s) in the named occupation(s) will not adversely affect the working conditions of similarly employed U.S. workers.  The employer's obligation extends for the longer of two periods: the validity period of the LCA(s) or the period during which the H-1B workers are employed by the employer.

**(b)**    Working conditions include hours, shifts, vacation periods, and benefits such as seniority-based preferences for training programs and work schedules.  Protected working conditions do not include the right to a job.  Therefore, if a U.S. worker is displaced by an H-1B worker, such displacement is not a violation of the working conditions attestation (even though it may violate other H-1B provisions or other laws).

**(c)**    "Similarly employed" means having substantially comparable jobs in the occupational classification at the worksite and in the area of intended employment.  The comparison is to be made among the employer's own employees, not among workers generally in the area of employment.

**71d18**    <u>Strike or lockout provisions (20 CFR 655.733).</u>

Any employer filing any LCA must attest that:

(a)     On the date the LCA is signed and submitted there is no strike or lockout in the course of a labor dispute in the named occupation at the intended place of employment or worksite.

(b)     The employer must adhere to requisites listed in 20 CFR 655.733(a)(1) if such a strike or lockout occurs after the LCA is submitted.  *See* FOH 71e04 and 71d13(d).

**71d19     Specific and accurate information on the LCA.**

(a)     The employer is required to provide specific and accurate information on the LCA concerning the number of H-1B workers sought, the occupational classification, and wage rate of the H-1B worker(s).  Misrepresentation of these three items can, in the alternative, be cited as a material misrepresentation (*see* FOH 71d16) or failed to otherwise comply with subpart H or I (*see* FOH 71d22 and FOH 71e17).

(b)     The employer's substantial failure to provide specific and accurate information would constitute a violation subject to a CMP not to exceed $1,000.00 per LCA (*see* FOH 71e06(b)(2)).

**71d20     Early cessation penalty (20 CFR 655.731(c)(10)).**

(a)     The INA prohibits the employer from requiring an H-1B worker to pay a penalty for ceasing employment with the employer prior to a date agreed to by the H-1B worker and the employer.  However, the employer is permitted to recoup bona fide liquidated damages for the employer's losses or expenses incurred due to the worker's leaving employment early (*see* 20 CFR 655.731(c)(10)(i)).  *See* FOH 71b06 for procedures for screening complaints and conducting investigations for alleged early cessation penalty violations.  Consultation with the RSOL on early cessation penalties is essential.

(b)     The employment agreement between the employer and the H-1B worker may contain a provision imposing a monetary payment on H-1B workers if they terminate employment prior to the agreed date.  The existence of such a contract clause does not, in itself, constitute a violation of the prohibition on an early cessation penalty and, conversely, does not ensure that the payment would constitute permissible liquidated damages.  The determination of the nature of the payment, whether liquidated damages or a penalty, must be made in light of the controlling state law.

(c)     **Liquidated damages**

In general, the laws of the various states recognize that liquidated damages are amounts which are fixed or stipulated by the parties at the inception of a contract, and which are reasonable approximations or estimates of the anticipated or actual damages caused to one party by the other party's breach of contract.  The liquidated damages cannot be speculative; they must reflect a potential bona fide loss to the employer.  Liquidated damages, in the context of an employee's early termination of employment, can cover business expenses and may include:

(1)     Worker-related expenses incurred by the employer, such as employer-paid costs for transporting a worker and/or family members from home country to the U.S.; employer-paid room and board for a worker upon arrival in the U.S.; or attorney's fees and filing fees, other than the special petition and anti-fraud fee (*see* FOH 71d08) and training costs.

(2)     Employer's losses attributable to an H-1B worker's early departure from
employment, such as a customer's cancellation of a contract with the employer due to
the unavailability of a crucial worker, or the employer's termination of a project or
office due to the loss of a worker's services.

**(d)     Penalties**

In general, the laws of the various states recognize that a penalty is an amount of money,
fixed or stipulated in a contract, that is not a reasonable approximation or estimate of the
damages actually resulting from the worker's early departure from employment.
Characteristics of a penalty include: an amount of money that the employer routinely
demands in a certain type of contract (*e.g.*, every H-1B contract specifies a termination
payment of $30,000.00 to employer); an amount of money that is the same regardless of
whether the agreement is terminated early in the contract period, when legitimate business
losses might be substantial, or near the end, when such losses would be minimal; an
unexplained or unjustified amount of money which is not attributed to any particular cost or
loss; *and* an amount of money which appears unreasonable in comparison to the worker's
earnings.

**(e)     Employer action to impose or collect penalty**

Once an amount of money has been determined to constitute a penalty, a violation will be
cited where the employer takes some action which can reasonably be construed as an effort to
collect the penalty.  A contract clause identifying the amount of money would not, in itself,
be sufficient for an early cessation penalty violation (*see* FOH 71d05 concerning intimidation
and/or retaliation).  A violation would exist where the employer makes a written or oral
demand for payment of the money, or where the employer has a history or a pattern of
behavior of seeking payment of the money from other workers.  An H-1B employer is not
prohibited from seeking to collect any liquidated damages for the early termination or seeking
to enforce, or obtain damages for, other contract terms allegedly breached by a worker.

**(f)**     A violation will be cited for every H-1B worker against whom the employer seeks to impose
and/or collect a penalty, including those workers who have entered a settlement with the
employer concerning the payment, with or without a state court order.  Such a settlement may
affect whether, and the extent to which, monetary relief should be obtained for the H-1B
worker.  In such instances, the amount of the H-1B back wages, if any, should be determined
only after consultation with the NO, OP, DEPP, Farm Labor/Immigration Branch.  Where a
state court, in adjudicating a lawsuit or approving a settlement between the parties, has itself
expressly made a judicial determination based on the facts of the case that a payment is not a
penalty under applicable state law, there can be no citation of an H-1B violation for an early
cessation penalty.

**(g)     Employer's method of collection of liquidated damages**

In no instance may an employer withhold an H-1B worker's final paycheck in an attempt to
recover any asserted liquidated damages owed the employer.

**(h)**     The special $750.00, $1,000.00, and/or $1,500.00 petition filing fee can never be considered
to be a liquidated damage.  The statute prohibits the H-1B worker's payment of this fee in
any circumstances.  *See* 20 CFR 655.731(c)(10)(ii) and FOH 71e11.

**71d21**     **Required records.**

H-1B employers are required to develop and maintain certain employment records to support their compliance with the attestations made on the LCA(s).  These records include those specifically required by the H-1B program; *see* 20 CFR 655.731(b), 20 CFR 655.738(e), 20 CFR 655.739(i), 20 CFR 655.760, and 20 CFR 655.805(a)(15)) as well as those required by the FLSA.  *See* FOH 71e15.

**71d22**     **Failed to otherwise comply with subpart H or I.**

**(a)**     H-1B employers must comply with all regulatory requirements in 20 CFR 655 subpart H or I.  CMPs and debarment may be imposed for violations of regulations that implement specific statutory standards (except public disclosure files).

**(b)**     CMPs but not debarment are available for violations of public disclosure requirements and other regulatory requirements (such as recordkeeping or refusal to cooperate in an investigation, where the violation impedes the WHD's ability to determine whether an attestation violation has occurred, or the public's ability to have information needed to file a complaint) which are not drawn from specific statutory provisions.  The distinction between these types of violations is clearly made in the regulation specifying the amounts of CMPs applicable to particular violations (*see* 20 CFR 655.810(b)).

**(c)**     Violations which are not subject to CMPs and debarment shall nevertheless be cited in the determination letter.  This violation category is used for any violation not addressed in FOH 71e01 -16.  *See* FOH 71e17.

**71d23**     **Good faith compliance or conformity (8 USC 1182(n)(2)(H)).**

**(a)**     The H-1B Visa Reform Act of 2004 provides for a good faith compliance defense, and a recognized industry standards defense.

**(b)**     The H-1B employer meets the good faith defense requirement only when:

(1)     the violation is technical or procedural only,

(2)     the employer has made a good faith attempt to comply,

(3)     the employer has corrected the problem within 10 business days of notice, and

(4)     the employer has not engaged in a pattern or practice of willful violations under the H-1B program.

**(c)**     The terms "technical" or "procedural" failures are not defined in the statute.

(1)     Technical failures are minor violations which do not result in or cause substantive violations of the statute.  Such technical failures may include clerical errors, insignificant failures to comply, or inadvertent mistakes.

(2)     Procedural failures in most instances are similar to technical failures and involve minor procedural discrepancies, mistakes or omissions.

(3)     Examples of technical or procedural failures:

       a.       A large firm with many public access files mixes up documents or fails to include a required document in an insignificant number of files.

       b.       Failure to report to the IRS in kind payments such as rent, bonuses, etc. as wages for tax purposes where the employer retroactively reports such wages, pays appropriate taxes and ceases the practice of non-reporting.

**(d)**      Failures to meet attestation requirements are not technical or procedural in nature.

**(e)**      Good faith requires that the employer affirmatively demonstrate that reasonable actions were taken to come into compliance.

**(f)**      The WHI should provide notice of the technical or procedural failure as soon as practicable and should provide at least 10 business days to correct the failure.  The WHI should document the date the notice was provided and note in the file the methods of compliance. The determination letter should not be issued until the period for correction has elapsed.



(b) (7)(E)

**71e**        **LIST OF VIOLATIONS AND REMEDIES**

**71e00**     <u>**Level or degree of employer's wrongdoing in violations.**</u>

   **(a)**      The INA specifies certain degrees of wrongdoing necessary in order to impose a penalty for
            certain violations (*i.e.,* CMPs, debarment, or both).  Some violations must be substantial (*see*
            FOH 71e05 -06 and FOH 71e09) and others must be willful (*see* FOH 71e01 -09), in order to
            assess CMPs and debarment.  However, in any case where an H-1B worker has been denied
            money in violation of H-1B requirements, the employer will be liable without regard to
            whether or not the violation was willful or substantial.

