The Honorable James L. Robart

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>PRADYUMNA KUMAR SAMAL,<br><br>Defendant. | NO. CR18-214JLR<br><br>**GOVERNMENT'S SENTENCING MEMORANDUM**<br><br>**FILED UNDER SEAL** |

The United States of America, by and through Brian T. Moran, United States Attorney for the Western District of Washington, and Siddharth Velamoor and Michael Dion, Assistant United States Attorneys, files this Sentencing Memorandum. The Sentencing hearing in this case is scheduled for September 20, 2019 at 9:30 a.m.

As set out below, the Defendant has informed the Government that he intends to object to three of the Sentencing Guidelines enhancements applied by the Presentence Investigation Report ("PSR"). The Defendant nonetheless does not object to the Court resolving the disputed enhancements on the basis of facts referred to herein, including the transcripts, interview memoranda, emails, and other documents attached as exhibits hereto. The Government therefore does not expect to call any witnesses to testify at the Sentencing hearing.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

**INTRODUCTION**

2      The U.S. government grants work status and visas to a limited number of highly

3 skilled foreign nationals under the H-1B program each year.  As conceived, the H-1B

4 program serves an important economic purpose by ensuring that the supply of workers

5 with specialized skills meets U.S. employers' demand.  In turn, as the program's

6 popularity makes clear,[1] H-1B visas benefit employers, by allowing them to recruit and

7 retain skilled employees who cannot easily switch jobs upon entry into the United States.

8 Because of the program's narrow purpose and the risk that employers may misuse the

9 program to exploit vulnerable foreign nationals, the H-1B process is strictly regulated by

10 several Executive agencies, including USCIS, the Department of State, and the

11 Department of Labor.

12      The Defendant, Pradyumna Kumar Samal, pleaded guilty to orchestrating the

13 largest and most sophisticated H-1B scheme ever prosecuted in this District.  He began

14 the scheme while serving a probationary sentence for a prior federal misdemeanor.  As

15 set out below, Samal ran businesses that defrauded the government into issuing long-term

16 H-1B work status and visas to hundreds of foreign-national employees.  Samal's

17 companies then marketed those H-1B employees to corporate clients for short-term

18 projects.  Through his scheme, Samal obtained an advantage over his competitors, as he

19 had a standing pool (or "bench") of workers available immediately to meet the needs of

20 his end-clients, without any of the delays or uncertainty associated with the H-1B

21 application process.  Samal and his subordinates took numerous steps to accomplish the

22 scheme, which required hundreds of fraudulent documents, lies to U.S. immigration

23 officials, and efforts to mislead Samal's corporate clients.

24      Although Samal's goal was to gain an advantage over his competitors, his fraud

25

26 ─────────────────

27 [1] *See* Exhibit K, M. Jordan, Visa Applications Pour In by Truckload Before Door Slams Shut, *New York Times*, April 3, 2017, *available at* https://www.nytimes.com/2017/04/03/us/tech-visa-applications-h1b.html ("Last year, the government received 236,000 applications in the first week before deciding it would accept no more.  A computer randomly chooses the winners.").

28

Samal/SENTENCING MEMORANDUM - 2
CR18-214JLR

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  inevitably harmed hundreds of individuals.  As Chief Magistrate Judge Tsuchida

2  remarked at the detention hearing, Samal's scheme generated "wreckage" all around him.

3  The collateral damage from Samal's scheme extended to scores of subordinates who he

4  conscripted into service as his co-conspirators, hundreds of foreign-national employees

5  who he exploited upon entry into the U.S., and corporate clients whose identities he stole

6  in furtherance of the scheme.  Samal also obstructed the investigative process, by

7  destroying documents, lying to federal agents, and concealing forfeitable assets.

8          Samal has posed a serious financial danger for the better part of the last decade,

9  and his conduct (including his post-arrest conduct) reveals his utter contempt for the rule

10  of law.  For the reasons set forth below, the Government respectfully recommends a 120-

11  month term of imprisonment, a fine of $100,000, and a 3-year term of supervised release.

12  The Government's recommendation falls in the middle of the relevant Sentencing

13  Guidelines range.

14                                **BACKGROUND**

15          Samal is the owner and Chief Executive Officer of two defunct Seattle-area

16  companies named Divensi, Inc. ("Divensi") and Azimetry, Inc. ("Azimetry").  He

17  established Divensi and Azimetry in 2010 and 2011 respectively, after a criminal

18  conviction caused him to dissolve his prior business.  Specifically, in 2009, Samal

19  pleaded guilty to a misdemeanor charge of Computer Intrusion, for directing an employee

20  to disable a customer's website, resulting in thousands of dollars of damage to the victim.

21  *See* Plea Agreement, *United States v. Samal*, CR09-00005MAT, Dkt. 8.  In that case,

22  Samal admitted that he lied (and directed his employee to lie) to the Federal Bureau of

23  Investigation.  *See* Def.'s Sentencing Memo., *United States v. Samal*, CR09-00005, Dkt.

24  27, at 13:18-21 (admitting that he "panicked and dissembled.  In addition, he instructed

25  [his employee] to tell the [FBI] agent either that he knew nothing or not to say anything

26  or words to that effect.").  During the detention hearing in this case, Chief Magistrate

27  Judge Tsuchida pointed out that Samal's conduct while serving his sentence of probation

28  in the prior case was "problematic" and a "red flag."

1  Indeed, as the Presentence Investigation Report ("PSR") explains, Samal
2  commenced the Mail Fraud scheme in this case while serving that prior probationary
3  sentence. *See* PSR ¶ 60. He now awaits sentencing for that mail-fraud offense (Count
4  One of the Second Superseding Information), as well as the separate offense of Failure to
5  Pay Over Tax under 26 U.S.C. § 7202 (Count Two). The government concurs with the
6  PSR's factual statement regarding both offenses.

7      A.   Mail Fraud

8          1.   *Overview Of The Mail Fraud Scheme*

9  Samal's mail-fraud conviction arises out of a multimillion-dollar scheme that
10 included thousands of false statements to U.S. immigration authorities, the exploitation of
11 hundreds of foreign nationals, and numerous efforts to obstruct justice. *See* PSR ¶¶ 9-19,
12 27-32. Samal has admitted that he generated more than $1.5 million in profits from the
13 scheme. *Id.* ¶ 37.