      (1)      If any violation does not meet the substantial or willful standard, the violation should
               nevertheless be cited in the determination letter without assessment of CMPs.





**(d)     Willful violation**

(1)     *Standard for willfulness*

The H-1B program uses the *Richland Shoe* standard for determining willfulness: the employer's action is willful if it is a knowing failure of compliance or a reckless disregard with respect to whether the conduct was contrary to the statute or regulations.  *See* 20 CFR 655.805(c) and *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128 (1988).  The employer's simple negligence, incorrect assumption of compliance, or mere carelessness in determining its H-1B obligations is not sufficient to meet the willful standard.  Actions that are clearly inconsistent with the employer's attestation obligations, as set forth in the LCA, would be strong evidence that a violation was willful, absent evidence of inadvertence.





(3)    *Violations requiring willfulness for imposition of penalties*

Willful violations are required for CMPs, up to $5,000.00 per violation, and debarment for an employer's failure to comply with the requirements concerning wage and benefits (*see* 20 CFR 655.731), working conditions (*see* 20 CFR 655.732), strike or lockout (*see* 20 CFR 655.733), notification (*see* 20 CFR 655.734), LCA specificity (*see* 20 CFR 655.730), displacement of U.S. workers: direct or secondary (*see* 20 CFR 655.738), recruitment of U.S. workers (*see* 20 CFR 655.739), or misrepresentation of a material fact on the LCA.  A non-willful misrepresentation of a material fact is subject to a CMP up to $1,000.00.



**(e)    Super penalty for certain willful violations**

Where the employer displaces a U.S. worker in its workforce (*i.e.*, U.S. worker employed by the violating employer) during the course of a willful violation, the willful violation is subject to an enhanced CMP up to $35,000.00 per violation plus debarment for at least 3 years.  It is not necessary for the WHD to show a causation link between the violation and the displacement, where the actions are contemporaneous or nearly so.  This enhanced CMP that applies to all H-1B employers, whether H-1B-dependent or non-dependent, requires NO, OP, DEPP, Farm Labor/Immigration Branch; SOL; and RSOL approval.  *See* FOH 71e10.

(1)    The super penalty applies where U.S. worker employees of the H-1B employer are displaced.  The penalty does *not* apply to the loss of work for U.S. worker consultants

and bona fide independent contractors who performed services for the H-1B employer.

(2)     In order for the super penalty to be applied, the displacement of the U.S. worker(s), in the course of the willful violation, must occur within the period beginning 90 days before and ending 90 days after the date of the employer's filing of any H-1B visa application (Form I-129/I-129W).  In other words, the super penalty is applicable only during specific time periods and is *not* available for all willful violations involving displacements of U.S. workers.

(3)     After an initial assessment that the violation(s) under investigation may be willful, the WHI should be alert to the possibility of displacement of U.S. worker(s) during the course of the violation(s) and within the pertinent time period(s).

(4)     The super penalty for a willful violation involving displacement of U.S. worker(s) is *not* to be confused with the non-displacement obligation which applies only to H-1B-dependent and willful violator employers.  *See* FOH 71d04.  The following differences are significant:

   a.     The super penalty applies to all H-1B employers, rather than only to H-1B-dependent and willful violator employers.

   b.     The super penalty applies only where the displaced U.S. workers are employed by the violating H-1B employer.  The secondary displacement concept, found in the H-1B-dependent and willful violator employer obligation, is not applicable to the super penalty.

   c.     The super penalty affects the size of the CMPs for the willful violation in which the displacement occurred.  The displacement itself is not penalized by the super penalty.  Therefore, an employer which is assessed a super penalty cannot be required to remedy the displacement through additional administrative remedies such as reinstatement.

H-1B Level or Degree of Wrongdoing: *Maximum* CMPs and *Minimum* Period of Debarment

| Violation | Base | If substantial | If willful | Regulation cite at 29 CFR | FOH cite |
|---|---|---|---|---|---|
| Misrepresentation of material fact | $1,000.00 1 year | $1,000.00 1 year | $5,000.00 2 years | 655.805(a)(1) | 71e01 |
| Failed to pay required wages or offer benefits | - | - | $5,000.00 2 years | 655.805(a)(2) | 71e02 |
| Failed to provide required working conditions | - | - | $5,000.00 2 years | 655.805(a)(3) | 71e03 |
| Filed LCA during a strike or lockout | $1,000.00 1 year | $1,000.00 1 year | $5,000.00 2 years | 655.805(a)(4) | 71e04 |

AILA Doc. No. 18011933. (Posted 1/19/18)

| Violation | Base | If substantial | If willful | Regulation cite at 29 CFR | FOH cite |
|---|---|---|---|---|---|
| Failed to provide notice of filing the LCA | - | $1,000.00 1 year | $5,000.00 2 years | 655.805(a)(5) | 71e05 |
| Failed to accurately specify number of workers sought, the occupational classification, or the wage rate and conditions | - | $1,000.00 1 year | $5,000.00 2 years | 655.805(a)(6) | 71e06 |
| Displacement of U.S. worker* | $1,000.00 1 year | $1,000.00 1 year | $5,000.00 2 years | 655.805(a)(7) | 71e07 |
| Failed to make required displacement inquiry of another employer at a worksite where H-1B workers are placed* | $1,000.00 1 year | $1,000.00 1 year | $5,000.00 2 years | 655.805(a)(8) | 71e08 |
| Failed to take good faith steps in recruitment* | - | $1,000.00 1 year | $5,000.00 2 years | 655.805(a)(9) | 71e09 |
| Displaced U.S. worker in the course of committing a willful violation | $35,000.00 3 years | $35,000.00 3 years | $35,000.00 3 years | 655.805(a)(10) | 71e10 |
| Required/accepted payment of employer's $750.00/$1,500.00 fee for filing petition | $1,000.00 0 years | $1,000.00 0 years | $1,000.00 0 years | 655.805(a)(11) | 71e11 |
| Required payment of penalty for early cessation of employment | $1,000.00 0 years | $1,000.00 0 years | $1,000.00 0 years | 655.805(a)(12) | 71e12 |
| Discriminated or retaliated for protected actions | $5,000.00 2 years | $5,000.00 2 years | $5,000.00 2 years | 655.805(a)(13) | 71e13 |
| Failed to make LCAs and public access documents available to public | $1,000.00 only if public impeded 0 years | $1,000.00 only if public impeded 0 years | $1,000.00 only if public impeded 0 years | 655.805(a)(14) | 71e14 |
| Failed to maintain required documentation | $1,000.00 only if public impeded 0 years | $1,000.00 only if public impeded 0 years 0 | $1,000.00 only if public impeded 0 years | 655.805(a)(15) | 71e15 |

| Violation | Base | If substantial | If willful | Regulation cite at 29 CFR | FOH cite |
|---|---|---|---|---|---|
| Failed to otherwise comply | $1,000.00 only if WHD impeded 0 years | $1,000.00 only if WHD impeded 0 years | $1,000.00 only if WHD impeded 0 years | 655.805(a)(16) | 71e17 |
| Failed to cooperate in Investigation | $1,000.00 only if WHD impeded 0 years | $1,000.00 only if WHD impeded 0 years | $1,000.00 only if WHD impeded 0 years | 655.800(c) -(d) | 71e16 |

*Note: applies only to H-1B-dependent employers

**71e01    Misrepresentation of a material fact on the LCA (20 CFR 655.730 and 20 CFR 655.805(a)(1)).**

(a)    *See* FOH 71d16.

(b)    A violation of this standard can be non-willful or willful.

  (1)    A non-willful violation should be cited as "(Name of firm on LCA) misrepresented a material fact on the LCA in violation of 20 CFR 655.730.  *See* 20 CFR 655.805(a)(1)."

         Maximum CMP: $1,000.00 per violation

         Minimum debarment: 1 year

  (2)    A willful violation should be cited as "(Name of firm on LCA) willfully misrepresented a material fact on the LCA in violation of 20 CFR 655.730.  *See* 20 CFR 655.805(a)(1)."

         Maximum CMP: $5,000.00 per violation

         Minimum debarment: 2 years

(c)    Any additional remedy: the employer will be required to file an LCA that reflects the correct material facts.  Filing a new LCA requires that the employer obtain the applicable prevailing wage and provide notice to workers.

(d)    A willful violation involving the displacement of a U.S. worker employed by the employer may be subject to an enhanced CMP, up to $35,000.00, and an enhanced debarment (minimum of 3 years).  *See* FOH 71e00(e) and FOH 71e10.

**71e02    Failed to pay wages as required (20 CFR 655.731 and 20 CFR 655.805(a)(2)).**

The wage category includes benefits and eligibility for benefits provided as compensation for services.  However, benefit violations are cited separately (*see* FOH 71e02A below).

**(a)**     *See* FOH 71d09 -10.

**(b)**     A violation of this standard can be non-willful or willful.

    **(1)**     A non-willful violation pertaining to wages should be cited as "(Name of firm on LCA) failed to pay wages as required in violation of 20 CFR 655.731.  *See* 20 CFR 655.805(a)(2)."

        CMP: none

        Debarment: none

    **(2)**     A willful violation pertaining to wages should be cited as "(Name of firm on LCA) willfully failed to pay wages as required in violation of 20 CFR 655.731.  *See* 20 CFR 655.805(a)(2)."