14 Specifically, Samal defrauded the U.S. Citizenship and Immigration Service
15 ("USCIS") and the State Department into granting H-1B work status and visas to
16 hundreds of foreign-national employees. Plea Agreement, Dkt. 51, ¶ 10(a). Samal
17 prepared and signed at least 250 H-1B petitions that claimed, falsely and under penalty of
18 perjury, that the foreign-national employees named in the petitions had been earmarked
19 for purported specialty-occupation projects, and that they would perform those projects at
20 the petitioning company (i.e., Divensi's or Azimetry's) offices. *Id.*; *see also* PSR ¶ 11.
21 The petitions characterized the purported projects as having been subcontracted to
22 Divensi and Azimetry by the companies' clients. *Id.* The petitions also claimed that the
23 projects had durations that were equal to the maximum permissible duration for work
24 status under the H-1B program. *Id.* In reliance on these materially false statements,
25 USCIS granted H-1B work status to Samal's foreign-national employees between 2012
26 and 2016, often for the maximum duration permitted by law. *Id.* In turn, the State
27 Department issued H-1B visas to Samal's employees, which entitled them to enter the
28 United States. Plea Agreement ¶ 10(a).

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    In reality, the foreign nationals named in Samal's companies' H-1B petitions had

2    not been earmarked for any specialty-occupation project.  *Id.*  Samal intended to create a

3    standing pool of H-1B employees with long-term work status who could then be

4    marketed to large corporate clients for short-term off-site projects.  *Id.* ¶ 13; *see also* Plea

5    Agreement ¶ 10(a).

6              2.    *The Purpose And Gains From The Mail Fraud Scheme*

7          Samal gained a substantial competitive advantage over other staffing companies as

8    a result of the scheme.  **First**, the scheme enabled Samal to "*bench*" (in Samal's words)

9    foreign nationals both after they entered the U.S. and between their short-term project

10    assignments, because USCIS had granted them long-term work status in reliance on

11    Samal's false claims.  *Id.* ¶¶ 13-14.  While benched, the foreign nationals were pitched by

12    Samal's marketing team to large corporate clients for short-term, off-site, projects.  *See*

13    *id.*  **Second**, the scheme enabled Samal to pitch foreign nationals to end clients who

14    otherwise would not have interviewed or considered foreign nationals who did not

15    already have work status in the United States.  *Id.* ¶ 14.  **Third**, Samal's scheme enabled

16    him to use foreign nationals to fill non-specialty-occupation roles in his offices that

17    otherwise would have required more expensive U.S.-citizen employees.  *Id.* ¶ 14. ████

18    ██████████████████████████████████████████████████████

19    ██████████████████████████████████████████████████

20    ████████████████████████████████████████████████████████

21    █████████████████████████████████

22          Samal also exploited his H-1B employees.  For instance, Samal forced H-1B

23    employees to submit phony sick and annual leave requests while they were on the

24    "bench," so that he would not need to pay them the salary to which they were entitled.

25    PSR ¶ 17.  Samal also circumvented regulations that require employers to pay H-1B

26    employees prevailing wage, by claiming that the fictitious project assignments had

27    prevailing-wage levels that were lower than the actual end-client projects to which

28    Samal's H-1B employees eventually were assigned.  *Id.* ¶ 16.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Finally, Samal forced H-1B employees to pay the filing fees associated with their petitions, in contravention of DOL regulations that require employers to pay for those fees. *Id.* ¶ 16. Samal styled these fee payments as purported "security deposits" in an effort to doctor their actual purpose. *See id.* In fact, only a portion of the "deposit" was refundable (such that Samal unlawfully used the non-refundable portion of the deposit to pay for visa fees). *Id.*

The parties have stipulated that Samal gained $1,625,532.84 from the scheme, consisting of (a) the profits he earned from placing H-1B employees on client projects and (b) the revenues he earned when he sold his H-1B operations in February 2018. *Id.* ¶ 37. In addition to that stipulated gain, Samal also used his companies' accounts as a personal piggy bank, such as when he used approximately $66,000 in H-1B employees' "security deposits," along with other funds from company bank accounts, to purchase shares in a technology startup. *Id.* ¶ 18. When that startup was acquired, Samal obtained the right to four annual distributions, beginning in 2018. *Id.* He received the first distribution (of approximately $400,000) in January 2018, and used that distribution to capitalize Indian bank accounts, purchase consumer electronics, and buy flight tickets.[2] *Id.* On September 1, 2019, the government learned that Samal received the second distribution (of approximately $41,120.91) on June 10, 2019. *See* Wire Transfer, Ex. B.

On August 2, 2019, less than two months after receiving the $41,120.91 distribution, Samal told the Probation Office that his liquid assets were worth less than $300. *See* Def. Objections to PSR, Ex. C, at 6. In addition, at a date unknown to the government, but which appears to have been within weeks of the $41,120.91 distribution, Samal told this Court that he "could no longer afford" the services of his financial accountant. *See* Order, Dkt. 70, at 1:20.

---

[2] As the government previously explained, Samal's financial affidavit seeking Criminal Justice Act ("CJA") representation falsely claimed that he had "reinvested" that $400,000 payment into his companies. *See* Response to Mot. to Substitute Attorney, Dkt. 36. The financial affidavit contained other material misstatements and omissions. *See id.*

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

3. *Samal's Use Of Stolen Identifications And Other False Statements In Furtherance Of The Scheme*

USCIS requires petitioning employers to substantiate the statements they make in petitions.  To satisfy that requirement, Samal and subordinates acting at his direction included forged and fraudulent materials in H-1B petitions, in order to substantiate the existence and duration of the so-called projects for which foreign-national employees had purportedly been earmarked.  Plea Agreement ¶ 10(a).  The forged and fraudulent materials included:

- **Fictitious employment contracts** between Samal's companies and H-1B employees, which reflected fake job titles.  PSR ¶ 12.

- **Doctored H-1B employee resumes**, which made it appear as if Samal's foreign-national employees had specialty-occupation expertise and experience that they did not actually have.  *Id.*

- **Forged client letters** that purported to have been issued by two of the clients for whom the H-1B employees purportedly had been earmarked, and included digital signatures belonging to senior executives at those clients.  Plea Agreement ¶ 10(a).  The forged client letters typically included language "verify[ing]" that the client "will be using the services of" the H-1B employee named in Samal's companies' petition.[3]  As explained in the section below regarding the relevant Sentencing Guidelines range, Samal both created some of the forged letters, and also applied forged digital signatures to other letters that his co-conspirators created.  In his plea agreement, Samal's former Chief Operating Officer, Prasad Puvvala, admitted that he "prepared unsigned drafts" of forged client letters and then "asked SAMAL to affix signatures to those letters."  Plea Agreement, *United States v. Puvvala*, CR019-19RAJ, ¶ 8.