        Maximum CMP: $5,000.00 per violation

        Minimum debarment: 2 years

**(c)**     Any additional remedy: the employer will be required to pay back wages and/or provide benefits as deemed appropriate.

**(d)**     A willful violation involving the displacement of a U.S. worker employed by the employer may be subject to an enhanced CMP, up to $35,000.00, and an enhanced debarment of a minimum of 3 years.  *See* FOH 71e00(e) and FOH 71e10.

**71e02A**     **Failed to offer benefits, equal eligibility for benefits, or both (20 CFR 655.731(c)(3) and 20 CFR 655.805(a)(2)).**

**(a)**     *See* FOH 71d09 -10.

**(b)**     A violation of this standard can be non-willful or willful.

    **(1)**     A non-willful violation pertaining to benefits should be cited as "(Name of firm on LCA) failed to either offer benefits or equal eligibility for benefits or both in violation of 20 CFR 655.731(c)(3).  *See* 20 CFR 655.805(a)(2)."

        CMP: none

        Debarment: none

    **(2)**     A willful violation pertaining to benefits should be cited as "(Name of firm on LCA) willfully failed to either offer benefits or equal eligibility for benefits or both in violation of 20 CFR 655.731(c)(3).  *See* 20 CFR 655.805(a)(2)."

        Maximum CMP: $5,000.00 per violation

        Minimum debarment: 2 years

**(c)**     Any additional remedy: the employer will be required to pay back wages and/or provide benefits as deemed appropriate.

**(d)**    A willful violation involving the displacement of a U.S. worker employed by the employer may be subject to an enhanced CMP, up to $35,000.00, and an enhanced debarment of a minimum of 3 years.  *See* FOH 71e00(e) and FOH 71e10.

**71e03**    <u>Failed to provide working conditions as required (20 CFR 655.732 and 20 CFR 655.805(a)(3)).</u>

**(a)**    *See* FOH 71d17.

**(b)**    A violation of any part of this standard can be non-willful or willful.

  **(1)**    A non-willful violation should be cited as "(Name of firm on LCA) failed to provide working conditions as required in violation of 20 CFR 655.732.  *See* 20 CFR 655.805(a)(3)."

    CMP: none

    Debarment: none

  **(2)**    A willful violation should be cited as "(Name of firm on LCA) willfully failed to provide working conditions as required in violation of 20 CFR 655.732.  *See* 20 CFR 655.805(a)(3)."

    Maximum CMP: $5,000.00 per violation

    Minimum debarment: 2 years

**(c)**    Any additional remedy: the employer may be ordered to provide working conditions to H-1B workers comparable to those provided to U.S. workers.  Other remedies may be formulated on a case by case basis, after consulting with DD and/or ADD; regional enforcement coordinator: immigration; RSOL; SOL; and the NO, OP, DEPP, Farm Labor/Immigration Branch (for failures pertaining to benefits, cite under 20 CFR 655.731 (*see* FOH 71e02)).

**(d)**    A willful violation involving the displacement of a U.S. worker employed by the employer may be subject to an enhanced CMP, up to $35,000.00, and an enhanced debarment of a minimum of 3 years.  *See* FOH 71e00(e) and FOH 71e10.

**71e04**    <u>Filed an LCA during a strike or lockout in the course of a labor dispute in the occupational classification at the place of employment (20 CFR 655.733 and 20 CFR 655.805(a)(4)).</u>

**(a)**    *See* FOH 71d18.

**(b)**    A violation of this standard can be non-willful or willful.

  **(1)**    A non-willful violation should be cited as "(Name of firm on LCA) filed an LCA during a strike or lockout in the course of a labor dispute in the occupational classification at the place of employment in violation of 20 CFR 655.733.  *See* 20 CFR 655.805(a)(4)."

    Maximum CMP: $1,000.00 per violation

Minimum debarment: 1 year

(2)    A willful violation should be cited as "(Name of firm on LCA) willfully filed an LCA during a strike or lockout in the course of a labor dispute in the occupational classification at the place of employment in violation of 20 CFR 655.733.  *See* 20 CFR 655.805(a)(4)."

Maximum CMP: $5,000.00 per violation

Minimum debarment: 2 years

**(c)**    Any additional remedy: the remedies for violations under this part should be formulated on a case by case basis, after consulting with the DD and/or ADD; regional enforcement coordinator: immigration; RSOL; SOL; and the NO, OP, DEPP, Farm Labor/Immigration Branch.

**(d)**    A willful violation involving the displacement of a U.S. worker employed by the employer may be subject to an enhanced CMP, up to $35,000.00, and an enhanced debarment of a minimum of 3 years.  *See* FOH 71e00(e) and FOH 71e10.

**71e05**    **Failed to provide notice of the filing of the LCA (20 CFR 655.734 and 20 CFR 655.805(a)(5)).**

**(a)**    *See* FOH 71d14.

**(b)**    A violation of this standard can be non-substantial, substantial, willful, or willful and substantial.

(1)    A non-substantial violation should be cited as "(Name of firm on LCA) failed to provide notice of the filing of the LCA(s) in violation of 20 CFR 655.734.  *See* 20 CFR 655.805(a)(5)."

CMP: none

Debarment: none

(2)    A substantial violation should be cited as "(Name of firm on LCA) substantially failed to provide notice of the filing of the LCA(s) in violation of 20 CFR 655.734.  *See* 20 CFR 655.805(a)(5)."

Maximum CMP: $1,000.00 per violation

Minimum debarment: 1 year

(3)    A willful violation should be cited as "(Name of the firm of LCA) willfully failed to provide notice of the filing of the LCA(s) in violation of 20 CFR 655.734.  *See* 20 CFR 655.805(a)(5)."

Maximum CMP: $5,000.00 per violation

Minimum debarment: 2 years

(4)    A willful and substantial violation should be cited as "(Name of the firm on LCA) willfully and substantially failed to provide notice of the filing of the LCA(s) in violation of 20 CFR 655.734.  *See* 20 CFR 655.805(a)(5)."

Maximum CMP: $5,000.00 per violation

Minimum debarment: 2 years

**(c)**   Any additional remedy: the employer may be required to provide the affected H-1B worker(s) with a copy of the applicable LCA(s), and/or re-post the required notice for the affected U.S. workers.  Any other remedy may be formulated on a case by case basis, after consulting with DD and/or ADD; regional enforcement coordinator: immigration; RSOL; SOL; and the NO, OP, DEPP, Farm Labor/Immigration Branch.

**(d)**   A willful violation involving the displacement of a U.S. worker employed by the employer may be subject to an enhanced CMP, up to $35,000.00, and an enhanced debarment of a minimum of 3 years.  *See* FOH 71e00(e) and FOH 71e10.

**71e06**    <u>**Failed to accurately specify on the LCA (20 CFR 655.730(c) and 20 CFR 655.805(a)(6)).**</u>

**(a)**   *See* FOH 71d19.

**(b)**   A violation of this standard can be non-substantial, substantial, willful, or willful and substantial.

(1)    A non-substantial violation of this standard should be cited as "(Name of firm on LCA) failed to specify accurately on the LCA in violation of 20 CFR 655.730(c).  *See* 20 CFR 655.805(a)(6)."

CMP: none

Debarment: none

(2)    A substantial violation should be cited as "(Name of firm on LCA) substantially failed to specify accurately on the LCA in violation of 20 CFR 655.730(c).  *See* 20 CFR 655.805(a)(6)."

Maximum CMP: $1,000.00 per violation

Minimum debarment: 1 year

(3)    A willful violation would be cited as "(Name of the firm on LCA) willfully failed to specify accurately on the LCA in violation of 20 CFR 655.730(c).  *See* 20 CFR 655.805(a)(6)."

Maximum CMP: $5,000.00 per violation

Minimum debarment: 2 years

(4)    A willful and substantial violation would be cited as "(Name of firm on LCA) willfully and substantially failed to specify accurately on the LCA in violation of 20 CFR 655.730(c).  *See* 20 CFR 655.805(a)(6)."

Maximum CMP: $5,000.00 per violation

Minimum debarment: 2 years

**(c)**   Any additional remedy: an employer who violates this standard may be required to file a new LCA containing the correct information.  Other remedies may be formulated on a case by case basis after consulting with the DD and/or ADD; regional enforcement coordinator: immigration; RSOL; SOL; and the NO, OP, DEPP, Farm Labor/Immigration Branch.

**(d)**   A willful violation involving the displacement of a U.S. worker employed by the employer may be subject to an enhanced CMP, up to $35,000.00, and an enhanced debarment of a minimum of 3 years.  *See* FOH 71e00(e) and FOH 71e10.

**71e07**    **Displaced a U.S. worker (20 CFR 655.738 and 20 CFR 655.805(a)(7)).**

**(a)**   *See* FOH 71d04 and 71e10.

**(b)**   A violation of this standard can be non-willful or willful.

   **(1)**   A non-willful violation should be cited as "(Name of firm on LCA) displaced a U.S. worker in violation of 20 CFR 655.738.  *See* 20 CFR 655.805(a)(7)."

   Maximum CMP: $1,000.00 per violation

   Minimum debarment: 1 year

   **(2)**   A willful violation should be cited as "(Name of firm on LCA) willfully displaced a U.S. worker in violation of 20 CFR 655.738.  *See* 20 CFR 655.805(a)(7)."

   Maximum CMP: $5,000.00 per violation

   Minimum debarment: 2 years

**(c)**   Any additional remedy: the employer may be required to pay back wages to the displaced U.S. workers, to reinstate these workers (direct displacement only), and/or provide front pay to these workers.  Remedies will be formulated on a case by case basis *only* after consulting with the DD and/or ADD; regional enforcement coordinator: immigration; RSOL; SOL; and the NO, OP, DEPP, Farm Labor/Immigration Branch.