---

[3] The government previously exhibited an example of a forged end-client letter in its submission in support of pre-trial detention.  *See* Ex. A to Mem. In Support of Detention, Dkt. 6-1.

Samal/SENTENCING MEMORANDUM - 7
CR18-214JLR

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Samal's companies also used an outside petition preparer—a disbarred former immigration lawyer—to prepare forged client letters.  As set out in her plea agreement, the outside preparer created forged letters and then asked Samal and Samal's former COO to affix forged signatures to them.  Plea Agreement, *United States v. Tomaszewski*, CR-18-213JLR, ¶ 7.

As set out below, the two clients whose identities Samal stole learned about the forged letters and confronted Samal in March 2015.  *See below* at 10.  Samal responded by disclaiming knowledge of the forged letters, blaming Puvvala for creating the forged letters without Samal's knowledge, and removing any references to those clients in the H-1B petitions that his companies filed in 2015 and 2016.  *Id.*

Samal/SENTENCING MEMORANDUM - 8
CR18-214JLR

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

In addition to misleading USCIS, Samal also directed his subordinates to send forged materials to U.S. consulates, and to coach foreign-national employees to lie to consular officers to ensure that their stories were consistent with the false statements in their petitions. See Plea Agreement ¶ 10(a); *see also* PSR ¶ 12. Specifically, in the event USCIS grants H-1B status to a foreign-national employee who is not already in the U.S., the foreign-national employee must ordinarily obtain a corresponding visa at a U.S. consulate in their country of residence—a matter that falls under the ambit of the State Department. *Id.* In deciding whether to grant the requested visa, the State Department typically interviews the employee at a consulate. *Id.*

As Puvvala admitted in his plea agreement, he "consulted with, and received instruction from, SAMAL about the contents of these false statements [by H-1B employees] to immigration officials." *See* Plea Agreement, *United States v. Puvvala*, CR19-019, Dkt. 6, at 9:8-10:2 (referring to emails in which Puvvala sought guidance from Samal about false statements to U.S. consulate officers, including email in which Puvvala reported to Samal about coaching an H-1B employee to lie to U.S. consular officers). ███████████████████████████
███████████████████████████████
███████████████████████████████████
██████████████████████████

Samal also deceived USCIS officers who conducted site visits to his companies' offices. *See* PSR ¶ 28. USCIS agents occasionally conduct such site visits to verify that H-1B employees are, indeed, working on the projects described in their petitions. *Id.* To deceive these USCIS officers, Samal staged his offices (e.g., with fake workstations) in advance of the site visits, thus making it appear as if the H-1B employees were working at the companies' offices (as the petitions claimed). *See id.* In reality, as explained above, the H-1B employees were either benched without pay awaiting a potential project assignment or had been assigned to an off-site short-term client project.

Samal/SENTENCING MEMORANDUM - 9
CR18-214JLR

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

4.    *Samal's Obstruction Of Justice*

Samal has repeatedly obstructed justice in this case, both before and after his arrest last year.  *See* PSR ¶¶ 27-32.  Specifically, in the spring of 2015, the two clients whose identities Samal had stolen in the forged letters confronted him after each client received initial inquiries from the State Department about a letter bearing each of their letterhead and signatures.  *See* Emails to Samal, Ex. F ("Pls advise on this his happened?"), Ex. G (asking for an explanation about "the facts including the actions you took and how you are ensuring that the Visa matter discussed does not happen again").

In response, Samal and his then-Chief Financial Officer decided to blame Puvvala, because Puvvala recently had left the company earlier that year.  PSR ¶¶ 28-29; *see also* Ex. H, Report of Interview of CFO, ¶ 64 ("It was decided to blame Prasad as he had left the company.").[5]  Thus, in an email to one of the clients (which the CFO helped draft), Samal made multiple false claims, including that: (a) Puvvala "was completely in charge of our immigration"; and (b) Samal "did not spend any time overseeing [Puvvala's] management of our immigration."  *See* Ex. G, at 1.  As Samal has now admitted, and as investigators later learned, Samal obviously knew about the forged and fraudulent documents; indeed, he personally had created and directed Puvvala and other subordinates to create them.  *See* Plea Agreement ¶ 10(a).

To make it appear as if he lacked knowledge of the falsehoods in his companies' H-1B petitions, Samal destroyed incriminating documents in his companies' offices.  *See* PSR ¶ 30.  Specifically, like other H-1B employers, Samal's companies preserved hard copies of petitions at their offices, even after those petitions have been mailed to the government.  *Id.*  Samal removed the fraudulent documents (e.g., the phony employment contracts, the forged client letters) from his hard copy files, so that he could later claim that Puvvala inserted those documents before filing (and without Samal's knowledge).

---

[5] Samal's former Chief Financial Officer had a federal felony conviction for bank fraud at the time Samal hired him. The government did not rely upon any statements by the CFO which were not otherwise corroborated by other materials generated during the investigation.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

As Samal's outside petition preparer explained in her plea agreement:

In or around the summer of 2015, the Defendant and two other employees of SAMAL's companies removed documents from hardcopies of visa petitions, at SAMAL's direction. Specifically, USCIS regulations require petitioning companies, like Divensi and Azimetry, to preserve certain petition-related materials. SAMAL directed the Defendant to remove materials from the petitions that would assist the Government in its investigation into the false statements made in those petitions. The Defendant removed the documents from the petitions in a conference room in the companies' offices, along with two other employees. SAMAL regularly checked into the progress of the spoliation of these documents while that process was ongoing. When removing the documents, the Defendant knew that the documents were material to the Government's investigation into Divensi and Azimetry for the acts of visa fraud described above.

Plea Agreement, *United States v. Tomaszewski*, CR18-213JLR, ¶ 7.