**(d)**   A willful violation involving the displacement of a U.S. worker employed by the employer may be subject to an enhanced CMP, up to $35,000.00, and an enhanced debarment of a minimum of 3 years.  *See* FOH 71e00(e) and FOH 71e10.

**(e)**   The employer can be debarred for placing a H-1B worker with a secondary employer that displaced(es) its U.S. worker(s), only if the H-1B worker was non-exempt, or placed under an LCA not solely used for exempt employees, and one of the following criteria is met:

   **(1)**   At the time of the placement of the H-1B worker(s) with the secondary employer, the employer knew or had reason to know of the secondary employer's displacement of its U.S. worker(s); or

    (2)    The employer has been subject to an enforcement sanction based on a previous placement of an H-1B worker with the same secondary employer.

**71e08**    **Failed to make the required displacement inquiry of another employer at a worksite where an H-1B nonimmigrant was placed, as required (20 CFR 655.738 and 20 CFR 655.805(a)(8)).**

**(a)**    *See* FOH 71d04.

**(b)**    A violation of this standard can be non-willful or willful.  This violation will be cited only against the primary employer (being investigated) and not against the secondary employer.  A displacement is not necessary for this violation to be cited.

    (1)    A non-willful violation should be cited as "(Name of firm on LCA) failed to make the required displacement inquiry of another employer at a worksite where an H-1B nonimmigrant was placed as required under 20 CFR 655.738.  *See* 20 CFR 655.805(a)(8)."

        Maximum CMP: $1,000.00 per violation

        Minimum debarment: 1 year

    (2)    A willful violation should be cited as "(Name of firm on LCA) failed to make the required displacement inquiry of another employer at a worksite where an H-1B nonimmigrant was placed as required under 20 CFR 655.738.  *See* 20 CFR 655.805(a)(8)."

        Maximum CMP: $5,000.00 per violation

        Minimum debarment: 2 years

**(c)**    Any additional remedy: remedies will be formulated on a case by case basis *only* after consulting with the DD and/or ADD; regional enforcement coordinator: immigration; RSOL; SOL; and the NO, OP, DEPP, Farm Labor/Immigration Branch.

**(d)**    A willful violation involving the displacement of a U.S. worker employed by the employer may be subject to an enhanced CMP, up to $35,000.00, and an enhanced debarment of a minimum of 3 years.  *See* FOH 71e00(e) and FOH 71e10.

**71e09**    **Failed to recruit in good faith steps, as required (20 CFR 655.739 and 20 CFR 655.805(a)(9)).**

**(a)**    *See* FOH 71d03.

**(b)**    A violation of this standard can be non-substantial, substantial, or willful.

    (1)    A non-substantial violation of this standard should be cited as "(Name of firm on LCA) failed to recruit in good faith as required under 20 CFR 655.739.  *See* 20 CFR 655.805(a)(9)."

        CMP: none

AILA Doc. No. 18011933.  (Posted 1/19/18)

Debarment: none

    (2)    A substantial violation should be cited as "(Name of firm on LCA) substantially failed to recruit in good faith as required under 20 CFR 655.739.  *See* 20 CFR 655.805(a)(9)."

           Maximum CMP: $1,000.00 per violation

           Minimum debarment: 1 year

    (3)    A willful violation would be cited as "(Name of firm on LCA) willfully failed to recruit in good faith as required under 20 CFR 655.739.  *See* 20 CFR 655.805(a)(9)."

           Maximum CMP: $5,000.00 per violation

           Minimum debarment: 2 years

    (4)    A willful and substantial violation would be cited as "(Name of firm on LCA) willfully and substantially failed to recruit in good faith as required under 20 CFR 655.739.  *See* 20 CFR 655.805(a)(9)."

           Maximum CMP: $5,000.00 per violation

           Minimum debarment: 2 years

**(c)**    Any additional remedy: the employer must ensure future compliance.  Other remedies may be formulated on a case by case basis after consulting with the DD and/or ADD; regional enforcement coordinator: immigration; RSOL; SOL; and the NO, OP, DEPP, Farm Labor/Immigration Branch.

**(d)**    A willful violation involving the displacement of a U.S. worker employed by the employer may be subject to an enhanced CMP, up to $35,000.00, and an enhanced debarment of a minimum of 3 years.  *See* FOH 71e00(e) and FOH 71e10.

**71e10**    **Displaced a U.S. worker within the period beginning 90 days before and ending 90 days after the date of filing of any visa petition supported by the LCA in the course of committing a willful failure and/or willful misrepresentation of a material fact on an LCA as prohibited under 20 CFR 655.738 and 20 CFR 655.805(a)(10).**

**(a)**    This violation will be cited when the investigation disclosed that the employer did two things: committed a willful violation *and*, during the course of that violation (within a specific time period), displaced a U.S. worker employed by the employer.  The applicable violations are listed in FOH 71e10(a)(2) below.  A citation under this provision is the only citation appropriate for this displacement situation.  When citing this violation, do *not* additionally charge employer with the willful failure and/or misrepresentation that the employer committed.

    (1)    *Displacement*

           The employer displaced a U.S. worker employed by the employer only if the employee's loss of his or her job meets the criteria for displacement and/or lay off

described in FOH 71d04(d).  The displacement must occur within the period beginning 90 days before and ending 90 days after the date of filing of any H-1B visa petition (Form I-129/I-129W).  The filing date of Form I-129/I-129W is the "Receipt Date" appearing on the Form I-797.

(2)   *Willful failures and/or willful misrepresentations*

   a.   <u>Willful failures</u>

      **1.**   Failed to pay wages (including benefits provided as compensation for services and/or wages for certain nonproductive time)

      **2.**   Failed to provide working conditions as required

      **3.**   Filed an LCA for H-1B nonimmigrant(s) during a strike or lockout

      **4.**   Failed to provide notice of the filing of the LCA as required

      **5.**   Failed to specify accurately on the LCA the number of workers sought, the occupational classification in which the H-1B nonimmigrant(s) will be employed, and/or the wage rate and conditions under which the H-1B nonimmigrant(s) will be employed

      **6.**   Failed to make the required displacement inquiry of another employer at a worksite where H-1B nonimmigrant(s) were placed

      **7.**   Failed to recruit in good faith as required

   b.   <u>Willful misrepresentations</u>

      **1.**   Misrepresented on the LCA the H-1B nonimmigrant's occupation

      **2.**   Misrepresented on the LCA the number of H-1B nonimmigrants sought

      **3.**   Misrepresented on the LCA the gross wage rate and/or how it should be paid (*i.e.*, whether hourly, weekly, biweekly, or monthly)

      **4.**   Misrepresented on the LCA the starting and ending dates of the H-1B nonimmigrant's employment

      **5.**   Misrepresented on the LCA the place(s) of intended employment

      **6.**   Misrepresented on the LCA the prevailing wage rate for the occupation in the area of intended employment and/or the specific source relied upon by the employer to determine the wage

      **7.**   Misrepresented on the LCA the employer's status as to whether or not the employer is H-1B-dependent and/or a willful violator, and if the employer is H-1B-dependent and/or a willful violator, whether the employer will use the application only in support of petitions for exempt H-1B nonimmigrants

(3)     The employer who is cited for this violation may be either H-1B-dependent or non-dependent.  Note: the enhanced penalty does not add to any substantive obligation imposed on a non-dependent employer.

**(b)**     A violation of this standard should be cited as "(Name of firm on LCA) displaced a U.S. worker within the period beginning 90 days before and ending 90 days after the date of filing of any visa petition supported by the LCA in the course of committing a willful failure to (insert the failure that was willful) and/or a willful misrepresentation of a material fact in an LCA as prohibited under 8 USC 1182(n)(2)(C)(iii), 20 CFR 655.738, 20 CFR 655.805(a)(10), and 20 CFR 655.___ (insert applicable CFR cite or cites from subpart H (20 CFR 655.730 - 20 CFR 655.734 and/or 20 CFR 655.739))."

Maximum CMP: $35,000.00 per violation

Minimum debarment: 3 years

**(c)**     Any additional remedy: to be determined on a case by case basis after consultation with NO, OP, DEPP, Farm Labor/Immigration Branch.

**(d)**     This violation does not include the concept of secondary displacement (*see* FOH 71d(04)).

**71e11**     **Required and/or accepted from an H-1B worker, payment or remittance of the additional $750.00, $1,000.00, and/or $1,500.00 fee incurred in filing an H-1B petition (20 CFR 655.731(c)(10)(ii) and 20 CFR 655.805(a)(11)).**

**(a)**     *See* FOH 71d08(b).

**(b)**     A violation of this standard should be cited as "(Name of firm on LCA) required or accepted from an H-1B worker, payment or remittance of the additional $750.00, $1,000.00 and/or $1,500.00 fee incurred in filing an H-1B petition as prohibited under 20 CFR 655.731(c)(10)(ii).  *See* 20 CFR 655.805(a)(11)."

Maximum CMP: $1,000.00 per violation

Debarment: none

**(c)**     Any additional remedy: the employer must ensure future compliance.  All monies paid by the H-1B worker for any part or all of the $750.00, $1,000.00, and/or $1,500.00 filing fee must be restored to the H-1B worker.  The employer shall be assessed for this reimbursement, even if the H-1B worker had paid the money to a third party.