When interviewed by law-enforcement agents on May 31, 2017, Samal made statements which showed that the document-destruction episode was part of his plan to plead ignorance and blame Puvvala.  PSR ¶ 31.  Specifically, Samal falsely claimed that he lacked knowledge about the forged letters because Puvvala had failed to "maintain[]" hard copies of those documents in the companies' offices:

---

[6] While Samal was not successful in destroying all the incriminating documents, agents noticed missing documents in several hardcopy petitions when they searched Samal's companies' offices in September 2017.  PSR ¶ 30.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Samal told [Reporting Agent] that it was only after Puvvala resigned that he realized that the only documents Puvvala maintained for Azimetry/Divensi's visa petitions were the I-129s, LCAs, and Cover Letters.  As such, Samal stated that ***he did not have a copy of the false [client] letter and he also does not know how many false [client] letters were ultimately submitted to DHS***.

Ex. I, Report of Interview, at 5 (emphasis added); *see also id.* at 8 ("[Reporting Agent] asked Samal if he had ever seen the letter, to which he responded no and reiterated that Divensi did not have many of the supporting documents for Divensi/Azimetry's H-1B petitions ***since Puvvala did not scan them in and/or retain them*** during the period when he (Puvvala) worked there.") (emphasis added); *id.* at 12 (noting that Samal falsely suggested he had no prior knowledge of the forged end-client letters before the victim clients confronted him in 2015).

> ### 5. *Samal's Trip to India And Dissipation Of Forfeitable Assets*

In February 2018, about one month after the government first approached his two-conspirators (Puvvala and Tomaszewski), Samal sold the entirety of Divensi's and Azimetry's H-1B operations to a Georgia company named Synapse Technologies LLC ("Synapse").  PSR ¶ 32.  He then flew to India where he coordinated the transfer of hundreds of thousands of dollars out of U.S. bank accounts and into overseas bank accounts.  *Id.*  On or about the day he landed in India, Samal immediately reached out to Puvvala over the encrypted messaging application WhatsApp.  *See* Ex. J, Email from Aoki to Velamoor, et al. (attachment) ("Prasad PK here in India ! Let me know if I can call you ?").  Puvvala, who had already admitted to his role in the offense, did not respond to Samal's message.  *Id.*

Samal engaged in other financial misconduct while in India, for which he now faces potential civil liability and administrative sanctions.  For instance, Synapse has sued Samal in King County Superior Court, alleging that he locked Synapse out of a client payment portal and thus misappropriated hundreds of thousands of dollars.  *See Synapse Technologies, LLC v. Azimetry Inc., et al.*, King County Superior Court No. 18-2-20495.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    In addition, the 401K retirement fund administrator used by Samal's companies

2    discovered that Samal's companies had failed to turn over employee 401K-plan

3    contributions for numerous employees. *See* PSR ¶ 26.[7]  Although the inherent liquidity

4    of money makes it impossible to trace the exact disposition of these stolen 401K

5    contributions, it bears emphasis that Samal used his companies' bank accounts to make

6    luxury car payments, pay off his home mortgage, and make large financial transfers to his

7    bank accounts in India. *Id.* ¶ 21; *see also id.* ¶ 24.

8    Samal returned to the United States on August 28, 2018, and was arrested upon his

9    arrival at Seattle-Tacoma Airport.[8]  He has been detained since his arrest. *See* Detention

10   Order, Dkt. 14; Minute Entry, Dkt. 61.

11   B.    Failure to Pay Over Tax

12   Samal also pleaded guilty to one count of Failure to Pay Over Tax, in violation of

13   18 U.S.C. § 7206.  Specifically, in his role as owner and CEO of Divensi, Azimetry, and

14   a third company named Divensi Technology, Inc., Samal employed various employees

15   and maintained authority over the companies' finances and other business-related

16   decisions.  Plea Agreement ¶ 10(b).  Samal was required by federal law to collect,

17   truthfully account for, and pay over payroll and employment taxes, including income and

18   Social Security and Medicare (FICA) withholdings, to the U.S. Department of Treasury,

19   Internal Revenue Service.  *Id.*

20

21

22   [7] It is the government's understanding that Samal is facing civil and administrative sanctions by the Department of Labor for his misappropriation of 401K contributions.  An aggravating factor may be that he engaged in similar conduct in 2010 (while serving his term of probation for his earlier misdemeanor conviction).  *See* Mot. to Modify Conditions of Release, *United States v. Samal*, CR09-0005, at 5 (letter from defense counsel to Probation Officer) ("These employees also complained that he collected 401(k) monies from them and did not remit them to Dynatech.").

23

24

25   [8] The government respectfully disagrees with the Probation Office's statement that Samal "voluntarily return[ed] to the United States to face these charges."  Recommendation, at 4.  Samal unsuccessfully made that very same claim in seeking pre-trial release. *See* Opp. to Mot. for Detention, Dkt. 10.  As the government explained in its written submission, Samal returned to the United States without knowledge of the under-seal warrant for his arrest.  Mem. In Support of Detention, Dkt. 6.  Indeed, Samal's behavior before and at the time of his arrest, including his possession of digital devices loaded with incriminating information, are flatly inconsistent with his claim that he expected to be arrested upon arrival in the United States.

26

27

28

Samal/SENTENCING MEMORANDUM - 13
CR18-214JLR

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

In contravention of his obligations under federal law, and together with employees at his companies' offices, Samal willfully failed to pay over such taxes to the IRS.  The chart below shows the financial quarters and dollar amounts associated with Samal's non-payment of taxes:

| # | Company | Tax Return Period | Tax Return Filed Filed | Taxes Due to IRS | Taxes Paid to IRS | Unpaid Tax Balance |
|---|---------|-------------------|------------------------|------------------|-------------------|--------------------|
| 1 | Azimetry | 2nd Quarter 2017 | 10/09/2018 | $ 125,770 | $ (166) | $ 125,604 |
| 2 | Azimetry | 3rd Quarter 2017 | 01/01/2018 | $ 120,875 | $ (22,930) | $ 97,945 |
| 3 | Azimetry | 4th Quarter 2017 | 04/02/2018 | $ 114,225 | $ (40,091) | $ 74,133 |
| 4 | Azimetry | 1st Quarter 2018 | 07/02/2018 | $ 52,413 | $ - | $ 52,413 |
| 5 | Azimetry | 2nd Quarter 2018 | 10/08/2018 | $ 30,302 | $ - | $ 30,302 |
| 6 | Divensi | 1st Quarter 2017 | 06/26/2017 | $ 176,432 | $ (56,936) | $ 119,496 |
| 7 | Divensi | 2nd Quarter 2017 | 09/18/2017 | $ 219,690 | $ - | $ 219,690 |
| 8 | Divensi | 3rd Quarter 2017 | 01/01/2018 | $ 185,695 | $ - | $ 185,695 |
| 9 | Divensi | 4th Quarter 2017 | 03/26/2018 | $ 151,486 | $ (51,788) | $ 99,699 |
| 10 | Divensi | 1st Quarter 2018 | 07/02/2018 | $ 81,930 | $ - | $ 81,930 |
| 11 | Divensi Tech | 4th Quarter 2017 | 04/02/2018 | $ 73,424 | $ (40,465) | $ 32,958 |
| | | | Totals | $ 1,332,242 | $ (212,375) | $1,119,867 |

*See* PSR ¶ 20.