**71e12**     **Required or attempted to require an H-1B nonimmigrant to pay a penalty for ceasing employment prior to an agreed upon date (20 CFR 655.731(c)(10)(i) and 20 CFR 655.805(a)(12)).**

**(a)**     *See* FOH 71d20.

**(b)**     A violation of this standard should be cited as "(Name of firm on LCA) required or attempted to require an H-1B nonimmigrant to pay a penalty for ceasing employment prior to an agreed upon date in violation of 20 CFR 655.731(c)(10)(i).  *See* 20 CFR 655.805(a)(12)."

Maximum CMP: $1,000.00 per violation

Debarment: none

**(c)**   Any additional remedy: the employer must ensure future compliance and repay the H-1B worker any penalty money that he or she paid.

**71e13**   **Discriminated against an employee for protected conduct (20 CFR 655.801 and 20 CFR 655.805(a)(13))**

**(a)**   *See* FOH 71d05.

**(b)**   Violation should be cited as "(Name of firm on LCA) discriminated against an employee for protected conduct as prohibited under 20 CFR 655.801.  *See* 20 CFR 655.805(a)(13)."

Maximum CMP: $5,000.00 per violation

Minimum debarment: 2 years

**(c)**   Any additional remedy: the employer must ensure future compliance.  Remedies will be formulated on a case by case basis after consulting with the DD and/or ADD; regional enforcement coordinator: immigration; RSOL; SOL; and the NO, OP, DEPP, Farm Labor/Immigration Branch.

**71e14**   **Failed to make available for public examination the LCA and necessary document(s) at the employer's principal place of business or worksite (20 CFR 655.760(a) and 20 CFR 655.805(a)(14)).**

**(a)**   *See* FOH 71c04.

**(b)**   A violation of this standard should be cited as "(Name of firm on LCA) failed to make available for public examination the LCA and necessary document(s) at the employer's principal place of business or worksite in violation of 20 CFR 655.760(a).  *See* 20 CFR 655.805(a)(14)."  A CMP may be assessed if the violation impedes the public's ability to get the information it needs to file a complaint or it impedes the WHD's ability to determine if a substantive violation has occurred (*see* 20 CFR 655.810(b)(1)(vi)).

Maximum CMP: $1,000.00 per violation

Debarment: none

**(c)**   Any additional remedy: the employer shall be required to create the required public access materials and to comply in the future.

**(d)**   The employer's failure to maintain public access material may instead be cited as a failure to maintain documentation (*see* FOH 71e15), but not both for the same failure.

**71e15**   **Failed to maintain documentation, as required (20 CFR 655.731(b), 20 CFR 655.738(e), 20 CFR 655.739(i), and/or 20 CFR 655.760(c) and 20 CFR 655.805(a)(15)).**

**(a)**   *See* FOH 71d21.

**(b)**    A violation of this standard should be cited as "(Name of firm on LCA) failed to maintain documentation, as required by 20 CFR 655.731(b), 20 CFR 655.738(e), 20 CFR 655.739(i), and/or 20 CFR 655.760(c).  *See* 20 CFR 655.805(a)(15)."  A CMP may be assessed only if the violation impedes the WHD's ability to determine if an H-1B violation exists (*see* 20 CFR 655.810(b)(1)(vi)).

   Maximum CMP: $1,000.00 per violation

   Debarment: none

**(c)**    Any additional remedy: the employer shall be required to develop and maintain the necessary documentation, and to comply in the future.  Other remedies may be formulated on a case by case basis after consulting with the DD and/or ADD; regional enforcement coordinator: immigration; RSOL; SOL; and the NO, OP, DEPP, Farm Labor/Immigration Branch.

**(d)**    The employer's failure to maintain documents that must be available to the public (*e.g.,* an LCA) may instead be cited as a public access failure (*see* FOH 71e14) but not both for the same violation.

**71e16**    <u>**Failed to cooperate in the investigation, as required (20 CFR 655.800(c)).**</u>

**(a)**    A violation should be cited as "(Name of firm on LCA) failed to cooperate in the investigation as required by 20 CFR 655.800(c)."  A CMP may be assessed only if the violation impedes the WHD's ability to determine if a violation exists (*see* 20 CFR 655.810(b)(1)(vi)).

   Maximum CMP: $1,000.00 per violation

   Debarment: none

**(b)**    Any additional remedy: the employer must ensure future compliance and provide any records requested.  Other remedies may be formulated on a case by case basis after consulting with the DD and/or ADD; regional enforcement coordinator: immigration; RSOL; SOL; and the NO, OP, DEPP Farm Labor/Immigration Branch.

**71e17**    <u>**Failed to comply with the provisions of subpart H or I (20 CFR 655.7xx and 20 CFR 655.805(a)(16)).**</u>

**(a)**    *See* FOH 71d22.

**(b)**    H-1B employers are required to comply with all the provisions contained in 20 CFR 655 subparts H or I.  Any violation(s) of these regulations that are not listed in the preceding FOH sections (*see* FOH 71e01 -16) are cited under this standard, with the appropriate subpart H citation.

**(c)**    Violations under this standard are cited as "(Name of firm on LCA) failed to comply with the provisions of subpart H or I in violation of (*insert the applicable section of subpart H*).  *See* 20 CFR 655.805(a)(16)."  A CMP may be assessed only if the violation impedes the WHD's ability to determine if an H-1B violation(s) exists (*see* 20 CFR 655.810(b)(1)(vi)).

   Maximum CMP: $1,000.00 per violation

Debarment: none

**(d)**     Any additional remedy: the employer shall be required to take appropriate action to correct any violation and to comply in the future.

**71f**            **REMEDIES**

**71f00**        <u>**General.**</u>

The regulations authorize the Administrator of the WHD (Administrator) to impose CMPs, back wages, and other appropriate remedies. The assessment of penalties and remedies is subject to administrative review.

**71f01**        <u>**Civil money penalty.**</u>

Use WH-592: Civil Money Penalty Computation Worksheet (*see* FOH 54: WH-592-1) to compute CMPs. A CMP can be assessed not to exceed $1,000.00; $5,000.00; or $35,000.00 depending on the violation. The CMP form takes into consideration the seven penalty assessment criteria found in 20 CFR 655.810(c) and the number of violations that should be cited (based on the number of workers affected or similar factors). For example, 15 workers willfully underpaid means 15 violations occurred. Additionally, the form, as in other programs, allows for no CMPs to be assessed if certain factors are met. *See* FOH 71e for a list of violations and remedies.

**71f02**        <u>**Back wages.**</u>

**(a)**        If the investigation finds that an H-1B worker was not paid correctly, willfully or otherwise, back wages must be assessed. The back wages shall be equal to the difference between the amount that should have been paid (*i.e.*, required wages) and the amount that was actually paid to such H-1B worker(s). *See* INA 212(n)(2)(D) and 20 CFR 655.810(a). Any back wages computed are shown on the WH-56: Summary of Unpaid Wages (WH-56).



(b) (7)(E)

**71f03**        <u>**Other remedy(ies).**</u>

Any other remedy as deemed appropriate by the Administrator may be sought. For example, if an employer failed to post the required notice, the employer must post immediately at worksites where workers are currently working and agree to comply with the posting requirement in the future. Also, if the employer failed to offer benefits to H-1B workers as are offered to its U.S. workers, the employer must offer the benefits to the H-1B workers retroactive to the date they should have been offered or provided, and agree to comply in the future.

**71f04**        <u>**Employer's satisfaction of penalties and remedies.**</u>

**(a)**        The CMPs, back wages and any other remedy(ies) are immediately due for payment or performance upon assessment by the Administrator unless a timely request for an

administrative hearing is filed.  In such cases, the employer need not comply with any remedy until the administrative review process is concluded.

**(b)**   The performance of any remedy shall follow procedures established in the determination letter, the DOL's administrative law judge (ALJ) decision, or the DOL's administrative review board (ARB) decision, whichever is applicable.

**(c)**   Installment payment schedules are allowed following the normal WHD procedures.

**71f05**   <u>**Debarment.**</u>

**(a)**   The DO shall notify the ETA and USCIS of the final determination of any violation requiring debarment, in accordance with 20 CFR 655.855.

**(b)**   The debarment of an employer under the H-1B program prohibits the employer's future sponsorship of any alien on any temporary visa, not merely on H-1B visas, or as permanent residents (*i.e.*, green cards) for a prescribed period of time.

**(c)**   The debarment is not a remedy imposed by the WHD, and is not discretionary for the ETA or USCIS.  Debarment for at least the specified period automatically follows a DOL final agency action finding a debarable violation such as a misrepresentation of a material fact or a willful failure to pay the required wage rate.  The USCIS has discretion to debar an employer for longer than the minimum period.

**(d)**   Upon notification by the DO, the ETA shall suspend the employer's LCA (if applicable) and shall not approve an LCA or any applications for any other employment program administered by the ETA (*i.e.*, H-2A, H-2B, permanent labor certification (green card)) for the length of the debarment period imposed by the USCIS.

**(e)**   The WHD's notification to the USCIS may recommend a debarment period within the range specified by the H-1B statute for the type of violation committed by the employer (*see* FOH 71j01).  The USCIS has final authority concerning the length of the debarment period.

**(f)**   The debarment of the employer does not invalidate the visas for H-1B workers already employed by the employer and does not require that these H-1B workers leave the U.S.  These H-1B workers may continue their employment with the employer until the expiration dates of their H-1B visas.  During this employment, they remain under the H-1B program's protections.  If the employer is still debarred at the time that the H-1B workers' H-1B visas expire, any extension requests by the employer for these H-1B workers will not be approved.  The debarment also bars the ETA from approving an application for permanent employment (*i.e.,* issuing a green card for any worker sponsored by the employer).