Samal has a history of engaging in this type of tax evasion, and has been cited on multiple prior occasions by the IRS, starting as early as 2012.  Samal was permitted to resolve these earlier deficiencies through civil resolution with the IRS, but was warned that future non-payment could result in his criminal prosecution.

## PENALTIES AND SENTENCING GUIDELINES CALCULATIONS

A.    Maximum Statutory Penalties

The maximum statutory penalties for Samal's two crimes are as follows:

| | Mail Fraud | Failure to Pay Over Tax |
|---|-----------|-------------------------|
| **Maximum Imprisonment** | 20 years | 5 years |
| **Maximum Supervised Release** | 3 years | 3 years |
| **Maximum Fine** | $250,000 | $250,000, together with the costs of prosecution |

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

B.   Advisory Sentencing Guidelines Range

The government concurs with the PSR's calculation of Samal's Sentencing Guidelines range.  *See* PSR ¶ 36-60.  As the Probation Office calculates, Samal's total offense level is 30,[9] and his Criminal History Category is II (3 points).  *Id.*  As a result, Samal's advisory Sentencing Guidelines range is: (1) a term of imprisonment of 108 to 135 months; (2) a fine of $35,000 to $350,000; and (3) a term of supervised release of 1 to 3 years.

Through counsel, Samal has informed the government that he objects to the PSR's application of the three enhancements addressed in the sub-sections below.  As set out below, these objections are baseless.

1.   *Enhancement For Sophisticated Means And/Or International Nexus (USSG § 2B1.1(b)(10)*

Section 2B1.1(b)(10) of the United States Sentencing Guidelines provides for a two-level enhancement if any one of three factors is present.  Here, the two-level enhancement is applicable to the mail-fraud offense for two *independent* reasons: (a) a substantial part of Samal's mail-fraud scheme was committed from outside the United States; and (b) the offense otherwise involves sophisticated means and Samal intentionally engaged in or caused the conduct constituting sophisticated means.  *See* USSG § 2B1.1(b)(10)(B), (C).

(a)   International Nexus (USSG § 2B1.1(b)(10)(B)

Samal's mail-fraud scheme plainly was committed, in substantial part, from outside the United States.  *See* PSR ¶ 37.

***First***, as explained above, Samal's employees coached H-1B employees to lie at their consular interviews in India.  The interview was a prerequisite to obtain a visa from the State Department that permitted the employees' entry into the United States.

---

[9] Although the PSR does not give Samal a three-point reduction for acceptance of responsibility under USSG § 3E1.1, the Probation Officer informed counsel for the government that the Probation Office will recommend its application after receiving a letter from Samal in which he formally accepts responsibility for his conduct.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    **Second**, many of the fraudulent documents used by Samal's companies were

2    created by prospective employees while those employees still lived in India.  *Id.*  As

3    Samal himself admitted when interviewed by law-enforcement agents, "Divensi's office

4    in Bhubanesar, India" was "responsible for overseas recruitment of potential H-1B

5    workers."  Ex. I, Report of Interview, at 3.  Indeed, *while they were still in India*, and

6    before Samal's companies petitioned for their work status, foreign nationals completed

7    documents that were used to substantiate the false statements in H-1B petitions.  Samal's

8    human-resources team asked prospective H-1B employees based in India to sign and

9    return electronically the fraudulent employment agreements, with the understanding that

10   false information in the contract was "*for USCIS purpose only*."  *See, e.g.*, Ex. L

11   (reflecting email chain between prospective employee in India and Samal, in which

12   employee stated that he "signed the agreement which Prasad sent me for USCIS

13   purpose"); Ex. M (reflecting email chain in which Divensi recruiter instructed

14   prospective employee based in India to sign fraudulent contract and noting that

15   information in the contract "is only for the purpose of filing the LCA, will be revised

16   later on approval of H1B"); Ex. N (same).  As explained above, these and other steps

17   completed by foreign nationals *before* they even entered the United States were essential

18   to the fraud and material to USCIS' adjudication of Samal's companies' petitions.

19       **Third**,

20

21

22

23

24                                                In his objections to the draft PSR, Samal

25   himself admitted that he gave H-1B workers the "option" to "return to India" while

26   benched, to the extent they chose not to submit to his requirement that they take sick and

27   annual leave while in the United States.  *See* Ex. C, ¶ 9.

28

Samal/SENTENCING MEMORANDUM - 16
CR18-214JLR

(b)      Sophisticated Means (USSG § 2B1.1(b)(10)(C)

Samal's scheme also involved sophisticated means of his own design.  As set out above, Samal's fraud scheme was extraordinarily complex and involved dozens of illegal acts by employees at virtually every level of Samal's organization.

In his objections to the draft PSR, Samal minimized his conduct as the mere submission of "forged signatures on official documents," followed by their mailing to the government. Ex. C, ¶ 24.  But that factual account is not consistent with the facts in the plea agreement and PSR.  As explained above, Samal and others acting at his direction sent hundreds of fraudulent documents to separate federal agencies, used forged digital signatures, and coordinated activity between offices in India and the United States.  *See* PSR ¶¶ 9-19, 38.  Samal also churned H-1B employees through short-term projects for large technology clients, all the while concealing from those clients that the employees had arrived in the United States on fraudulent grounds.  *See* Plea Agreement ¶ 10(a); PSR ¶ 9.  Finally, Samal induced numerous subordinates to participate in the fraud, including recruiters who found prospective employees in India, human-resources staff who prepared fraudulent documents, and marketers who pitched H-1B employees to clients.

In sum, there are two separate, independent, bases for the application of a two-level enhancement under USSG § 2B1.1(b)(10).