**71f06**   <u>**An employer's refusal to comply, pay back wages, and/or perform the remedy(ies).**</u>

If an employer refuses to comply, pay back wages, and/or perform the remedy(ies) after the assessment has become the final agency action, *see* FOH 71i02.

**71g**          **REVIEW AND DISPOSITION**

**71g00**     <u>Review.</u>

    **(a)**     **Special JRC procedures**

JRC procedures are established for the H-1B program.  The JRC procedures will enable the DOL teams to quickly identify and resolve legal issues and evidentiary problems, (b) (7)(E)



    **(b)**     Prepare a determination letter.  *See* FOH 71h.

**71g01**     <u>Disposition.</u>

    **(a)**     Upon completion of the investigation, a final conference shall be held with the employer in (b) (7)(E)



(b) (7)(E)



AILA Doc. No. 18011933. (Posted 1/19/18)

**71h          WRITTEN NOTIFICATION OF INVESTIGATION FINDINGS**

**71h00     <u>General.</u>**

   **(a)     Written notification of investigation findings to the employer**

      Upon JRC review and approval of any finding and remedy, if any, the employer must be provided with a determination letter. This letter can be personally served at the final conference or the DD and/or ADD may mail the determination letter to the employer. The complainant and any interested party must also be provided with written notification. *See* FOH 71h00(d) -(e) below for the procedure to notify any interested party, including the complainant.

   **(b)     The determination letter will follow the format and text of the prototype letter, using the options appropriate to the particular investigation. The summary of violation(s) and remedy(ies) and the WH-56 (if back wages are due and the form has not previously been provided to the employer) will be attached to the determination letter. The form used to compute CMPs shall *not* be attached to the determination letter or otherwise provided to the employer. Additionally, the WHI may share with the employer the WH-55: Wage Transcription and Computation Sheet, but it shall *not* be attached to the determination letter. The RSOL must review and approve every determination letter. Therefore, the WHI must be prepared to provide the RSOL with any material needed for its review. *See* FOH 71g00(a). If the NO, OP, DEPP, Farm Labor/Immigration Branch and SOL were included in the JRC, they also must review the determination letter. *See* FOH 71g00(a)(4). If the NO, OP, DEPP, Farm Labor/Immigration Branch and SOL were not included in the JRC, the NO will continue to review the determination until the determination letters are incorporated into WHISARD. The regulations at 20 CFR 655.815 require that the determination letter incorporate all of FOH 71h00(c) below.**

   **(c)     The determination letter will:**

      (1)     set forth the determination of the Administrator and the reason or reasons therefore, and in the case of a finding of violation(s) by an employer, prescribe any remedy, including the amount of any back wages assessed, the amount of any CMP assessed and the reason therefore, and/or any other remedy assessed;

      (2)     inform any interested party that he or she may request a hearing pursuant to 20 CFR 655.820;

      (3)     inform any interested party that in the absence of a timely request for a hearing, received by the ALJ within 15 calendar days of the date of the determination, the determination of the Administrator shall become final and not appealable;

      (4)     set forth the procedure for requesting a hearing, the addresses of the ALJ with whom the request must be filed, and all parties upon whom copies of the request must be served;

      (5)     where appropriate, inform the parties that, pursuant to 20 CFR 655.855, the Administrator shall notify the ETA and USCIS of the occurrence of a violation by the employer; and

(6)     advise that the complainant and any interested party will receive a copy of the determination letter as described in FOH 71h00(d) -(e) below.  The determination letter and the interested party cover memo (*see* FOH 71h00(d) -(e)) are to be mailed to the complainant and any interested party on the same day the determination letter is provided, or mailed, to the employer.

**(d)     Written notification of investigation findings to any interested party**

An interested party must be provided with a copy of the determination letter with his or her individual cover memo, as discussed in FOH 71h00(e) below and FOH 71h01, and provided an opportunity to appeal the investigation findings.  A WH-56 that may be attached to the determination letter sent to the employer will *not* be attached to the determination letter copy provided to any interested party, including the complainant.  An interested party is defined in the regulations (*see* 20 CFR 655.715) as a person or entity who or which may be affected by the actions of an H-1B employer or by the outcome of a particular investigation, and includes any person, organization or entity who or which has notified the DOL of his, her, or its interest or concern in the Administrator's determination.  An interested party will include the following: any complainant; any H-1B worker due back wages or any H-1B worker who believes he or she is owed back wages but none were computed; any worker directly affected by a non-monetary remedy, such as a reinstatement order for a retaliation violation; any U.S. worker who has alleged that he or she was displaced or not recruited by the H-1B-dependent or willful violator employer; any collective bargaining representative of the investigated employer where the investigation found a notification violation; any secondary employer who displaced a U.S. worker; any person, organization, or entity who or which has notified the DOL of his, her, or its interest or concern in this determination; and any attorney or other representative of an interested party who has identified his or her representative status to the WHD.

**(e)**     As mentioned in FOH 71h00(d) above, any interested party, including the complainant, will be provided his or her own copy of the determination letter with his or her individualized cover memo.  The cover memo is individually tailored to properly notify each interested party of the investigation results.  The determination letter with its cover memo can be hand-delivered or mailed.  If mailed, *see* FOH 71h01 below.  If hand-delivered, for evidentiary purposes, the investigation file must be properly annotated.  The WH-56 will never be provided to an interested party as part of the investigation.

**71h01     Service of determination letter and cover memo.**

**(a)**     Copies of the determination letter must be provided to the employer, the complainant, and any interested party.  As mentioned in FOH 71h00(e) above, an individualized cover memo, attached to the determination letter, is provided to each interested party.  A copy of any cover memo should *not* be mailed to the ALJ or the employer as to do so could unnecessarily disclose the identity of witnesses or others affected by the investigation and could disclose other private information.  A copy of any cover memo must also be provided to any DOL official, except the ALJ, who is listed as a "cc" on the determination letter.

**(b)**     The determination letter should be served upon the employer and any interested party by certified mail or personal service.  All letters mailed by certified mail should have the certified mail number typed on the letter to identify these documents for evidence.  If these documents are mailed, they must be mailed within 10 days of the final conference.  In

exceptional circumstances, these documents may be transmitted electronically (*see* FOH 71h01(e) below).

**(c)**   A copy of the determination letter, plus a copy of the complaint, must be mailed to the ALJ, as provided in 20 CFR 655.815(b).  These documents may be sent by regular mail.  Copies of the determination letter and any cover memos should be mailed to the DOL officials.

**(d)**   The WHI should routinely request complainants, and any individuals from whom they seek information relating to the investigation, to provide a postal address and to notify the WHI of any change in the address.  In all cases, determination letters and a cover memo should be mailed to an individual or entity at his, her, or its last known postal address.  The letter must be sent to the interested party even if his, her, or its address is believed to be no longer current.  By sending the letter to the interested party's last known address, the WHD satisfies the notification requirements of the statute and regulation.  Any envelopes returned as undeliverable should be retained in the investigation file.

**(e)**   The WHI also may (if permitted by his or her office's policy) e-mail the determination letter to the employer, complainant, or other interested party if there is some doubt about the currency of the individual's postal address.  In such instances, a hard copy of the e-mail should be retained in the investigation file along with the documents identified in FOH 71h01(d) above.  To the extent technology permits, the WHI shall utilize any available e-mail options for receipts that the message has been delivered to the e-mail address and has been opened or read by the recipient.  A hard copy of such receipts should be retained in the investigation file**.**

AILA Doc. No. 18011933. (Posted 1/19/18)

**71i**          **POST-DETERMINATION LETTER ISSUES**

**71i00**    **Request for hearing.**

(a)    The H-1B statute provides that any interested party, including the complainant and the employer, may request an ALJ hearing, which is to be held within 60 days of the date of the WHD's determination letter.  The request for hearing must be filed directly with the ALJ and must be received within 15 calendar days of the date on the determination letter, as explained in the letter.  Should a request for hearing be submitted to the DO, rather than to the ALJ as directed in the determination letter, the request must be forwarded immediately to the ALJ.  It is the ALJ who will make the determination about whether or not a request for a hearing is properly filed and timely.

(b)    The WHD will not be a participant in many ALJ hearings.  The WHD has the discretion to participate in any hearing, but its participation is required only where the WHD has determined that the H-1B employer has committed a violation and that particular determination has been challenged (*see* 20 CFR 655.820(b)(2)).  Where the complainant or other interested party requests a hearing on a no violation determination, the complainant or the interested party will be the prosecuting party and the employer will be the respondent (*see* 20 CFR 655.820(b)(1)).  The WHD will not conclude an H-1B investigation where the complainant or other interested party requests a hearing.  A case will be concluded only after the investigation findings become a final agency action.

**71i01**    **Handling of investigation findings that become a final agency action.**

(a)    The investigation findings become a final agency action of the Secretary upon the earliest of the following events:

(1)    Where the Administrator issued the determination letter and no timely request for hearing (*i.e.*, within 15 calendar days of the date of the determination letter) is made by any party pursuant to 20 CFR 655.820

(2)    Where, after a hearing, the ALJ issues a decision and order and no timely petition for review (*i.e.*, within 30 calendar days of the date of the decision and order) is filed with the ARB, pursuant to 20 CFR 655.845

(3)    Where, after a review, the ARB either declines within 30 days to entertain the appeal, pursuant to 20 CFR 655.845(c), or the ARB reviews and affirms the ALJ's determination.  To determine whether a timely request for an ALJ hearing or a petition to the ARB has been filed or granted, the WHI should inquire of the ALJ or the ARB: ALJ: (202) 693-7300; ARB: (202) 693-6200.