2.      *Enhancement For Using Means of Identification to Produce Five Or More Means of Identification (USSG § 2B1.1(b)(11)(C)(ii))*

USSG 2B1.1(b)(11)(C)(ii) provides for a two-level enhancement where the offense involved "the possession of 5 or more means of identification that unlawfully were produced from, or obtained by the use of, another means of identification."  The guideline incorporates the definition of the phrase "means of identification" in 18 U.S.C. § 1028, the federal identity theft statute.  *See* App. Note 1 to USSG § 2B1.1. That statute defines "means of identification" to include "any name . . . that may be used, alone or in conjunction with any other information, to identify a specific individual."  *See* 18 U.S.C. § 1028(d)(7).  As the Ninth Circuit held in *United States v. Blixt*, "forging another's

1    signature constitutes the use of that person's name and thus qualifies as a 'means of

2    identification' under 18 U.S.C. § 1028A."  548 F.3d 882, 887 (9th Cir. 2008).

3         Samal does not and cannot dispute that the scheme involved the use of forged

4    client signatures (a means of identification) to produce dozens of letters bearing those

5    same forged signatures (other means of identification).  In his Plea Agreement, Samal

6    admitted that he and others "attached forged letters that appeared to have been issued and

7    signed by the Companies' clients to H-1B petitions."  Plea Agreement ¶ 10(a); *see also*

8    Ex. C, ¶ 24 (acknowledging that offense involved submission of "forged signatures on

9    official documents").  His co-conspirators have referred to specific instances in which

10   Samal created and reviewed these forged client letters before they were sent to USCIS.

11   *See* Plea Agreement, *United States v. Puvvala*, CR19-019, Dkt. 6, ¶ 8 (noting that the

12   scheme involved dozens of forged letters, identifying three instances in which Samal

13   affixed forged signatures to letters, and identifying five other instances in which Samal

14   reviewed forged letters before submission to USCIS); Plea Agreement, *United States v.*

15   *Tomaszewski*, CR18-213, Dkt. 7, ¶ 7 (referring to Samal's participation in creation of

16   forged documents).

17        Rather than disputing the factual basis for this enhancement, Samal appears to rely

18   on a fundamentally incorrect reading of the law.   Specifically, in his objections to the

19   draft PSR, Samal seemed to assert that only the *ultimate* objective of the offense conduct

20   can be considered, rather than the steps taken in pursuit of that objective.  *See* Ex. C,

21   ¶ 25.  Thus, under Samal's reasoning, even though the scheme involved the use of used

22   "fraudulent signatures" in H-1B petitions, *see id.*, the guideline still does not apply

23   because the ultimate objective of the scheme was to obtain H-1B work status.  *Id.*

24        Samal's arguments lack any merit.  The guideline does not require that the *goal* of

25   the scheme was to produce means of identification, but merely requires that the offense

26   "***involved***" their production.  *See* USSG § 2B1.1(b)(11).  Indeed, courts routinely and

27   sensibly apply the enhancement in cases where means of identification are produced in

28   furtherance of some other goal.  *See, e.g.*, *United States v. Sardariani*, 754 F.3d 1118,

1  1120 (9th Cir. 2014) (use of forged signatures to obtain loans); *United States v. Kleiner*,

2  765 F.3d 155, 157 (2d Cir. 2014) (use of driver's license to withdraw money).

3       In sum, Samal's novel argument is contradicted by the guideline's plain language,

4  and has no basis in the law.  This offense plainly involved the use of a means of

5  identification to produce five or more means of identification.

6               3.    *Enhancement For Obstruction Of Justice (USSG § 3C1.1)*

7       Samal's objection to the PSR's two-level enhancement for obstruction of justice is

8  also meritless.  USSG § 3C1.1 requires that: (a) "the defendant willfully obstructed or

9  impeded, or attempted to obstruct or impede, the administration of justice with respect to

10  the investigation, prosecution, or sentencing of the instant offense"; and (b) the

11  obstructive conduct related to" either "the defendant's offense of conviction and any

12  relevant conduct" or "a closely related offense."  As the application note to that guideline

13  explains, "[o]bstructive conduct that occurred prior to the start of the investigation of the

14  instant offense of conviction may be covered by this guideline if the conduct was

15  purposefully calculated, and likely, to thwart the investigation or prosecution of the

16  offense of conviction."  App. Note 1 to USSG § 3C1.1.

17       Samal's document-destruction episode is a textbook example of obstruction of

18  justice.  The guideline itself defines obstruction to include "destroying" or "directing

19  another person to destroy" evidence "that is material to an official investigation."  App.

20  Note 4(D) to USSG § 3C1.1.  Courts regularly apply the obstruction enhancement in

21  cases involving the destruction or concealment of incriminating evidence.  *See, e.g.*,

22  *United States v. Chaudhary*, 451 Fed. Appx. 713, at *1 (9th Cir. 2011) (affirming

23  application of obstruction enhancement where defendant concealed "computers and

24  incriminating documents" from discovery by law-enforcement agents); *United States v.*

25  *Bowser*, 667 Fed. Appx. 188, 189 (9th Cir. 2016) (affirming obstruction enhancement

26  where defendant destroyed "material evidence"); *United States v. Shetty*, 130 F.3d 1324,

27  1334 (9th Cir. 1997) (concealment of money that served as evidence of tax crimes

28  supported application of obstruction enhancement).  In short, Samal destroyed

Samal/SENTENCING MEMORANDUM - 19
CR18-214JLR

1  incriminating evidence upon learning about the government's investigation, thereby

2  obstructing justice.

3         In his objections to the draft PSR, Samal did not dispute that he and others acting

4  at his direction removed forged client letters and other fraudulent documents from

5  hardcopy petition files kept at his offices. *See* Ex. C, ¶ 27.  Instead, Samal claimed that

6  the episode was a mere "reassembly" of his companies' files, purportedly performed at

7  the "behest" of an immigration law firm that had audited his files. *Id.*  This argument

8  lacks any factual basis.  Indeed, the letter from Samal's outside counsel, which Samal

9  attached to his objections to the draft PSR, was dated November 3, 2016, which is more

10 than one year after the document-destruction episode.  *See* Ex. C (attaching outside

11 counsel's letter).  Nor does the letter direct Samal to remove his employees' employment

12 agreements or the client letters submitted in support of his petitions.  *See id.*

13        In reality, Samal's purge of incriminating documents was consistent with his plan

14 to make Puvvala the scapegoat for his crimes.  On the heels of his decision to blame

15 Puvvala, Samal directed Tomaszewski and other subordinates to remove incriminating

16 documents from the companies' hard copy files.  Samal then *repeatedly relied* on the

17 absence of those incriminating documents during his interview with law-enforcement

18 agents as purported proof that he did not participate in the fraud scheme, and claimed that

19 Puvvala purportedly concealed the existence of the fraudulent documents from Samal

20 when sending those documents to USCIS.  In sum, Samal's own actions confirm that the

21 purpose of removing incriminating documents from his companies' hardcopy files was to

22 obstruct the government's discovery of his role in the criminal offense.