(b) (7)(E)

**CHAPTER 71 TABLE OF CONTENTS          INDEX          FOH TABLE OF CONTENTS**

b.     The DD and/or ADD must determine whether the employer has complied with any remedy imposed, and based on that determination, the DD and/or ADD must take one of the following actions: if any remedy has been fulfilled, *see* FOH 71i03; if any remedy has not been fulfilled within the prescribed time period, *see* FOH 71i02.

**71i02      Unfulfilled performance of remedy(ies).**

**(a)**    The DO should ensure that the employer performs any imposed remedy (*e.g.,* pay back wages, pay CMPs, post the notice, etc.) that has become a final agency action. (b) (7)(E)



(b) (7)(E)

**(e)**    Under the INA, there is no individual private right to file suit against an employer for back wages as there is under the FLSA and the Migrant and Seasonal Agricultural Worker Protection Act.  However, H-1B workers may have rights of action under contract law or other law in the state courts.  The WHD has no authority or responsibility with regard to any such remedies available under state law.

**71i03      Fulfilled performance of remedy(ies).**

(b) (7)(E)



(b) (7)(E)

(b) (7)(E)

**71i04**      **Installment payments.**

(b) (7)(E)

AILA Doc. No. 18011933. (Posted 1/19/18)

**71j**      **PROGRAM COORDINATION**

**71j00**    <u>**Exchange of information between the WHD and the Department of Homeland Security's USCIS.**</u>

(a)    The sharing of information and referrals between the USCIS and WHD should follow principles developed in the 1998 INS (*i.e.*, currently USCIS) memorandum of understanding (*see* FOH 50f20).

(b)    For H-1B investigations, much of the communication between the WHD and USCIS will be conducted through one of the four service centers where H-1B petitions are adjudicated and where all related paperwork (*e.g.*, LCA and all USCIS forms) is maintained.  The service centers, current contact person, public telephone numbers, and internal telephone numbers for WHD use only are as follows:

*Eastern*: Connecticut, Delaware, District of Columbia, Maine, Maryland, Massachusetts, Michigan, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, Puerto Rico, Rhode Island, Vermont, Virginia, and West Virginia

    St. Albans, VT
    Public: (800) 375-5283 (the same number for all four centers)
    Jackie Moyer-Padilla, Internal: (802) 527-3259 x235

*Northern*: Colorado, Idaho, Illinois, Indiana, Iowa, Kansas, Minnesota, Missouri, Montana, Nebraska, North Dakota, South Dakota, Utah, Wisconsin, and Wyoming

    Lincoln, NE
    Public: (800) 375-5283
    Ron Ryan, Internal: (402) 323-2560/2561

*Southern*: Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Mississippi, New Mexico, North Carolina, Oklahoma, South Carolina, Tennessee, and Texas

    Dallas, TX
    Public: (800) 375-5283
    Thomas Prusinowski, Internal: (214) 962-2023
    Henry Jacobs, Internal: (214) 962-2017
    Gary Conroy, Internal: (214) 962-2025
    Cheryl Parker, Internal: (214) 962-2021
    Ron Thomas, Internal: (214) 962-2022
    Melissa Griffin, Internal: (214) 962-2032

*Western*: Alaska, Arizona, California, Hawaii, Nevada, Oregon, and Washington

    Laguna Nigel, CA
    Public: (800) 375-5283
    Rand Gallagher or Tim Bowman, Internal: (949) 389-3236/3230

(c)    The Northern Service Center (Lincoln, NE) handles all questions and adjudication of petitions pertaining to North America Free Trade Agreement and all major and minor

AILA Doc. No. 18011933. (Posted 1/19/18)

professional sports teams.  The Eastern Service Center (Vermont) handles H-1C petitions (area nurse shortages).

**(d)**     For questions pertaining to the Form I-9, the WHI should contact the District of Columbia USCIS number at 1 (800) 357-2099 or (202) 305-1949.  The local USCIS district office addresses and telephone numbers can be found at this web address: http://www.immigration.gov/graphics/fieldoffices/distsub_offices/index.htm.

**71j01**     **Debarment notification to the USCIS.**

**(a)**     The H-1B statute requires the debarment of the employer when there is a final DOL action finding that the employer has committed a violation for which this penalty is prescribed.  Debarment is not negotiable; if the finding of an appropriate violation becomes final, then debarment is required.  The USCIS imposes the debarment, upon notification from the WHD that a final DOL action has occurred.

**(b)**     A debarring violation is one of the following:

    (1)     Misrepresented a material fact on the LCA

    (2)     Filed an LCA during a strike or lockout in the course of a labor dispute

    (3)     Displaced a U.S. worker

    (4)     Failed to make an inquiry about displacement of a U.S. worker of the secondary employer

    (5)     Retaliated against a WB

    (6)     Substantially failed to provide notice of LCA filing

    (7)     Substantially failed to be specific on the LCA

    (8)     Substantially failed to recruit U.S. workers

    (9)     Willfully failed to pay the required wage rate

    (10)    Willfully failed to offer fringe benefits

    (11)    Willfully failed to provide working conditions

    (12)    Willfully filed a petition during a strike or lockout in the course of a labor dispute

    (13)    Willfully displaced a U.S. worker

    (14)    Willfully failed to make an inquiry about displacement of a U.S. worker of the secondary employer

    (15)    Willfully failed to provide notice of the LCA filing

    (16)    Willfully failed to be specific on the LCA

(17)    Willfully failed to recruit U.S. workers

(18)    Willfully misrepresented a material fact on the LCA

**(c)**    The DD and/or ADD will send the notification to the USCIS utilizing the "USCIS Notification Letter."  The notification will be sent only after the DOL finding of a debarring violation has become final (as provided in 20 CFR 655.855(b)).

**(d)**    The USCIS debarment means that the employer will not be able to sponsor any future alien under any INA program.  Any nonimmigrants already employed under the sponsorship of the debarred employer are not affected by the employer's debarment; existing visas are not revoked and workers are not deported.  For the length of the debarment period, the USCIS will not approve the employer's petitions under H-1B, H-2A, H-2B, or any other nonimmigrant program, or under the permanent employment based program.

**(e)**    The debarment period is a minimum of either 1, 2, or 3 years, depending on the violation cited (*see* 20 CFR 655.810(d)).  Typically the minimum period is appropriate.  However, in cases involving egregious behavior or repeat offenders, a longer debarment period may be considered.  Examples of debarment period recommendations:

(1)    The investigation found that there was a strike in the occupational classification at the place of employment at the time the firm filed the LCA.  The employer, a first-time violator, ensured future compliance.  Minimum debarment period: 1 year.  Recommended debarment period: 1 year.

(2)    The investigation found that the employer willfully paid less than the required wage, misrepresented the pay and occupation on the LCA, refused to pay back wages, and refused to comply in the future.  Minimum debarment period: 2 years.  Recommended debarment period: 2 years.

(3)    During the investigation, the WHI was blocked by the employer at all phases of the investigation (*i.e.*, holding the opening conference, examining records, and holding the final conference) and impeded from examining the public access file.  Employees were being harassed and intimidated by the employer to discourage their participation in the investigation.  The investigation found that the employer had committed non-willful wage violations and substantial notice violations, in addition to the intimidation violations.  Minimum debarment period: 1 year.  Recommended debarment period: 2 years.

(4)    The employer in FOH 71j01(e)(3) served the debarment period, remained (or re-entered) in the H-1B program, and a new investigation found additional violations including a willful failure to pay the required wage rate.  Minimum debarment period: 2 years.  Recommended debarment period: 3 years.

**(f)**    When the USCIS receives any complaint from a worker or any other person it will refer this information through channels to the WHD.

**71j02**     **Exchange of information between the ETA and WHD.**

(a)     The exchange of information between the ETA and WHD should take place informally.  The ETA National Processing Centers and state Office of Workforce Security officials can be located at http://ows.doleta.gov/foreign.asp.

(b)     For purposes of making a complaint to the WHD, the ETA is not considered to be an aggrieved party with respect to any information the ETA receives from an employer in connection with the employer's sponsorship of an alien in any immigrant (*i.e.*, green card) or nonimmigrant program (*e.g.*, H-1B, H-1C, H-2A, H-2B).

(c)     When the ETA receives any complaint, directly or through the job service complaint system, it will immediately refer this information to the WHD through channels to the RA of the appropriate RO.

(d)     The ETA will implement the debarment of a violating employer based upon notification from the WHD as specified in the regulations (*see* 20 CFR 655.855(a) and 20 CFR 655.855(d)). Upon the DOL enforcement action becoming final, the DD and/or ADD will notify the ETA NO utilizing the ETA debarment notification letter.  The notification will be mailed to:

>     U.S. Department of Labor
>     Employment and Training Administration
>     Division of Foreign Labor Certification
>     200 Constitution Ave., NW, Room C4312
>     Washington, DC 20210

(e)     The letter will inform the ETA of the calendar period that the WHD has recommended to the USCIS for debarment of the employer.  The letter must include a copy of the LCA utilized during the investigation.

**71k**        **H-1B1 NONIMMIGRANT WORKERS**

**71k00**      <u>**Background and enforcement responsibilities.**</u>

(a)    The U.S.-Chile Free Trade Agreement (Chile FTA) and the U.S.-Singapore Free Trade
        Agreement (Singapore FTA) were implemented by the U.S. Congress through legislation
        (09/03/2003).  The Chile FTA Implementation Act amends the INA to create a new visa
        category (the H-1B1 visa) for the temporary entry and employment in the U.S. of
        professionals from countries with which the U.S. has entered into agreements identified in
        section 214(g)(8)(A) of the INA.  *See* section 101(a)(15)(H)(i)(b1) of the INA.  The H-1B1
        visa is available for individuals in specialty occupations who seek to come to the U.S.
        temporarily to engage in professional activities for an employer.  These INA amendments
        were effective 01/01/2004.  The INA as amended identifies two agreements with countries
        that qualify for the H-1B1 program (*i.e.*, the Chile FTA and Singapore FTA).  Both
        agreements state that they cover "a business person seeking to engage in a business activity as
        a professional, or to perform training functions related to a particular profession, including
        conducting seminars, if the business person otherwise complies with immigration measures
        applicable to temporary entry."