23 ## SENTENCING RECOMMENDATION

24        For the foregoing reasons, and pursuant to the factors set forth in Title 18, United

25 States Code, Section 3553(a), the government recommends a term of imprisonment of

26 120 months, a fine of $100,000, and a 3-year term of supervised release.

27

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

A.   <u>Samal's History And Characteristics</u>

As Chief Magistrate Judge Tsuchida observed, the record in this case "paint[ed] the picture of an individual who has a long and consistent history of a dishonesty and theft."  Order, Dkt. 14, 2:7-9.  Indeed, for more than a decade, Samal has subsisted almost exclusively on lies and deceit.  He lied to the FBI in connection with his prior federal misdemeanor conviction, performed poorly on probation, and then launched a scheme in which he lied compulsively to his clients, his employees, government administrators, law-enforcement agents, and the courts in this District.

Samal's greed harmed many lives.  Although his H-1B employees were not true crime victims in light of their complicity in the false statements to the government, they indisputably were exploited by Samal.  Samal illegally forced vulnerable H-1B employees to take unpaid leave, illegally collected visa fees, and enlisted a host of people into his scheme.  Samal then blamed others to save himself.

Though Samal deserves credit under the Guidelines for accepting responsibility in this case, his other behavior during this criminal investigation and prosecution is consistent with his history of concealment, dishonesty and minimization.  While under criminal investigation, Samal moved hundreds of thousands of dollars of forfeitable assets into overseas accounts, diverted his employees' 401K contributions, and misappropriated company funds to his personal use.  In the days after his arrest, Samal coordinated financial misconduct from the Federal Detention Center, culminating in his submission of a CJA financial affidavit that materially misstated his assets.  *See* Response, Dkt. 38.

Samal apologies profusely to this Court in his letter of acceptance.  The letter also, however, includes Samal's characteristic minimizations and inaccuracies.  Samal portrays himself as an ambitious businessman who was driven by his Olympian goals and "urgen[t]" demands from clients to take "short cuts."  In truth, Samal's businesses were riddled with fraud and criminality from top to bottom.  Forgery, lies and deceit were part of the everyday routine at Azimetry and Divensi, and that was the case from the inception

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  of those businesses – businesses which began before Samal's probation from his prior
2  case had even expired.

3      Samal also claims that, when he returned from India in 2018, he expected to be
4  arrested, and decided – against the advice of "others" – to return to the United States to
5  "confront this indictment."  The evidence shows that this is a convenient fiction.  In
6  reality, Samal returned to the United States because his spiritual advisor told him it was
7  safe, and Samal was shocked and furious when he was arrested.

8      More specifically, following Samal's arrest, agents searched Samal's computer
9  and found instant messages between Samal and "Babaji," the spiritual advisor.  These
10  messages show that in the two months before his decision to return to the United States,
11  Samal agonized about whether it was a good idea to do so and sought guidance from his
12  spiritual adviser.  In response, his spiritual adviser repeatedly advised Samal to "go [to
13  the U.S.] my child," promising that "God will take care that the entire journey is without
14  problem" and that "everything will be alright," "everything will surely be alright."  Samal
15  eventually decided to take Babaji's advice, telling Babaji that he was booking a flight to
16  the United States and was "leaving everything to you and Guruji [a spiritual figure]."

17      Samal clearly regretted following Babaji's advice.  After being arrested and
18  ordered detained, Samal called his family from the Federal Detention Center and raged
19  against his Babaji.  As Samal told his family after the detention hearing:

20      I knew Jhummi that I can't escape.  I knew that.  Babaji literally killed us.  He
21      destroyed our family.  Babaji ruined it.  Totally finished it.  He just finished the
       whole family.  I had taken advice only from one person in my life, not from
22      anyone else.  I have trusted him so much.  Mark also prevented me.

23  Translation of Telephone Call, Ex. O, 4:22-28.

24      Samal also told his wife to tell Babaji that he "ha[s] spoiled our whole family.
25  Our family is ruined because of you."  In an apparent reference to his lawyer's advice not
26  to return to the United States, Samal told his wife and son that the "lawyer clearly
27  advised me not to come to that place," but that Samal followed his Babaji's advice
28  instead.  Translation of Telephone Call, Ex. O., at 4-5.

Samal/SENTENCING MEMORANDUM - 22
CR18-214JLR

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    Nothing in Samal's history or characteristics excuses his crimes.  He is not the

2    product of a difficult background.  *See* PSR ¶¶ 70.  He was not destitute.  *Id.* ¶ 71.  In

3    sum, Samal history and characteristics weigh strongly in favor of a lengthy term of

4    imprisonment.

5         B.    Nature And Circumstances Of The Offense

6    The offense conduct also weighs in favor of a lengthy term of imprisonment.  Both

7    the mail-fraud offense and the tax offense are crimes of greed.  The mail-fraud offense

8    was particularly egregious because Samal built an entire organization around the fraud

9    and conscripted his subordinates to carry it out at his direction.  In other words, the mail-

10   fraud scheme was not an isolated instance of financial misconduct in an otherwise lawful

11   business operation.  Rather, it *was* the driving purpose of Samal's companies, and the

12   source of millions of dollars in revenue, between 2012 and 2016.

13   The mail-fraud offense is also serious because it impaired and tarnished the proper

14   functioning of the U.S. immigration system, resulting in serious competitive harm to

15   other U.S. employers.[10]  Because H-1B visas are subject to annual cap, Samal's scheme

16   deprived other, deserving, employers of access to H-1B employees.  Samal's scheme also

17   provided him an unfair advantage over other law-abiding staffing firms, who lacked

18   access to a standing "bench" of employees.  Finally, Samal's scheme necessarily

19   impaired the ability for U.S. citizens with specialized skills to compete for jobs against

20   Samal's H-1B employees (who had been forced to accept wages below the prevailing-

21   wage standards).