        (1)    The number of Chilean professionals entering the U.S. on H-1B1 visas is limited to
                1,400 annually.

        (2)    The number of Singaporean professionals entering the U.S. on H-1B1 visas is limited
                to 5,400 annually.

(b)    The DOL has made the existing H-1B regulations generally applicable to H-1B1
        nonimmigrants, rather than writing new rules for the H-1B1 program.  The DOL's
        responsibilities regarding H-1B1 visas are to be implemented in a manner similar to those
        regarding the H-1B program for temporary employment of nonimmigrant aliens in specialty
        occupations and as fashion models.  The new section in 20 CFR 655.700(d)(1) lists the
        provisions of the H-1B regulations that do not apply to H-1B1 nonimmigrants:

        (1)    H-1B1 visas are not available to fashion models of distinguished merit and ability.

        (2)    Provisions related to H-1B dependent employers and willful violators of the H-1B1
                rules are not included in the legislation establishing the H-1B1 visa (specifically, 20
                CFR 655.710(b), 20 CFR 655.730(d)(5), 20 CFR 655.730(e)(3), 20 CFR 655.736 -
                .739, 20 CFR 655.760(a)(8) -(10), part of 20 CFR 655.705(c), and 20 CFR
                655.805(a)(7) -(9)).

        (3)    Portability of H-1B status provision is inapplicable to H-1B1 nonimmigrants (*see*
                FOH 71a00(b)).

(c)    The employer's responsibilities under H-1B1 program are identified in 20 CFR
        655.700(d)(4).

        (1)    The LCA must be filed and approved by the ETA for coverage to exist.  Filing
                procedures are identified in 20 CFR 655.700(d)(3).  The ETA will compile and
                maintain a list of H-1B1 labor attestations (*see* 20 CFR 655.760(b)).

AILA Doc. No. 18011933. (Posted 1/19/18)

(2)    Enforcement provisions: the WHD will receive, investigate, and make determinations of complaints filed by any aggrieved person or organization regarding the failure of an employer to meet the terms of its attestation.  Penalties for failure to meet conditions of the labor attestations are the same as those under the H-1B program.

**71L**  **E-3 NONIMMIGRANT WORKERS**

**71L00**  **Background and enforcement responsibilities.**

**(a)**  The Emergency Supplemental Appropriations Act for Defense, the Global War on Terror, and Tsunami Relief, 2005 was signed into law by the president on 05/11/2005.  Division B, title V, section 501 of the act adds a new nonimmigrant visa classification for certain treaty aliens who are coming to the U.S. solely to perform services in a specialty occupation.  The new visa category (*i.e.*, the E-3 visa) is for the temporary entry and employment in the U.S. of professionals from the country of Australia with which the U.S. has entered into an agreement identified in section 214(g)(8)(A) of the INA.  *See* section 101(a)(15)(E)(iii) of the INA) The E-3 visa is available for Australian nationals who seek to come to the U.S. temporarily to engage in professional activities for an employer.  These INA amendments were effective **TBA**.

**(b)**  The DOL has made the existing H-1B regulations generally applicable to E-3 nonimmigrants, rather than writing a new rule for the E-3 program.  The DOL's responsibilities regarding E-3 visas are to be implemented in a manner similar to those regarding the H-1B program for temporary employment of nonimmigrant aliens in specialty occupations and as fashion models.  The new section in 20 CFR 655.700(d)(1) lists the provisions of the H-1B regulations that do not apply to E-3 nonimmigrants:

  **(1)**  Provisions related to H-1B dependent employers and willful violators of the H-1B rules are not included in the legislation establishing the E-3 visa (specifically, 20 CFR 655.710(b), 20 CFR 655.730(d)(5), 20 CFR 655.730(e)(3), 20 CFR 655.736 - .739, 20 CFR 655.760(a)(8) -(10), part of 20 CFR 655.705(c), and 20 CFR 655.805(a)(7) -(9)).

  **(2)**  Portability of H-1B status provision is inapplicable to E-3 nonimmigrants (*see* FOH 71a00(b)).

**(c)**  The employer's responsibilities under E-3 program are identified in 20 CFR 655.700(d)(4).

  **(1)**  The LCA must be filed and approved by the ETA for coverageto exist.  Filing procedures are identified in 20 CFR 655.700(d)(3).  The ETA will compile and maintain a list of H-1B1 labor attestations (*see* 20 CFR 655.760(b)).

  **(2)**  Enforcement provisions: the WHD will receive, investigate and make determinations of complaints filed by any aggrieved person or organization regarding the failure of an employer to meet the terms of its attestation.  Penalties for failure to meet conditions of the labor attestations are the same as those under the H-1B program.

# EXHIBIT B

**From:** Butler, Diane
**Sent:** Wednesday, February 28, 2018 5:14 PM
**To:** Kent, Brooke - WHD <Kent.Brooke@dol.gov>
**Subject:** Azimetry supplemental security deposit refund information

Brooke,

Attached is the requested supplemental security deposit information.

As indicated in the letter to you dated December 16, 2016, Azimetry has had a policy of requesting a security deposit because the H-1B cap/quota/lottery system results in a high degree of uncertainty for H-1B employers and employees, for many reasons:

- Some potential H-1B workers have had Azimetry and at least one other potential employer file an H-1B petition, to improve the chances of being selected in the lottery, without Azimetry's knowledge.
- The Azimetry H-1B petition might not be selected in lottery, despite the company's need for employees, and despite going through the effort to file during the very limited H-1B cap period.
- After the H-1B petition is selected in the lottery, USCIS may take an indefinite amount of time to process the petitions. (USCIS still has not adjudicated many H-1B cap cases submitted last year, on April 1, 2017.)
- If the Azimetry H-1B petition and another employer's H-1B petition both are accepted in the lottery and approved, the employee may decline to work Azimetry.
- After an employee has come to the U.S. and started work for Azimetry, the employee could move to another employer under H-1B transfer rules within a short period of time.

For these reasons, as previously stated, Azimetry's policy is to collect a deposit from the H-1B beneficiary which is refunded provided that the employee continues Azimetry employment for a period of time. Up to the fiscal year beginning October 1, 2015, the time period was 12 working months, including H-1B petitions filed April 1, 2015; since then, the employment term for deposit refund eligibility has been 24 working months.

Azimetry does not consider the security deposit amounts to include H-1B filing fees, as the company recognizes it bears the responsibility for the fees.

Diane

*New address as of August 1, 2017:*
**Diane Butler** | Davis Wright Tremaine LLP
Partner, Immigration Law
1201 Third Avenue, Suite 2200 | Seattle, WA 98101
Tel: (206) 757-8354 | Cell: (206) 499-3977 | Fax: (206) 757-7354
Email: dianebutler@dwt.com | Website: www.dwt.com

| No | Candidate | Deposit Amount | | Refunded | Reason |
|---|---|---|---|---|---|
| 1 | Charles, Marlon T | $ | 5,500 | No | Didn't complete employment term |
| 2 | Chillara, Srimurali Krishna | $ | 5,300 | No | Didn't complete employment term |
| 3 | Dorasani, Jayapratapreddy | $ | 5,500 | No | Not eligible yet |
| 4 | Dubey, Anchita | $ | 4,800 | No | Didn't complete employment term |
| 5 | Gopinath Susheelamma, Deepak Babu | $ | 5,000 | No | Not eligible yet |
| 6 | Guddeti, Pitchi Reddy | $ | 5,500 | No | Not eligible yet |
| 7 | Gupta, Arunav | $ | 5,500 | No | Didn't complete employment term |
| 8 | Hyder Khan, Maanasa | $ | 6,000 | No | Didn't complete employment term |
| 9 | Ismail, Shahzaib | $ | 5,500 | No | Didn't complete employment term |
| 10 | Kuppili, Aruna | $ | 5,200 | No | Not eligible yet |
| 11 | Malhotra, Saurabh | $ | 5,000 | No | Didn't complete employment term |
| 12 | Mumballi, Bijesh | $ | 5,200 | No | Not eligible yet |
| 13 | Navulipuri, Sreenivasulu | $ | 5,200 | No | Didn't complete employment term |
| 14 | Pachala, Rajeev | $ | 5,500 | No | Not eligible yet |
| 15 | Ragavendrakumar, Rekhaa | $ | 5,200 | No | Not eligible yet |
| 16 | Ramakrishna, Jeevan Kumar | $ | 6,000 | No | Didn't complete employment term |
| 17 | Ravidoss, Arulprasad | $ | 4,700 | No | Not eligible yet |
| 18 | Ringwala, Sujal | $ | 5,340 | No | Didn't complete employment term |
| 19 | Sahu, Monalisa | $ | 5,500 | No | Didn't complete employment term |
| 20 | Sarigehalli-Shivakumarasw, Vinay | $ | 5,500 | No | Didn't complete employment term |
| 21 | Sivaraj, Deepika | $ | 5,500 | No | Not eligible yet |
| 22 | Sukla, Somodeep | $ | 5,500 | No | Didn't complete employment term |
| 23 | Sunkara, Anil K | $ | 5,500 | No | Not eligible yet |