22   Samal's exploitation of H-1B workers is another feature of the offense conduct

23   that justifies a lengthy term of imprisonment.  As explained above, Samal took advantage

24

25   _____

26   [10] The defense has claimed that Samal was the victim of a criminal prosecution of "administrative-style fraud that
     was typically not prosecuted in prior presidential administrations."  Motion for Release, Dkt. 54, at 13:7-9.  This is

27   inaccurate. H-1B schemes have been prosecuted in prior presidential administrations.  *See, e.g.*, *United States v.
     Deguzman*, 133 Fed. Appx. 501 (10th Cir. 2005); *United States v. Kalu*, 791 F.3d 1194 (10th Cir. 2015); *United

28   States v. Trichy*, 2012 WL 2094409 (6th Cir. 2012); *United v. Ramirez*, 420 F.3d 134 (2d Cir. 2005).  Indeed, as
     explained above, the criminal investigation in this case commenced in 2015.

Samal/SENTENCING MEMORANDUM - 23
CR18-214JLR

of foreign-national employees' obvious desire to immigrate to the United States, by forcing them to cover their visa fees and go without pay while benched.  At the same time that he deprived his employees of money to which they were entitled, Samal used his companies' bank accounts to enrich himself, by diverting funds for his investments, his house, his car, his travel, and other luxuries.

Finally, Samal's obstructive conduct also justifies a lengthy term of imprisonment. Samal did not simply destroy documents in an effort to save himself.  He forced other subordinates to participate in the obstructive conduct, attempted to blame Puvvala, and then dissipated assets to protect them from forfeiture.

C.      Respect For The Rule Of Law, Deterrence, And Incapacitation

A lengthy sentence in this case will promote respect for the rule of law, ensure adequate deterrence, and incapacitate Samal from continued financial danger to this community.

*First*, as explained in this memorandum's introduction, the H-1B program and the immigration system generally serve critical purposes in promoting this country's economic growth and cultural diversity.  Samal's crimes fuel cynicism about the entire H1-B program.  A long sentence can promote respect for the law by showing the public that those who abuse the program face stiff punishment.

*Second*, a lengthy sentence serves important deterrent purposes.  Like any government program with a high volume of applicants, the H-1B program cannot properly function if criminality escapes serious punishment.  USCIS agents and U.S. consulate officers cannot verify every statement in every one of the hundreds of thousands of petitions filed each year.  H-1B fraud is therefore a crime best addressed through general deterrence, by imposing serious punishment on the few offenders who do get caught.  Samal is a worthy candidate for serious punishment because he did not simply abuse the H-1B system, but also engaged in other, serious, criminal behavior, as described above.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1        ***Third***, Samal deserves to be incapacitated because of his long history of crimes,

2  his continued misconduct after his arrest, and the absence of any evidence that he intends

3  to reform himself.

4        D.    <u>The Need to Avoid Sentencing Disparity</u>

5  In reviewing the sentences imposed in other "bench-and-switch" prosecutions over the

6  last several years, the government has found no consistent trend in the terms of

7  imprisonment that have been imposed.  Instead, courts appear to have imposed sentences

8  of varying length in other cases involving the submission of fraudulent H-1B petitions,

9  relying heavily on the specific facts of each case.  As a result, the sentence issued in this

10  case is unlikely to result in disparity one way or the other.

11        E.    <u>Restitution</u>

12        In the plea agreement, Samal agreed to make restitution to the Internal Revenue

13  Service "in a total amount equal to the amounts accounted for but not paid over" in

14  connection with Count Two.  In an email to the Probation Officer and counsel for the

15  government, Samal accepted the PSR's calculation of the tax loss as $1,119,687.  PSR,

16  ¶ 20.  Thus, at sentencing, the government will request the imposition of a restitution

17  order in the amount of $1,119,687.

18        F.    <u>Recommended Fine</u>

19        The Probation Office recommended the imposition of a $10,000 fine.  With

20  respect, the government submits that a substantially higher fine is warranted in this case,

21  and asks that the Court impose a fine of $100,000.  Although the Probation Office relies

22  on Samal's claims about his purported lack of assets, he has not earned the benefit of the

23  doubt.  Samal's history of financial misconduct in this case includes the transfer of

24  hundreds of thousands of dollars to overseas bank accounts—a fact that he was forced to

25  admit only after the government produced bank records that evidenced the transfers.  *See*

26  Mot. for Release, Dkt. 54, 4:15-18 (conceding that Samal transferred nearly $200,000 to

27  Indian bank accounts in February 2018).  Samal also has continued to receive payouts

28  from his shareholdings, such as the distribution he received on June 10, 2019.

1    In short, Samal does not have a history of being candid about his assets, and his

2  financial transfers suggest that he continues to hold substantial assets in overseas account.

3  The government respectfully requests the imposition of a $100,000 fine in this case.

4                                    **<u>CONCLUSION</u>**

5    For the foregoing reasons, the Government respectfully requests that the Court

6  sentence Samal to a 120-month term of imprisonment, a fine of $100,000, and a three-

7  year term of supervised release.  The Government also requests that the Court order

8  Samal to pay restitution to the Internal Revenue Service in the amount of $1,119,687.

9

10    DATED this 13th day of September, 2019.

11

12                              Respectfully submitted,

13                              BRIAN T. MORAN
                                United States Attorney
14

15                              */s/ Siddharth Velamoor*
16                              SIDDHARTH VELAMOOR
17                              MICHAEL DION
                                Assistant United States Attorneys
18                              700 Stewart Street, Suite 5220
                                Seattle, WA 98101-1271
19                              Telephone:    (206) 553-7970
20                              Fax:          (206) 553-0755
                                E-mail:
21                                     Siddharth.Velamoor@usdoj.gov
22

23

24

25

26

27

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**CERTIFICATE OF SERVICE**

I hereby certify that on September 13, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the attorney(s) of record for the defendant(s).  I hereby certify that I have served the attorney(s) of record for the defendant(s) that are non CM/ECF participants via e-mail and/or telefax.

*/s/ Kylie Noble*
KYLIE NOBLE
Legal Assistant
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, WA 98101-3903
Telephone: (206) 553-2520
Fax: (206) 553-4440
E-mail: kylie.noble@usdoj.gov

Samal/SENTENCING MEMORANDUM - 27
CR18-214JLR

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970